## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMUEL RANDOLPH,<br>     Petitioner, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 1:06-CV-0901 |
| JEFFREY BEARD, Commissioner, | : | |
| Pennsylvania Department of | : | **THIS IS A CAPITAL CASE.** |
| Corrections; LOUIS B. FOLINO, | : | |
| Superintendent of the State Correctional | : | |
| Institution at Greene; and FRANKLIN | : | Christopher C. Conner, USDJ |
| J. TENNIS, Superintendent of the State | : | |
| Correctional Institution at Rockview, | : | |
|      Respondents. | : | |

## PETITION FOR A WRIT OF HABEAS CORPUS

ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
Capital Habeas Unit
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
717-782-3843

ROBERT BRETT DUNHAM
ASST. FEDERAL DEFENDER
Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
601 Walnut Street
Suite 545 West–The Curtis Center
Philadelphia, PA 19106
215-928-0520

Co-Counsel for Petitioner

Dated:  February 5, 2007

## TABLE OF CONTENTS

PRELIMINARY STATEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE PARTIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PRIOR COUNSEL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GROUNDS FOR RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

INTRODUCTORY STATEMENT ON EXHAUSTION  . . . . . . . . . . . . . . . . . . . . . . . . . 4

CLAIMS FOR RELIEF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CLAIM I.      AS A RESULT OF COURT ERROR, POLICE AND PROSECUTORIAL
              MISCONDUCT, AND INEFFECTIVE ASSISTANCE OF COUNSEL,
              COMPELLING AND SUBSTANTIAL EVIDENCE OF PETITIONER'S
              INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF
              PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CLAIM II.     AS A RESULT OF COURT ERROR, PROSECUTORIAL MISCONDUCT AND
              INEFFECTIVE ASSISTANCE OF COUNSEL, THE ADMISSION OF ALISTER
              CAMPBELL'S PRELIMINARY HEARING TESTIMONY VIOLATED
              PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CLAIM III.    PETITIONER WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF
              THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.  . . . . . . . . 58

CLAIM IV.     PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT
              TRIAL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
              AMENDMENTS.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

CLAIM V.      PETITIONER IS ENTITLED TO RELIEF BECAUSE THE COURT PRECLUDED
              PETITIONER AND HIS COUNSEL FROM BEING PRESENT DURING
              COMMUNICATIONS WITH THE JURY REGARDING POSSIBLE OUTSIDE
              INFLUENCES IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND
              FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 85

CLAIM VI.     AS A RESULT OF COURT ERROR AND INEFFECTIVE ASSISTANCE OF
              COUNSEL, JURORS WHO WERE BIASED AND INCAPABLE OF RENDERING
              A FAIR AND IMPARTIAL VERDICT WERE NOT DISMISSED IN VIOLATION
              OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS 88

CLAIM VII.    AS A RESULT OF JUROR MISCONDUCT, PETITIONER'S FIRST, SIXTH,
              EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

CLAIM VIII.   PETITIONER IS ENTITLED TO A NEW SENTENCING PROCEEDING
              BECAUSE HIS WAIVER OF COUNSEL AT THE PENALTY-STAGE OF TRIAL
              WAS NOT KNOWING, VOLUNTARY, AND INTELLIGENT, IN VIOLATION OF
              HIS RIGHTS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH
              AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

CLAIM IX.     TRIAL COUNSEL WAS  INEFFECTIVE IN FAILING TO INVESTIGATE,
              PREPARE, AND DEVELOP MITIGATING EVIDENCE, RESULTING IN THE
              DEPRIVATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH
              AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

CLAIM X.      PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE
              THE COURT DID NOT INSTRUCT THE SENTENCING JURY THAT A
              CAPITAL DEFENDANT WHO IS SENTENCED TO LIFE IN PRISON IS
              INELIGIBLE FOR PAROLE. . . . . . . . . . . . . . . . . . . . . . . . . . . 143

CLAIM XI.     PETITIONER SHOULD BE AFFORDED A NEW TRIAL AND SENTENCING
              HEARING BECAUSE THE REASONABLE DOUBT INSTRUCTION VIOLATED
              PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

CLAIM XII.   PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S INSTRUCTIONS ERECTED UNCONSTITUTIONAL REQUIREMENTS THAT THE DEFENSE MITIGATING EVIDENCE HAD TO HAVE BOTH A FACTUAL NEXUS TO THE OFFENSE AND MEET A QUALITATIVE THRESHOLD BEFORE THE JURY COULD GIVE EFFECT TO IT AS A REASON TO SPARE PETITIONER'S LIFE. . . . . . . . . . . . . . 194

CLAIM XIV.   MR. RANDOLPH'S DEATH SENTENCE IS ILLEGAL BECAUSE, AS A RESULT OF TRIAL COURT ERROR, THE JURY WAS GIVEN IMPROPER INSTRUCTIONS AS TO THE EXISTENCE OF AGGRAVATING FACTORS IN REACHING ITS DETERMINATION IN VIOLATION OF PENNSYLVANIA'S CAPITAL SENTENCING STATUTE, AND THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 216

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

## PRELIMINARY STATEMENT

On May 4, 2006 this Court granted Petitioner's *Motion* and ordered that undersigned counsel be appointed to represent Petitioner in his to-be-filed Petition for a Writ of Habeas Corpus, and permitting Petitioner to proceed *in forma pauperis.* The Court directed counsel to file the instant *Petition* within 180 days.

Following counsels' requests for additional time, the Court ordered that this *Petition* be filed by February 5, 2007.

Notes of testimony of court proceedings will be cited as "NT" followed by the date and page number. The Pennsylvania Supreme Court has generated one substantive opinion on direct appeal (Commonwealth v. Randolph, 873 A.2d 1277 (Pa. 2005), reargument denied, Commonwealth v. Randolph, No. 432 CAP (September 6, 2005), cert denied, Randolph v. Pennsylvania, 2006 WL 271812 (NO. 05-8984) (U.S. Apr. 3, 2006)). This opinion will be cited as Randolph.

All other citations are either self-explanatory or will be explained.

All emphasis in this *Petition* is supplied unless otherwise indicated.

As in other capital habeas cases in this District and Circuit, Petitioner shall brief procedural issues and issues relating to the habeas statute, in his memorandum of law. While that Civil Rule 83.32.2(C), permits the filing of a supporting memorandum within 60 days, Petitioner has discovered unexhausted claims and, as

1

a result will also be filing a motion to hold these proceedings in abeyance or, in the alternative dismiss these proceedings without prejudice to permit Petitioner to exhaust in state court.

### THE PARTIES

1.    Samuel B. Randolph, IV, is incarcerated by the Pennsylvania Department of Corrections and is currently confined in the State Correctional Institution at Greene, under a sentence of death.

2.    Respondent Jeffrey A. Beard is Commissioner of the Pennsylvania Department of Corrections.

3.    Respondent Louis S. Folino is Superintendent of the State Correctional Institution – Greene and currently maintains custody of Petitioner.

4.    Respondent Franklin J. Tennis is Superintendent of the State Correctional Institution – Rockview and is responsible for supervising executions in the Commonwealth of Pennsylvania.

### PROCEDURAL HISTORY

5.    Following his conviction for first-degree murder and related counts, Petitioner was sentenced to death on March 15, 2003, in the Court of Common Pleas, Dauphin County (Nos. 1746 CR 2002, 1220 CR 2002; 1374 CR 2002). Petitioner's convictions and sentence of death were affirmed on September 6, 2005.

2

Commonwealth v. Randolph, 873 A.2d 1277 (Pa. 2005), reargument denied, Commonwealth v. Randolph, No. 432 CAP (September 6, 2005). His petition for certiorari review was denied on April 3, 2006. Randolph v. Pennsylvania, ___ U.S. ___, 126 S.Ct. 1659 (2006).

6.      On April 28, 2006, Petitioner filed his *Motion for Leave to Proceed In Forma Pauperis and Appointment of Federal Habeas Corpus Counsel Under 21 U.S.C. § 848(q)*. Doc. 1. On the same date, this Court issued an order granting Petitioner's motion to proceed *in forma pauperis*, appointing undersigned as co-counsel and directing that Petitioner file his *Petition* within 180 days. The Court also directed that any state proceedings for execution are stayed pursuant to 28 U.S.C. § 2251. Doc. 2.

7.      On June 28, 2006, the Governor of Pennsylvania issued a Warrant of Execution, scheduling Petitioner's execution date for August 17, 2006. Also on June 28, 2006, Deputy General Counsel Suzanne N. Hueston notified this Court of the Warrant of Execution and informed the Court that the Commonwealth intended to honor this Court's previously issued stay. On June 29, 2006, this Court issued an order directing that the correspondence from Deputy General Counsel Hueston be filed and reaffirming the stay of execution.

## PRIOR COUNSEL

8.    Petitioner was represented during the preliminary hearing by Anthony N. Thomas, Esquire and Kirstin M. Sweigard, Esquire, and at trial Petitioner was represented by Allen C. Welch, Esquire and Anthony N. Thomas, Esquire.  During post-trial proceedings and on direct appeal, Petitioner was represented by Samuel C. Stretton, Esquire and Anthony N. Thomas, Esquire.

## GROUNDS FOR RELIEF

9.    By this Petition for a Writ of Habeas Corpus, Petitioner submits that his conviction(s) and sentence(s) violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10.    Moreover, the rulings and decisions of the state courts, including the Pennsylvania Supreme Court, in this case were contrary to, and/or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; and/or were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

## INTRODUCTORY STATEMENT ON EXHAUSTION

11.    Petitioner makes this Introductory Statement on Exhaustion pursuant to Civil Local Rule 83.32.2(B).

12.    This petition contains claims that are exhausted because their legal and factual basis were expressly presented to the state courts on direct appeal.

13.    Counsel have identified additional claims that were not presented to the state courts and that were not exhausted by operation of state law.  It is undersigned counsel's belief that these claims are substantial and meritorious, and that review of these federal claims is available in state court in litigation under Pennsylvania's Post-Conviction Relief Act.  Consequently, undersigned counsel has advised Petitioner to pursue state court remedies.

14.    As noted above, Petitioner will be filing a Motion that these federal proceedings be stayed or, in the alternative the Petition for a Writ of Habeas Corpus be dismissed without prejudice to permit exhaustion of state remedies.

### CLAIMS FOR RELIEF

**CLAIM I.    AS A RESULT OF COURT ERROR, POLICE AND PROSECUTORIAL MISCONDUCT, AND INEFFECTIVE ASSISTANCE OF COUNSEL, COMPELLING AND SUBSTANTIAL EVIDENCE OF PETITIONER'S INNOCENCE WAS NOT PRESENTED TO THE JURY IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

15.    The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

16.    Petitioner was convicted of murder and other assault charges arising out

of three shooting incidents occurring on September 2, 2001, September 3, 2001, and September 19, 2001. During the September 2nd incident (hereinafter referred to as the "Roebuck Bar" incident), no one was hurt. During the September 3rd incident (hereinafter referred to as the "McClay Street" incident), Gary Waters was injured; and during the September 19th incident (hereinafter referred to as the "Todd and Pat's Bar" incident), Thomas "Fiendball" Easter, and Anthony Burton were killed and Alister "Capone" Campbell, Lakisha Warren, Tameka Jackson, John Brown, and Reginald Gillespie were injured.

17.    It was the prosecution's theory that these shootings were purportedly instigated as revenge for a fist-fight that occurred in Roebuck's bar, the Baby Grand. That fight occurred in the early morning hours of August 31, 2001. During that fight, Alister "Capone" Campbell hit Petitioner over the head with a bottle. Thus, it was the prosecution's theory that over three weeks after a fist-fight, Petitioner entered Todd and Pat's Bar and fired two weapons at Campbell, Easter, and Burton as well as other patrons of the bar.

18.    Although evidence existed that others had a stronger and more recent motive to shoot the decedents, because of police and prosecutorial misconduct, court error, and ineffective assistance of counsel, none of that evidence was presented to the jury in violation of Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

6

19.   No physical evidence connected Petitioner to these shootings. Nor did any disinterested witness identify Petitioner as being involved in these incidents. The Commonwealth's case thus rested on the testimony of five biased witnesses who identified Petitioner as being involved in these incidents: Gary Waters, who testified Petitioner as the shooter in the McClay Street shooting; Syreeta Clayton (Waters' girlfriend) who testified Petitioner was the shooter in the McClay Street shooting; Ronald Roebuck, who testified Petitioner was the shooter in the Roebuck's Bar incident; Alister Campbell, whose preliminary hearing testimony was admitted at trial (because Campbell – despite grant of immunity – refused to testify), identifying Petitioner as the shooter in the Todd and Pat's Bar incident; and, Amahl Scott, who testified that Petitioner was the shooter in the Todd and Pat's Bar incident.

20.   While there were other patrons in the bar during the Todd and Pat's Bar incident, those patrons were unable to identify the shooter and gave various descriptions of the shooter that included a male 6 feet tall to 6 feet one or two to a male 5 feet six or seven; a male wearing various differently described masks or no mask at all; and a male wearing various differently described sweat-clothes, fatigues, or jeans. Not surprising, the prosecution only presented those witnesses who gave a description close to Petitioner's height and weight. Nevertheless, these witnesses still did not identify Petitioner as the perpetrator.

21.    As described more fully below, each of the five witnesses who provided testimony purporting to directly connect Petitioner to these shootings had significant and compelling reasons to lie and to present false or misleading testimony favorable to the prosecution.   Yet as a result of prosecutorial misconduct, court error, and ineffective assistance of counsel, the jury was not presented any of the evidence demonstrating these witnesses' biases, motives to lie, and complete unreliability. This violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments.

22.    Moreover, despite evidence that others were involved in these crimes, police officers and investigators engaged in conduct and misconduct to coerce witnesses to (falsely) testify that Petitioner was the perpetrator in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

**A.    Counsel was Ineffective in Failing to Develop and Present Readily Available Evidence Demonstrating that Others Had Motive, Means and Opportunity to Commit the Murders.**

23.    The duty to investigate is fundamental to counsel's role as an advocate. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." Strickland, 466 U.S. at 688. This can be done only if counsel actually investigates, id. at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4.1 (2d ed. 1982 Supp.) ("[i]t is the duty of the lawyer to

8

conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case").[1] The duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997).

24.    Moreover, a criminal defendant may not be denied the right to a fair opportunity to defend against the state's accusations. Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); Davis v. Alaska, 415 U.S. 308 ( 1974); United States v. Cronic, 466 U.S. 648, 656 (1984); Strickland v. Washington, 466 U.S. 668, 684-685 (1984); California v. Trombetta, 467 U.S. 479, 485 (1984); Rock v. Arkansas, 483 U.S. 44, 51 (1987).   Whether by court error or trial counsel's ineffectiveness, the denial of these fundamental rights requires relief.

25.    Furthermore, the Eighth Amendment requires that the defendant's rights

---

[1] This precise national standard of conduct was referenced by the United States Supreme Court in Strickland, 466 U.S. at 688-89, Wiggins v. Smith, 539 U.S. 510, 524 (2003), and Rompilla v. Beard, 545 U.S. 374, 387 (2005) as national guides to determining what constitutes reasonable attorney conduct.   See also Marshall v. Cathel, 428 F.3d 452, 467 (3d Cir. 2005).

to be heard and present a defense be given even greater protection in a capital case. See, e.g., Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Hitchcock v. Dugger, 481 U.S. 393, 394 (1987).

26.     As described more fully below, Easter, Burton, and their associates were no "choirboys." As a result of a lifestyle that included robberies, thefts, and drug and weapons involvement, these individuals encountered a number of persons other than Petitioner with motive, means, and opportunity to attack them. Despite the existence of this information and evidence, counsel failed to investigate and develop this evidence for trial. As a result, the jury never heard compelling evidence that others had clear motives, ample opportunity, and substantial means to commit these assaults and murders.

27.     Counsel's failures denied Petitioner his federal constitutional rights to due process, to present a defense, to confrontation, and to cross-examination and constituted prejudicially deficient performance in violation of the Sixth, Eighth, and Fourteenth Amendments.

1.     *Evidence connecting Quendell Oliver and his "associates" to these incidents.*

28.     Police incident reports and interviews demonstrate that on the evening

10

of September 19, 2001, at or around 10:52 pm, the police were called to the location of Todd and Pat's Bar in response to a shooting where there were fatalities.

29.     The first indication that this was not a typical shooting became evident when the police learned that persons associated with the decedent, Anthony Burton, and a survivor, Alister Campbell, had taken evidence – including weapons – from the scene before the police arrived. Ahmal Scott eventually admitted to the police that as Campbell was fleeing the bar after the shooting, he (Campbell) gave Scott a 9 millimeter gun. Scott also told the police that he gave that gun to Kemyah Washington.[2] Similarly, Kahlil Williams ultimately admitted that, directly after the shooting, he moved Anthony Burton's car and took items from that car.

30.     The persons inside the bar gave various descriptions of the perpetrator. Some described the individual as 6' to 6'2" tall and skinny, while others described the person as shorter (anywhere from 5'6" to 5'9") and medium or even stocky build. The descriptions of the clothing worn by the individual were similarly inconsistent. They included: a fatigue jacket, sweats, various masks including a black mask, a gold mask, and a "scream mask"; some said the individual had no mask but wore glasses and some said the individual merely had a hood pulled down. Even the route of

---

[2]   According to Scott, Washington kept the gun to put it in the decedent's coffin.

11

escape varied depending on the witness.

31.    During the course of the investigation, the police learned that Easter and Campbell had robbed Quendell Oliver and Kevin Pitts shortly before the murders. When the police contacted Oliver on September 20th, he verified the robbery but denied being in the vicinity of Todd and Pat's Bar on the 19th and claimed that he was at the home of a friend at the time of the murders. Oliver also told the police, however, that he was not unhappy that Easter was killed and that he wanted to prosecute Campbell for the robbery.

32.    On September 21, 2001, Kevin Pitts admitted that he, Quendell "Q" Oliver, Adeleno "Al" Horton, and Thomas "Tut" Logan were searching for Easter, Campbell, Ahmal Scott, and their associates on the evening of September 19, 2001 from 9:00 or 9:45 pm until 11:15 to take revenge for multiple assaults and robberies Easter, Campbell, and Scott had committed on Oliver, Pitts, and Thomas Logan. Pitts also acknowledged that their search took them in the area of Todd and Pat's Bar and that they drove right by the bar. Pitts further admitted that Oliver, Horton, and Logan were armed and that they were involved in a shoot-out at 4th and Woodbine Streets with Ahmal Scott and Kemyah Washington around the time of the Todd and Pat's Bar

12

shooting.[3]

33.    On September 22, 2001, the police executed a search warrant for Oliver's home.  That search resulted in the seizure of an AK-47 rifle, numerous bullets of various calibers (including the calibers used in these incidents), gun holsters, $3800.00 in cash, drugs (cocaine and marijuana), and – in the washing machine – a black hooded sweat shirt, a pair of black jeans, and a pair of black sweat-pants.[4]  After conducting the search, the police arrested Oliver and Horton, each of whom gave statements to the police.

34.    Horton acknowledged that they were out looking for Easter and his "associates" on the evening of September 19th to exact revenge.  He also acknowledged that he was armed and that they were involved in a shoot-out with Kemyah Washington and Ahmal Scott.  When asked what he was wearing on the 19th, Horton admitted that he had been wearing the black sweat-pants that the police seized, that others with him were wearing hooded sweat-shirts, and that Oliver wore a grey hat.

---

[3] The route Pitts told the police that they took to get home took them very near 1500 Arsenal Boulevard, a location where the police found a mask shortly after the shootings.

[4] There is no indication that these clothes were ever tested, or even submitted for testing in the police paperwork provided to trial counsel.

35.    Oliver also admitted that he and his "associates" – Pitts, Logan, and Horton (his brother) – were driving around the vicinity of Todd and Pat's Bar on the evening of September 19th, from 10:00 pm until 11:00 pm.  Oliver told the police he and his "associates" were looking for Easter, Campbell, and Scott to exact revenge for a robbery that had occurred two days before and an assault that had occurred the day before.

36.    Oliver stated that on September 17, 2001, between 12 and 12:20 am, he and Kevin Pitts were approached by Thomas "Fiendball" Easter, Alister "Capone" Campbell, and Ahmal "Maudy"[5] Scott. Easter put a gun to Oliver's head and told him to empty his pockets and that "he was not playing."   Campbell took Oliver's cellphone, Scott took Oliver's car keys from Pitts, and then Easter grabbed Oliver around the neck and started to drag Oliver to the car. Oliver broke free and ultimately escaped, but Easter and his "associates" took his car, his cellphone, and the contents of his pockets.  The same evening, Oliver called his cellphone at around 1:00 or 1:30 am.  Easter answered and told Oliver where his car was and also told Oliver that he (Oliver) cannot go on 9th Street unless he pays Easter $1,000.00.

37.    Oliver further stated that on September 18, 2001, from 8:00 - 10:00 pm,

---

[5] In various different reports, this alias is spelled a number of different ways, (i.e. "Moddy," "Moody" and "Moddie"). The above was the spelling used in Oliver's statement.

he, Horton, and Pitts searched for Scott and Easter, but did not locate them.

38.     According to Oliver, the next evening (September 19, 2001), the three resumed their search for Scott and Easter. Oliver received a call notifying him that Stanley "Chase" Patterson (a friend of Easter and his "associates") and Thomas "Tut" Logan (a friend of Oliver and his "associates") were fighting "uptown" and that Easter and Scott were also there. When Horton, Pitts, and Oliver arrived, only Logan was there. Logan told Oliver that Easter, Campbell, and Patterson had assaulted and robbed him (Logan).

39.     According to Oliver, he, Horton, and Logan resumed their search for Easter, Campbell, and Scott. Essentially, they rode around a 1-1.5 mile radius of the area in the vicinity of Todd and Pat's Bar. They were traveling in a red four-door mercury. Oliver further admitted that he was armed with a 9 millimeter luger, chrome with a black handle; that his brother was armed with a .22 caliber handgun; and that Logan had a 30/30 rifle. Oliver claimed that around 10:50-10:55, they saw Scott and Kemyah Washington at 4th and Woodbine Streets (less than six full blocks from Todd and Pat's Bar), and engaged in a shoot-out in the alley by Woodbine Street after Oliver saw Kemyah Washington brandish a handgun.

40.     Although Oliver acknowledged being in the area of Todd and Pat's Bar at or around the time of the murders and that his purpose was to find Easter,

Campbell, and their "associates" to take revenge, not surprisingly, he denied any involvement in the shooting at Todd and Pat's Bar.

41.    Ahmal Scott ultimately gave a statement to the police acknowledging that he had been at Todd and Pat's Bar with his "associates" Campbell, Easter, and Burton and that, at the time of the shooting, he was waiting for them outside the bar. Scott further admitted that, after the shooting, Campbell gave him a handgun and that he (Scott) ultimately gave that gun to Kemyah Washington for disposal. Scott also acknowledged that he and Washington were involved in the shoot-out near 4th and Woodbine Streets with Oliver and his "associates."

42.    Kemyah Washington ultimately gave a statement to the police admitting that he had been involved in the shoot-out near 4th and Woodbine Streets and that Ahmal Scott had given him Campbell's gun. Washington told the police that he had hid the gun in a tree; however, when he took the police to the purported location, the gun was not there.

43.    Thus, the available evidence demonstrates that:

- Oliver and his "associates" were in what can best be described as an on-going battle from at least September 17th until and including September 19th;

- Oliver and his "associates" were searching for Easter and his "associates" at the time of the Todd and Pat's incident, in the area of Todd and Pat's bar, and were admittedly at Todd and Pat's bar at or

16

around the time of the shooting;

- Oliver and his "associates" were armed when they went on their hunt for revenge against Easter and his "associates;"

- Oliver and his "associates" had access to an assorted array of weapons (as demonstrated by the sheer number and variety of caliber of bullets found in the search) and, thus, were capable of discarding the actual murder weapons without fear of not having arms to continue their campaign of revenge; and

- Oliver and his "associates" were admittedly wearing clothing that matched descriptions of the perpetrator that had been given by the bar patrons.

44.    Such evidence would have provided the jury with others (Oliver and his "associates") who had a stronger, more recent motive to attack Easter and his "associates;" who had clear means to commit the assaults; and who had the opportunity to commit the assault.  Thus, had the jury heard this evidence, it is reasonably probable that it would have acquitted Petitioner of the Todd and Pat's incident.

45.    Further, this evidence would have strongly countered the prosecution's theory that Petitioner committed the McClay Street and Roebuck's Bar shootings. Oliver's statement to the police acknowledged a history of animosity between his "associates" and the Easter "associates" from before the September 17th assault and robbery incident.  According to Oliver, the "robbery" was revenge for an alleged

assault on one of Easter's "associates," Stanley Patterson that occurred before the 17th.

46.    Thus, the "battle" was on-going and – particularly in light of the Commonwealth's theory that the various incidents were connected – it is reasonably probable that a jury exposed to the strong evidence that Oliver and his "associates" were involved in the Todd and Pat's Bar incident would have concluded that Petitioner was not involved, or at least that there was reasonable doubt regarding Petitioner's involvement in the other incidents.[6]

    2.    *Evidence connecting Eddie Capers to the shootings.*

47.    During the post-shooting investigation, the police interviewed family members and friends of decedent Burton. His girlfriend, Denise Romaine, told the police that it was possible that Eddie Capers was involved because Capers had accused Burton of stealing $40,000.00 from him. Ms. Romaine also acknowledged that Burton sold drugs.

48.    A review of Capers' history includes involvement in drugs, weapons, and assaults that spans from 1994 to the present. Thus, it is reasonably probable that

---

[6] Indeed, when this evidence is combined with the un-presented evidence undermining the reliability of those witnesses who claimed to have seen Petitioner commit the other incidents, the jury would have had substantial evidence that he was not guilty of all the charges.

a jury presented with this evidence would have concluded that Capers had the means, opportunity, and motive to commit these crimes. Counsel, however, failed to investigate, develop, and present this evidence at trial.

### 3. Counsel was ineffective.

49.    The evidence described above was placed in the lap of trial counsel through the police reports of the investigation following the Todd and Pat's Bar shooting. Despite being handed on the proverbial silver platter substantial evidence demonstrating that: (1) the Easter group's assaultive and other criminal activities – far more serious than a fist-fight in a bar – created a constellation of numerous individuals who had the motive, means, and opportunity to assault and murder members of the Easter group; (2) at least one other group, the Oliver group, was admittedly in the vicinity of Todd and Pat's Bar at or around the time of the shootings, looking for the Easter group armed and ready for battle, and wearing clothing similar to that described by witnesses to the shootings; and (3) at least one other, Eddie Capers, had a strong motive and means to arrange or commit these shootings, counsel presented little or nothing in defense of these charges.[7]

---

[7] Indeed, as described more fully elsewhere (see Claim IV), the defense that counsel mounted was so ineffectively presented that what little exculpatory value that "evidence" might have had was vastly overshadowed by the prosecution's ready ability to not only rebut that "evidence" but convert it into indicia of guilt.

50.     One of the most fundamental defenses to any crime is that somebody else actually did it.   Here, counsel had at their disposal substantial and compelling evidence that strongly suggested that persons other than Petitioner actually committed the murders.   Counsel's performance in failing to marshal this evidence at trial is deficient to its core.

51.     Moreover, the prejudice is manifest in a case like this in which the prosecution had no physical evidence connecting Petitioner to these crimes and relied upon unreliable, tainted, and specious witness testimony to support its charges. Indeed, as the evidence set forth above (and the evidence Petitioner will present at an evidentiary hearing) demonstrates, Petitioner is innocent. Under these circumstances, relief is required.

**B.     As a Result of Court Error, Prosecutorial and Police Misconduct and Ineffective Assistance of Counsel, Substantial and Compelling Evidence Directly Disputing the Key Prosecution Witnesses Was Not Presented to the Jury in Violation of Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.**

52.     As described earlier, although there were many others who witnessed the shootings in each of the three incidents, only five of the prosecution witnesses identified Petitioner as being involved. Also as described above, the prosecution had no physical evidence connecting Petitioner to any of these incidents.   Thus, the prosecution's case rose and fell on the reliability and veracity of these five witnesses.

20

As described more fully below, each of these witnesses had motives to lie, yet those motives were not disclosed to the jury.

     *1.*    *The Purported Identifying Eyewitnesses to the Todd and Pat's Bar Incident.*

53.    As described above, the sole witnesses from the Todd and Pat's Bar incident that identify Petitioner as the perpetrator were Alister "Capone" Campbell and Ahmal "Maudy" Scott. Each had their own baggage, yet none of the evidence directly disputing their reliability and credibility was ever presented to the jury.

54.    Indeed, as described above, both were involved in criminal activities, including assaults, robberies and weapons offenses in the circumstances leading up to the shootings. Both were involved in tampering with and removing evidence from the scene of the shooting. Both had their own outstanding charges and offenses for which they were facing significant prison time. And, finally, the history of the activities of both in the weeks prior to the shootings demonstrates that each had their own reasons to keep any knowledge they had about the actual perpetrator to themselves so that they could exact their own form of street revenge. In Campbell's case, these considerations are even more significant in light of the trial court's order permitting the admission of Campbell's preliminary hearing testimony in lieu of live testimony.

a.    *Campbell's Testimonial Baggage*

55.    As described above, the police learned shortly after the Todd and Pat's Bar shooting that Campbell was armed and gave his weapon to Amahl Scott to dispose of the weapon prior to the police's arrival. His desire to ensure that the police did not obtain possession of that gun speaks volumes. Similarly, as described above, prior to the Todd and Pat's Bar shootings, Campbell and his "associates" were involved in multiple robberies and assaults against others, thus creating a plethora of individuals with motive to exact revenge.

56.    Moreover, everything about Campbell's conduct following the shooting bears against any claim that his preliminary hearing testimony identifying Petitioner as the shooter should be believed. However, due to court error, prosecutorial misconduct and ineffective assistance of counsel, none of this information was presented to the jury.

57.    Indeed, immediately after the shootings, Police Officer Ryan interviewed Campbell at the hospital. In that interview, Campbell told Officer Ryan that the person who committed the shootings was wearing a mask, a jean jacket and pants. Campbell also told Officer Ryan that he did not remember anything after he was shot.

58.    On September 20, 2001, Police Officer Pickles reported that Campbell stated that the person who committed the shooting was shorter than him (described

as being 5'11"), wearing a mask and a hooded sweatshirt. Campbell also told Officer

Pickles that the shooter shot Campbell in the chest, Campbell immediately covered

his face, was hit in the leg and then fell to the floor. Campbell was still unable to

identify anyone. On the same date, Investigator Carter reported that Campbell

described the shooter as being thin build. Carter's report indicates that Campbell

stated that he was shot in the chest, put his arms up to his face, was shot again in the

arm and fell to the floor. Carter's report further indicates that Campbell stated that

he did not recognize the shooter.[8]

59. On September 24, 2001, Investigator Carter again interviewed Campbell.

He again denied knowing who was the shooter and, when specifically asked if

Petitioner did it stated that he did not know that and would not identify him if he was

not sure. When Carter asked if Petitioner had previously dated his (Campbell's)

current girlfriend, he denied any knowledge of that. He told Carter to speak with

John Brown, who was standing near him during the shooting.[9]

---

[8] Campbell also told Carter that he did not want to prosecute, purportedly because he just wanted to forget the whole thing. As described below, however, statements he made to others indicates a completely different motive for not wanting to identify the actual shooter.

[9] Notably, Mr. Brown gave a description of the shooter as tall and thin and wearing a mask and, thus, not identifiable.

23

60.    After he obtains information that Campbell and Ronald Collins[10] returned fire during the Roebuck's Bar incident, Police Officer Heffner obtains permission from the District Attorney's Office to file charges against Collins and Campbell. On March 26, 2001, Officer Heffner arrests Campbell on the outstanding assault charges arising out of the Roebuck's Bar incident. In the course of that arrest, Campbell is found to be in possession of drugs and a 9 millimeter handgun. He is charged with those offenses also.

61.    On March 26, 2001, at 9:40 a.m., Campbell told Officer Heffner that he will not talk without a deal. At 2:15 p.m. Campbell gave a written statement to Investigator Carter suddenly recalling that Petitioner was the shooter in the Todd and Pat's Bar incident, although he had never identified Petitioner in the past and specifically refused to do so since he did not know it was Petitioner; and, that he suddenly recalled phone calls from Petitioner prior to the fight in Roebuck's regarding Campbell's dating his former girlfriend, although in prior statements he had denied even knowing Petitioner or any connection between Petitioner and his (Campbell's) girlfriend.

62.    Although there is no police report regarding what happened between 9:40 a.m. and 2:15 p.m., what happened after that signed statement speaks volumes.

_____

[10] Another 'associate' of Easter, Campbell and Scott.

24

The preliminary hearing for the aggravated assault and gun charges arising out of Campbell's conduct during the McClay incident was scheduled for April 15, 2002. On that date, the felony charges were dismissed. The next day, April 16, 2002, Campbell gives his testimony before the grand jury, once again suddenly recalling that Petitioner was the shooter in the Todd and Pat's Bar incident and suddenly recalling that there was a dispute between Petitioner and him regarding his current girlfriend. Shortly thereafter, on May 23, 2002, Campbell gives similar testimony at Petitioner's preliminary hearing.

63.    In September, 2002, Campbell was charged with homicide charges arising out of an incident that occurred on September 11, 2002. Campbell was ultimately convicted of third degree murder and related charges. The circumstances of those charges are remarkably familiar. Campbell and others robbed Keyattha Duncan at gunpoint. Duncan and others subsequently search for, find and confront Campbell. A shoot-out ensues and, in the course of that shoot-out, Robert Mitchell, an associate of Duncan, is killed. Thus, even after the shooting at Todd and Pat's Bar, Campbell continued the lifestyle and conduct described above by Quendell Oliver and his 'associates.'

64.    By the time of Petitioner's trial, Campbell was facing homicide

25

charges.[11] Campbell refused to testify against Petitioner and was found in contempt. As a result, the trial court (erroneously) permitted the prosecution to admit the preliminary hearing notes of testimony.[12]

65.    As described elsewhere in this *Petition*, see Claim II, during the preliminary hearing, the prosecution conducted direct examination and, before turning the witness over for cross-examination, turned over to defense counsel Petitioner's statement of September 27, 2001; his statement of March 26, 2001; an order granting Campbell immunity; and, a motion that Campbell's counsel was filing regarding a request for bail as a result of purported threats Campbell had received.[13] Defense counsel was given five minutes to review these materials before cross-examination.

66.    While the prosecution turned over the two written statements by Campbell, at no time before cross-examination did trial counsel have the reports of

---

[11]   Although it appears this was a death-eligible homicide case, it appears no notice was filed by the prosecution seeking to capitally prosecute Campbell.

[12]   See Claim II (involving the violation of Petitioner's federal constitutional rights arising out of the court's erroneous determination that the preliminary hearing notes of testimony were admissible at Petitioner's trial).

[13]   No charges were ever filed against Petitioner arising out of these purported threats, nor is there any indication in the police paperwork disclosed to counsel during the pretrial proceedings indicating that the prosecution ever obtained the source of these threats or even confirmed that such threats were actually made.

26

the multiple statements Campbell gave to the police prior to September 27, 2001. Nor did the prosecution turn over the statement Campbell made at 9:40 a.m. on March 26, 2001 to Officer Heffner. Nor did the prosecution notify defense counsel that the felony charges against Campbell were dropped or the timing of that dismissal.

67.     Thus, any claim by the prosecution that it intended to give Petitioner's counsel a "full and fair" opportunity to cross-examine Campbell at the preliminary hearing in support of an argument that the notes of testimony might be admissible at trial was, at best illusory.

68.     There is no question that the prosecution was aware of Campbell's likely failure to cooperate at Petitioner's trial. That was why the prosecution turned over the formal statements and other documents. That the prosecution elected to withhold the other critical evidence directly disputing Campbell's reliability and credibility constitutes a violation of the Sixth, Eighth and Fourteenth Amendments.

69.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995). A prosecutor's duty to disclose is especially important in a capital case. Kyles, 514

U.S. at 422 (in assessing a <u>Brady</u> claim the court acknowledged that its "duty to search for constitutional error with <u>painstaking</u> care is never more exacting than it is in a capital case").[14]   The duty to disclose continues past a defendant's arrest, conviction and sentencing. <u>Imbler v. Pachtman</u>, 424 U.S. 409, 427 n.25 (1976).

70.   'Favorable evidence' under <u>Brady</u> includes evidence that impeaches the prosecution's theory or witnesses. <u>Bagley</u>, 473 U.S. at 676 (<u>Brady</u>'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); <u>Napue</u>, 360 U.S. at 269 ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); <u>see also</u> <u>Wilson v. Beard</u>, 2006 WL 2346277, *17 (E.D. Pa. 2006) (Padova, J.) (finding that the prosecution's failure to disclose impeachment evidence violated <u>Brady</u> and its progeny).

71.   As the prosecution was well aware of the strong likelihood that it would be relying on Campbell's preliminary hearing testimony at trial (there is no other explanation for the prosecution's limited disclosure of the documents it did turn over prior to cross-examination), the failure to turn over all the other exculpatory evidence

---

[14] See also <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985); <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985); <u>Ford v. Wainwright</u>, 477 U.S. 399, 414 (1986) (each holding that a capital case requires heightened judicial review and enforcement of procedural safeguards).

described above violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

72.    Similarly, even if the prosecution was under no duty to turn over this evidence at the time of the preliminary hearing, and it was, counsel was ineffective for failing to argue that this evidence precluded the admission of the preliminary hearing or, at the least, failing to seek to admit the evidence described above once the court granted the prosecution's motion to admit the preliminary hearing testimony.

73.    Indeed, the evidence disputing Campbell's reliability and credibility known to counsel by the time of trial was compelling.  Counsel knew:

- that Campbell had engaged in robberies and assaults against others (Oliver and his "associates") shortly before the shootings that gave those others a clear motive for revenge and those others (Oliver and his "associates") admitted that they were searching for Campbell in the very location of Todd and Pat's Bar in order to exact that revenge;

- that Campbell gave no identification of the shooters in either the Roebuck's Bar shooting or the Todd and Pat's Bar shootings until after he told the police he would not cooperate without a deal;

- that Campbell never acknowledged knowing that Petitioner previously dated his girlfriend or that he had altercations with Petitioner as a result of that until after he told the police that he would not cooperate without a deal;

- that Campbell had drug and weapons (a 9 millimeter handgun) possession charges pending at the time of the preliminary hearing and grand jury testimony;

- that Campbell had aggravated assault and weapons charges that were dismissed to misdemeanor weapons and criminal mischief charges shortly before the preliminary hearing testimony;

- that, at the time of trial, Campbell was facing homicide charges with circumstances very similar to those that occurred with Oliver and his "associates" shortly before the Todd and Pat's Bar incident;[15] and,

- that the police had uncovered evidence that Campbell possessed a 9 millimeter gun during the Todd and Pat's Bar incident and gave it to his 'associate' Amahl Scott for disposal prior to the police arrival.

74. Moreover, during the grand jury proceedings, the prosecution called Daryl Parker in an apparent attempt to elicit testimony from Mr. Parker that Petitioner made inculpatory statements while they were incarcerated together. Although Mr. Parker did not give the hoped-for testimony, he did testify that he had learned from Campbell's cellmate that Campbell intended to identify Petitioner as the shooter so that he, (Campbell), could "take care of" the actual shooter on his own. Despite being

---

[15] During a pretrial hearing, the prosecution moved to preclude the defense from admitting the evidence of this open homicide charge unless Campbell actually testified. Without disclosing the striking similarity between the circumstances of that homicide and the circumstances in this case, the prosecution contended that, if Campbell refused to testify at trial, there was no bias or motive issue. Having heard the prosecution's limited version without any response by trial counsel, the court agreed that evidence of the charge was inadmissible unless Campbell testified. NT 3/27/03 at 27. As described elsewhere in this *Petition*, see Claim IV, counsel's failure to object to the preclusion on the basis that the evidence of that incident was so strikingly similar to the circumstances described by Quendell Oliver and his "associates," it was relevant, admissible and exculpatory and the preclusion of that evidence violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

provided with a transcript of the testimony prior to trial, counsel did not conduct a constitutionally adequate investigation, nor did counsel present this evidence at trial.

75.    Although all of this evidence was readily available to counsel by the time of trial, counsel presented nothing in response to the admission of the preliminary hearing testimony.   Counsel's failure to present the above-described evidence demonstrating that a critical prosecution witness connecting Petitioner to the Todd and Pat's Bar shooting had substantial and compelling reasons to lie or curry favor with the prosecution constitutes deficient performance. As it is more than reasonably probable that, had it heard this compelling evidence, the jury would have disregarded Campbell's testimony and acquitted Petitioner, counsel's deficient performance resulted in prejudice.

    *b.* *Scott's Testimonial Baggage.*

76.    The only other witness identifying Petitioner as the shooter in the Todd and Pat's Bar incident was Amahl "Maudy" Scott.   In addition to identifying Petitioner, Scott also told the jury that shortly before the shootings, he saw Shariff Layton ("Dooger") enter the bar, buy a 40 ounce of beer and leave. NT Vol. IV at 66-67.[16]

---

[16]   Although it was the prosecution's theory that Layton was the "watch-out" who told Petitioner whether or not the purported victims were in the bar, Layton was never charged with conspiracy or any other charges arising out of this incident.

31

77.    Although trial counsel cross-examined Scott on various inconsistencies in his descriptions and did raise Scott's pending charges, at no time did counsel confront Scott with his criminal conduct leading up to the Todd and Pat's Bar incident, his connections with Easter and his "associates" or the evidence regarding Oliver's (and his "associates") activities in the time leading up to the shootings that included the assaults against the Oliver crew and the subsequent 'hunt' for Scott, Campbell and Easter by Oliver and his "associates" for revenge.

78.    Nor did counsel cross-examine Scott on his illegal conduct directly following the shootings.  As described above, Scott admitted to the police that Campbell gave him a 9 millimeter handgun as he (Campbell) was exiting Todd and Pat's Bar just after the shootings.  Scott further admitted that he left the shooting location, despite his possession of evidence directly related to that incident, and ultimately gave that gun to Kemyah Washington for disposal.  Thus, in addition to the outstanding charges the prosecution did file against him, Scott had a separate and distinct motive to testify in a manner consistent with the prosecution's theory in order to ensure that he did not get charged with tampering with evidence.

79.    Nevertheless, counsel failed to cross-examine Scott on his movements and conduct before or after the shooting, all of which would have pointed to others with more recent and more serious motive for the shootings and would have directly

contradicted Scott's credibility and reliability as one of only two witnesses who identified Petitioner as the shooter.

80.     The evidence described above is far from cumulative and went to the heart of the reliability of the prosecution's case.   Thus, counsel's deficient performance resulted in prejudice and relief is required.   Moreover, when combined with counsel's failures, described above, regarding counsel's prejudicially deficient performance arising out of the only other witness connecting Petitioner to the shooting, prejudice is manifest and, for this reason as well, Petitioner is entitled to relief.

2.     *Ronald Roebuck's Testimonial Baggage*

81.     The only witness that connected Petitioner to the Roebuck's Bar incident was Ronald Roebuck, owner of Roebuck's Baby Grand Bar.   According to Roebuck, at the time of the shooting, he was able to see the individual who was shooting at individuals across the street from the bar.   Roebuck claimed that he was able to see Randolph through the driver's side rear window that was "cracked" open.   NT Vol. III at 130.   Roebuck did not see Randolph's face but claimed to know it was him because they made "eye-contact."   Id.   Roebuck also claimed that after the shooting he had a conversation with Petitioner wherein Petitioner purportedly told him he would pay for the damage to one of Roebuck's friend's cars.   Id.

82.     On cross-examination, Roebuck admitted that he did not give the police

this information at the time of the shooting; that he was attempting to purchase

Petitioner's mother's bar license; and, that Roebuck did not give the police the

information until "several weeks or maybe a month after the shooting."[17] Id. at 135-

36.  Although counsel asked whether or not Roebuck had issues with either the

prosecution or liquor control board hanging over his head, Roebuck denied any such

reasons for testifying.  Id. at 140.

83.     Had counsel conducted a constitutionally adequate investigation, they

would have learned that there were witnesses who directly disputed Roebuck's

version of events and his ability to identify the shooter.  Everyone else said that the

windows were up on the side of the car facing the bar, that as soon as the shooting

started, they shut the door to the bar to prevent the patrons from being harmed, and

that Ronald Roebuck was nowhere near the door when the shooting happened.

84.     Counsel would have learned that there were witnesses available at the

time of Petitioner's trial who would have testified that Donald Roebuck was the

Roebuck brother at the door with bouncers Heath Wells and Sean Sellers on the night

of the shooting.  Counsel would have learned that witnesses available at the time of

---

[17] Actually, the first statement from Roebuck in the police reports turned over
to counsel pretrial indicates that his statement was not until February 13, 2002, during
an interview with Detective Lau and Officer Heffner.

trial (including Donald Roebuck, Sean Sellers and Shannon Taylor), would have testified that Ronald was working at the bar with the barmaid, Shannon Taylor and in no position to see the shooting.

85.    Indeed, despite pressure and coercion, described below, Donald Roebuck consistently told the police that, while he did see a black car drive down the street just before the shooting, the windows were tinted and there was no way anyone at the bar could see who the occupants were.

86.    In addition to discovering evidence directly contradicting Ronald Roebuck's version of events, had counsel conducted a constitutionally adequate investigation, they would have uncovered substantial evidence demonstrating Ronald Roebuck's motive to lie in favor of the prosecution's theory and police misconduct and coercion.

87.    Indeed, contrary to Roebuck's testimony, he was facing code violation charges at the time of Petitioner's trial and thus had a motive to present testimony in favor of the prosecution. [18]Thus, Ronald Roebuck lied when he stated that there were no charges pending against him.

88.    Moreover, had counsel conducted a constitutionally adequate

---

[18] See Commonwealth v. Ronald Roebuck, NT -000383-03; Commonwealth v. Ronald Roebuck, NT-0000275-03.

investigation they would have learned the persons who knew Ronald Roebuck knew

that Roebuck was an informant for the police. They would have learned that Roebuck

had a longstanding arrangement with police that involved his giving the police

favorable testimony and information in exchange for the authorities' turning a blind

eye to his own criminal activity. Counsel would have learned that Ronald Roebuck

was a crack-cocaine user who regularly charged persons crack-cocaine for favors,

including illegal conduct. Counsel would have learned that Ronald Roebuck was

known to engage in illegal gambling and drug use in the bar after it closed with his

select associates.

89.   Indeed, had counsel conducted a constitutionally adequate investigation,

they would have learned that Ronald Roebuck admitted that he lied and that he did

so as a result of his arrangement with the police and that he does favors for the police

and prosecution all the time.

90.   Counsel's failure to marshal the above-described evidence directly

contradicting the testimony of Ronald Roebuck constitutes prejudicial deficient

performance.   There is no question that Ronald's testimony was critical to the

prosecution's case. Had the above-described evidence been presented to the jury that

directly contradicted his claim of being able to see Petitioner at the time of the

shooting and that would have provided multiple motives to lie in favor of the

36

prosecution, there is much more than a reasonable probability that the jury would have disregarded his testimony altogether and acquitted Petitioner.

91. Moreover, had counsel conducted a constitutionally adequate investigation, they would have learned that there were witnesses available who could have told the jury that Donald Roebuck, Heath Wells and Sean Sellers were subpoenaed to the Dauphin County Prison to testify against Petitioner. They were met by Officer Heffner and Detective Lau outside the prison. Heffner told them that they had to identify Petitioner as the shooter in the Roebuck's Bar incident. When Donald Roebuck, Wells and Sellers denied seeing Petitioner, Heffner became angry and verbally assaultive. When Donald Roebuck, Wells and Sellers insisted that they did not see Petitioner, they were told to leave.

92. Indeed, had counsel conducted a constitutionally adequate investigation, they would have learned that the police engaged in a pattern of conduct intended to coerce Donald Roebuck and others to lie and say that they saw Petitioner commit the Roebuck's Bar shooting, despite their protestations to the contrary.

93. Counsel would have learned that police officers, including Heffner, told witnesses that they had to connect Petitioner to the prior shootings because "one plus one equals two" meaning that once they did that, they would be able to connect Petitioner to the murders. Counsel would have learned that members of the

37

investigative team, including Heffner, used coercion and threats to attempt to obtain

testimony connecting Petitioner to these shootings and that these officers and

prosecution personnel were determined to obtain a conviction for murder against

Petitioner, no matter what the truth was.

94.     Indeed, counsel would have learned that Donald Roebuck was arrested

on March 13, 2003, for drug and weapons charges following execution of a search

warrant on the basis of a "confidential informant." Counsel would have learned that

just after his arrest on these charges, Officer Heffner attempted once again to coerce

Donald Roebuck, stating that this was "his last chance."[19]

95.     Had counsel conducted the constitutionally required investigation and

uncovered this evidence of police coercion, they would have been able to present the

above-described additional evidence directly disputing the reliability and credibility

of Ronald Roebuck's late-developed memory of seeing Petitioner on the various

dates.[20] Thus, for this reason as well, counsel's failure to investigate constitutes

---

[19]   Police intimidation did not end with the trial. Following trial, after
subsequent counsel filed a motion that included an affidavit from Donald Roebuck,
Investigator Lau visited Petitioner in prison and attempted to convince and coerce Mr.
Roebuck to recant.

[20]   As described more fully below, this evidence also constitutes undisclosed
Brady evidence directly impacting the reliability of the police investigation and the
credibility of other witnesses who developed late recollections of seeing Petitioner
at the various shootings.

prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

3. *The Identifying Eye-Witnesses to the McClay Street Shooting.*
   a. *Gary Waters' Testimonial Baggage*

96.     Prior to February 7, 2002, Gary Waters vehemently denied knowing who had shot him during the McClay Street shootings. Nor did Waters ever tell the police about the on-going animosity between his "associates" Easter, Campbell and Scott and the Oliver crew. Indeed, even after the police sent him notice that they would close the case if he did not provide information on the perpetrators in the shooting, Waters failed to come forward with any information identifying the shooters.

97.     What changed on February 7, 2002, was Waters' arrest for drugs and related offenses. The officers who arrested Waters were Officer Heffner and Investigator Lau. Not surprising, once Lau and Heffner had Waters on felony drug charges, they were able to obtain a statement from Waters that he now miraculously recalled that Petitioner was the shooter in the McClay Street shooting.

98.     In addition to failing to investigate the available evidence, described below, demonstrating that Lau and Heffner engaged in misconduct in order to obtain false and misleading testimony against Petitioner, counsel also failed to investigate and develop other evidence directly disputing the reliability of Waters' testimony.

99.    That testimony included the above described evidence describing the relationship between Waters and the Easter "associates" and their activities in the weeks prior to the shootings that resulted in others with more recent and more significant motives for exacting revenge against the members of the Easter faction. In addition, even when Waters gave a statement helpful to the prosecution, there were substantial contradictions and inconsistencies that counsel failed to present to the jury.

100.    For example, in his statement to the police, Waters did not recall seeing "Muzz" on the street prior to the McClay Street shooting.  His girlfriend, Syreeta Clayton, however, claimed that Waters and his "associates" were talking to "Muzz" at the time of the shooting.  Not surprising, by the time of trial, Waters changed his story to include "Muzz" to make his version consistent with his girlfriend's.

101.    More importantly, Waters claimed that others would back up his story that Petitioner was the shooter, including Yahimba Cooper.  When, however, the police questioned Ms. Cooper, she denied ever saying that Petitioner was involved and specifically stated that she could not identify who the shooter was.  Indeed, although she was in a position similar to Ms. Clayton, Ms. Cooper stated that the only thing she could see was the hand of the assailant.

102.    Had counsel conducted a constitutionally adequate investigation, they

40

would have discovered this evidence directly disputing the reliability and credibility of Waters' claim that he saw Petitioner commit the shooting. Counsels' failure to do so constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

### b.   Syreeta Clayton's Testimonial Baggage

103. Ms. Clayton, Gary Waters' girlfriend, did not give a statement to the police about this shooting until February 14, 2002, after her boyfriend had been arrested and incarcerated for drugs and after he had given his statement to the police that Petitioner was the shooter. She gives her statement to Police Officer Heffner. Ms. Clayton, remarkably, was able to see a great deal, despite the inability of others in similar positions to see anything. She testified that she saw the driver and identified him as Jerome Britton. She further testified that Petitioner was the shooter.

104. When asked on cross-examination, Clayton acknowledged that she did not tell the police about her observations until she contacted Officer Heffner. Unfortunately, counsel failed to establish for the jury that Clayton did not contact Heffner until *after* Waters had given his statement to the police following his arrest. A jury could have reasonably inferred that the timing of Clayton's sudden recollection that Petitioner was the shooter was nothing more than an effort to help her boyfriend get out from under the charges against him. Yet, counsel failed to

41

present this evidence.

105.   Nor did counsel conduct a constitutionally adequate investigation into the relationship between Heffner and Clayton.   Clayton testified that she "always call[s] Heffner when something goes on with [her]."   NT Vol. III at 151.   As described more fully below, Heffner and other police officers engaged in misconduct in order to obtain false and misleading testimony against Petitioner.   Thus, establishing that Heffner and Clayton had such a prior relationship that she would "always call" him when "something goes on," would have provided the jury with further evidence directly disputing Clayton's (and her boyfriend, Waters') credibility and reliability.

106.   Had the jury heard the above-described evidence, there is a reasonable probability that the jury would have disregarded both Clayton's and Waters' stories and acquitted Petitioner.   Thus, counsels' failure to conduct a constitutionally adequate investigation and presentation at trial constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

C.   **As a Result of Police Misconduct, the Jury's Verdict Was Based on False and Misleading Evidence in Violation of Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.**

107.   Shortly after the shooting at Todd and Pat's Bar, members of the police force began a campaign to develop false or at a minimum, misleading testimony connecting Petitioner to these incidents.   Individuals who refused to "join the ride" were harassed and coerced.

108.   As described above, Donald Roebuck, Sean Sellers and Heath Wells were just some of the witnesses that Police Officer Heffner sought to coerce, cajole or force into testifying against Petitioner.   When they refused to identify Petitioner as the shooter in the Roebuck's incident, Heffner became verbally abusive and assaultive.

109.   Indeed, a comparison of the police contacts with those witnesses who initially refused to identify Petitioner as the perpetrator, but later changed their stories to suit the theory that Petitioner was the shooter in these various incidents raises troubling questions about the police investigation.   The questions are especially troubling in light of the police's abject failure to pursue other leads, including the obvious leads surrounding the conduct of Oliver, Horton and Pitts on the evening of September 19, 2001.

110.   Evidence Petitioner expects to present at an evidentiary hearing will

43

demonstrate that, the reason for the absence of any investigation of other suspects was, in part, because Heffner and Lau were on a mission to convict Petitioner of murder despite the absence of evidence. As described above, Donald Roebuck, Heath Wells and Sean Sellers were threatened when they refused to (falsely) identify Petitioner as being involved in the Roebuck's shooting. Repeated attempts to coerce Donald Roebuck into changing his statement that he – and no one else at Roebuck's for that matter – could not see the shooter from Roebucks.

111. The motive was clear: these police officers were bent on convicting Petitioner for murder for reasons other than competent evidence and they knew that tying Petitioner to the other two shootings would accomplish just that. Indeed, evidence will demonstrate that the words consistently used by Heffner during the course of his attempts to coerce others to falsely accuse Petitioner were that "one plus one equals two," meaning that if they got evidence against Petitioner on the other two shootings, they would be able to convict him of the murders.

112. Not surprisingly, it is Heffner and Lau who are involved in the critical arrests of others that lead to statements pinning these crimes on Petitioner and it is Heffner and Lau who obtain the 'revised' versions from those who previously stated that they either did not see the perpetrator or that Petitioner was not the person.

113. There is no question that the evidence described above involving the

44

coercion and harassment subjected upon Donald Roebuck, Sean Sellers and Heath
Wells was indicative of the conduct utilized with other witnesses. Nor is there any
question that, had the jury heard what the police did to these individuals, it would
have found the testimony of those who did bend under the pressure and ultimately
provide testimony against Petitioner unreliable and incredible.

114.    Yet, counsel ineffectively failed to investigate and develop this evidence
for trial, although it was readily available. Counsels' constitutionally inadequate
investigation constituted prejudicially deficient performance in violation of the Sixth,
Eighth and Fourteenth Amendments. Nor did the prosecution disclose the true
circumstances surrounding the police interrogations and coercion that resulted in false
and misleading testimony. The prosecution's failure to disclose this evidence violated
Petitioner's federal due process rights as well as his rights to a fair trial, confrontation
and cross-examination as guaranteed by the Sixth, Eighth and Fourteenth
Amendments. Finally, the use of false, inaccurate or misleading  prosecutorial
testimony deprives a defendant of a fair trial if "the false testimony could . . . in any
reasonable likelihood have affected the judgment of the jury." Napue v. Illinois, 360
U.S. 264, 271 (1959); Giglio v. United States, 405 U.S. 150 (1972); Carter v.
Rafferty, 826 F.2d 1299 (3d Cir. 1987). For this reason as well, Petitioner was denied
his Sixth, Eighth and Fourteenth Amendment rights.

115.   Where, as here, a man's life literally hangs in the balance, the conduct,

and misconduct, described above cannot be sanctioned. Petitioner is entitled to relief.

**D.   Petitioner was Denied His Sixth, Eighth and Fourteenth Amendment Rights Because the Prosecution Failed to Disclose Evidence that Was in the Possession of the Prosecuting Police Department of Yet Another Individual Who Confessed to the Todd and Pat's Bar Shooting.**

116.   Following trial and sentencing, the prosecution turned over to counsel

documents indicating that the Johnstown Police had notified the Harrisburg Police

of evidence of another potential suspect in the Todd and Pat's Bar shootings. Andrew

Stanko notified the Johnstown Police that he and Alexander Bush, Jr. had a

conversation in which Bush admitted to committing a shooting in a bar in Harrisburg.

117.   Although the report was in the custody of the Harrisburg Police

Department, it was never turned over to the defense. Nor did the police ever follow-

up on that report until *after the prosecution had obtained Petitioner's conviction and*

*death sentence.*[21]

118.   As described above, the prosecution is constitutionally obligated to turn

over exculpatory evidence. Evidence that someone other than the accused committed

the crimes falls squarely within such exculpatory evidence. Moreover, the failure to

------

[21] Although Stanko backed down from his original statement to the Johnstown
Police, not surprisingly, that occurred only after interrogation by Investigator Lau and
Officer Heffner.

disclose all material evidence favorable to an accused violates due process *whether or not the prosecutor acted in good faith or whether the evidence was actually in the possession of the prosecutor.* <u>Brady</u>, 373 U.S. at 87. The prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf, including the police." <u>Kyles</u>, 514 U.S. at 437. <u>See also id.</u> at 438 (knowledge of favorable evidence "known . . . to police investigators and not to the prosecutor" is imputed to the trial prosecutor). As the United States Supreme Court has recently reiterated, a prosecutor is "responsible for 'any favorable evidence known to others acting on the government's behalf in the case, including the police,'" even if the failure to disclose is legitimately inadvertent. <u>Strickler v. Greene</u>, 527 U.S. at 275 n.12 (1999) (citing <u>Kyles</u>, 514 U.S. at 437). <u>See also</u> <u>United States v. Risha</u>, 445 F.3d 298 (3d Cir. 2006) (finding that federal prosecutors were obligated under <u>Brady</u> to disclose favorable evidence arising out of state court prosecution of material witness).

119. Accordingly, there is no question that the above-described evidence should have been disclosed pretrial under clearly established federal constitutional standards.

120. During the state-court post-trial proceedings, counsel raised the discovery of this evidence under a state-law "newly discovered evidence" claim. The state court found no error on the basis that the failure to disclose the evidence was not

prejudicial. To the extent state court's adjudication is a prejudice determination for purposed of federal constitutional law, and it is not, that determination is objectively unreasonable for a number of reasons.

121.   First, Petitioner does not have to demonstrate that the evidence regarding the other suspect eliminates any and all other possibilities. Instead, materiality [or prejudice] for purposes of a <u>Brady</u> violation is established when a defendant demonstrates:

> [A] 'reasonable probability' of a different result, and *the adjective is important.* The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Accordingly, a 'reasonable probability' of a different result is shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

<u>Kyles</u>, <u>id.</u> at 434, <u>quoting</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985).

122.   Thus, materiality exists when the withheld evidence could have provided a "reasonable doubt" about Petitioner's guilt. <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984) ("the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt"); <u>United States v. Hill</u>, 976 F.2d 132, 135 (3d Cir. 1992) (same); or when the withheld evidence had "any adverse effect" upon the defendant's ability to prepare for trial or present a defense. <u>Bagley</u>, 473 U.S. at 683 ("the reviewing court may consider

48

directly any adverse effect that the prosecutor's failure to respond might have had on

the preparation or presentation of the defendant's case"). As the Third Circuit noted:

> A defendant is entitled to a new trial where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is [defined as] a probability sufficient to undermine confidence in the outcome. This court has recognized that the Bagley inquiry requires consideration of the totality of the circumstances, *including possible effects of non-disclosure on the defense's trial preparation.*

United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991) (internal citations

omitted).[22] Moreover, the determination of materiality as to undisclosed evidence

cannot be considered in a vacuum. Instead, the courts are required to consider the

"cumulative effect of all such evidence suppressed by the government." Kyles 514

U.S. at 421. See also Wilson v. Beard, 2006 WL 2346277, at *15 (quoting Kyles).

123.   Here, even if the jury failed to believe that Bush was the actual murderer,

the evidence may have, at the very least, caused the jury to doubt Petitioner's guilt –

especially in light of the above-described evidence further calling into question the

---

[22]  See also Wilson v. Whitley, 28 F.3d 433, 438 (10th Cir. 1994) ("Bagley evidences concern with any adverse effect that the prosecutor's failure to respond [to the discovery request] might have had on the preparation or presentation of the defendant's case") (quotations and citations omitted); United States v. Spagnoulo, 960 F.2d 990, 994 (11th Cir. 1992) (Brady violation found when withheld evidence "could have" altered defense strategy); Smith v. Secretary, 50 F.3d 801, 827 (10th Cir. 1995) (same).

credibility and reliability of the prosecution's case. Thus, prejudice is demonstrated and Petitioner is entitled to relief.

## E.   Conclusion

124.  The above-described errors, individually and cumulatively, provides compelling bases for doubting the reliability, credibility and veracity of the sole witnesses tying Petitioner to these shootings. Where, as here, the prosecution had no physical evidence – or any other competent evidence – connecting Petitioner to these crimes, the denial of Petitioner's federal constitutional rights is manifest and requires grant of relief, or at a minimum, an evidentiary hearing.

**CLAIM II.   AS A RESULT OF COURT ERROR, PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL, THE ADMISSION OF ALISTER CAMPBELL'S PRELIMINARY HEARING TESTIMONY VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

125.  The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

126.  Alister Campbell testified for the prosecution at Petitioner's preliminary hearing. Following the direct testimony, the prosecution provided the defense with two written statements Campbell gave to the police. One, given on September 27, 2001, where Campbell essentially denied any knowledge of the perpetrator in the Todd and Pat's Bar incident and the second, given on March 26, 2001, suddenly