recalling that Petitioner was the shooter. The prosecution also provided the defense with an order of immunity and a motion by Campbell's counsel requesting bail for Campbell on the basis of unspecified purported threats against Campbell. See NT 5/23/02 at 23-24. The District Justice gave counsel five minutes to review these documents. Id. at 24.

127.    Taking the unusual course of disclosing these documents at the preliminary hearing stage demonstrates the prosecution's knowledge that Campbell would likely refuse to testify at a later proceeding.

128.    As the prosecution predicted, Campbell, through his attorney, notified the prosecution and the defense that Campbell would refuse to testify at Petitioner's trial. NT 3/27/03 at 21. Not surprisingly, the prosecution moved to admit the notes of testimony from the preliminary hearing. In the course of his argument that the notes would be admissible, the prosecution stated the following:

> I provided everything that Mr. Campbell said prior to the preliminary hearing and I provided it at the preliminary hearing as the transcript reflects. The only thing I didn't provide is that which I could not legally, which is his grand jury testimony.

NT 3/27/03 at 21.

129.    As expected, Campbell refused to testify at trial, despite grant of immunity. NT Vol. IV at 35- 38. The court declared Campbell unavailable and

granted the prosecution's request to admit Campbell's preliminary hearing testimony. Id. at 47.

130. Contrary to the representations during the pretrial proceedings and the trial, the prosecution did not "provide[] everything that Mr. Campbell said prior to the preliminary hearing" with the exception of the grand jury testimony. Instead, there were multiple other statements made by Campbell consistent with his statement of March 26, 2001 that he did not know who committed the shooting at Todd and Pat's Bar. Moreover, the prosecution was aware of other compelling evidence directly disputing the reliability, credibility and veracity of Campbell's March 26, 2002 statement and his preliminary hearing testimony. Indeed, as described more fully elsewhere in this *Petition*, see Claim I, *supra*, Campbell had multiple motives to lie, not the least of which was his own criminal conduct shortly before and at the time of the shooting at Todd and Pat's Bar. Moreover, there was a direct connection between the prosecution's charges against Campbell and his sudden change of heart and agreement to provide testimony supporting the prosecution's theory against Petitioner.

131. In sum, the prosecution knew, but failed to disclose:

- that, after the Todd and Pat's Bar shooting but before the police responded, Campbell gave Amahl Scott a 9 millimeter handgun to take from the scene;

52

- that Campbell and his "associates" were involved in confrontations with Quendell Oliver and his "associates" in the days preceding and the day of the Todd and Pat's Bar incident that included robberies and assaultive conduct;

- that the police had taken multiple statements from Campbell, not disclosed to the defense at the time of the preliminary hearing, that were consistent with his September 27, 2001 statement that he did not know who the shooter was in the Todd and Pat's shooting or the other incidents and inconsistent with Campbell's March 26, 2001 statement;

- that in one of the undisclosed statements, Campbell specifically denied that Randolph was the shooter;

- that Campbell was arrested on March 26, 2001 for assault and weapons crimes arising out of his conduct during the incidents leading up to the Todd and Pat's Bar shooting;

- that at the time of his arrest on March 26, 2001, Campbell was in possession of drugs and yet another 9 millimeter weapon;

- that, at 9:40 a.m. on March 26, 2001, Campbell told the police he would not cooperate without a deal;

- that Campbell gave a statement supporting the prosecution's theory at trial five hours later; and,

- that the felony assault charges against Campbell were dismissed on April 15, 2002, the day before Campbell testified against Petitioner in the grand jury and a month before Campbell testified at the preliminary hearing.

132.   It is clearly established federal constitutional law that an accused has the right to confront and cross-examine his accuser.  For that reason, a witness' prior

53

testimony is not admissible against an accused unless the prosecution demonstrates that the witness is legally unavailable and that the accused had a full and fair opportunity to confront and cross-examine the witness during the prior proceeding. Crawford v. Washington, 541 U.S. 36, 58 (2004) (noting the longstanding Sixth Amendment requirement that "prior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine")(citations omitted); id. 541 U.S. at 61 (the Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination"); Pointer v. Texas, 380 U.S. 400, 407 (1965) (finding the Sixth Amendment violated where the defendant was not represented by counsel during the preliminary hearing " who had been given a complete and adequate opportunity to cross-examine"). Moreover, as this was a capital prosecution, heightened procedural safeguards are required. Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Caldwell v. Mississippi, 472 U.S. 320 (1985); Ford v. Wainwright, 477 U.S. 399, 414 (1986).

133.  As described above, what the prosecution knew, but failed to disclose to defense counsel at the time of the preliminary hearing, went to the very heart of Petitioner's federal confrontation and cross-examination rights.  In light of the overwhelming evidence directly disputing the reliability and credibility of Campbell's

54

testimony that the prosecution failed to disclose, any 'opportunity' Petitioner had to cross-examine Campbell was nothing more than illusory and the admission of the preliminary hearing violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

134. Moreover, it is clear that the prosecution was aware that it would ultimately rely on Campbell's preliminary hearing testimony as a result of his refusal to testify. There is no other reason for turning over the few documents it did turn over during the preliminary hearing. Having knowledge that it would likely seek to admit the notes of testimony, the prosecution was under a duty to turn over *all* the exculpatory evidence arising out of Campbell's recent revelation that Petitioner was purportedly the shooter, obviously motivated by his own legal troubles.

135. As described earlier, 'favorable evidence' under Brady includes evidence that impeaches the prosecution's theory or witnesses. Bagley, 473 U.S. at 676 (Brady's disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); Napue, 360 U.S. at 269 ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); see also Wilson v. Beard, 2006 WL 2346277, *17 (E.D. Pa. 2006) (Padova, J.) (finding that the prosecution's failure to disclose impeachment evidence violated Brady and its

progeny). The failure to disclose the above-described evidence where, as here, the prosecution was aware that it would ultimately seek to admit Campbell's preliminary hearing testimony violated Petitioner's federal due process rights as well as his federal rights to present a defense, cross-examination and confrontation.

136. Moreover, the prosecution's patently false representation to the court that it had provided the defense with "everything that Mr. Campbell said prior to the preliminary hearing," further denied Petitioner of his Sixth, Eighth and Fourteenth Amendment rights. It is clearly established federal constitutional law that the "State's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935). Here, the state sought, and obtained the admission of the preliminary hearing testimony on the basis of the prosecution's material misleading representation to the court.

137. There was no physical evidence connecting Petitioner to any of the shootings. Campbell was one of only two witnesses from the Todd and Pat's Bar incident who identified Petitioner as the shooter. Thus, prejudice/materiality is demonstrated and relief is required.

138.    Finally, counsel was ineffective for a number of reasons. First, counsel failed to raise the prosecution's failure to disclose the overwhelming evidence directly contradicting the veracity, reliability and credibility of Campbell's preliminary hearing testimony despite the prosecution's clear knowledge that it would ultimately seek to admit those notes of testimony at trial when counsel argued that the defense did not have the required full and fair opportunity to cross-examine Campbell. Nor did counsel raise the prosecution's blatant misrepresentation to the court that it had disclosed "everything Mr. Campbell said prior to the preliminary hearing." In addition, as described previously, see Claim I, counsel failed to present the evidence described above that directly disputed Campbell's veracity, reliability and credibility following the court's order admitting those notes of testimony.

139.    In short, counsel did little or nothing to challenge the admissibility and the reliability of Campbell's preliminary hearing testimony, although there was a plethora of evidence available at the time of trial. Counsel's performance was deficient. As Campbell was only one of two witnesses connecting Petitioner to the Todd and Pat's Bar shooting, and as there was absolutely no physical evidence connecting Petitioner to any of these shootings, prejudice is demonstrated and relief is required.

**CLAIM III.   PETITIONER WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF**

### THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

140.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

141.   As described below, the relationship between Petitioner and appointed counsel was, at best contentious, and from at least January, 2003 up until and including the trial, that relationship had degenerated to a complete breakdown in communications to the point that Petitioner had no confidence in counsel's performance and counsel engaged in conduct that was actually harmful to Petitioner's defense.

142.   As a result of the complete breakdown in the attorney/client relationship, counsel's palpable animosity towards Petitioner, and counsel's failure to conduct the constitutionally required investigation and development of evidence of his innocence, Petitioner requested that the court appoint new counsel.  When it became obvious in January, 2003, that Petitioner's complaints about his counsel would go unheeded, Petitioner began attempting to hire private counsel, Attorney Samuel Stretton.  While his family attempted to obtain the necessary funds, the relationship between Petitioner and appointed counsel continued to degenerate to the point that counsel was making comments harmful to Petitioner and his defense and Petitioner lost all confidence that counsel would aggressively advocate on his behalf.  After struggling with the

decision of proceeding *pro se* when it became evident that Petitioner's choice was to proceed with ineffective counsel or no counsel at all, Petitioner ultimately decided that he was incapable of marshaling his defense in this capital prosecution.

143. Petitioner's family was finally able to obtain the funding to retain Attorney Stretton in late April, 2003. Mr. Stretton filed his entry of appearance and requested a continuance. When the trial court denied a continuance, Attorney Stretton asked whether or not the court would consider selecting the jury and then recess to permit retained counsel to adequately prepare for the capital prosecution. The court refused to rule on that request prior to the start of jury selection. Thus, retained counsel was in the unenviable position of entering his appearance and beginning a capital trial without any assurances that he would be provided the required time to properly prepare. Not surprising, counsel elected to refrain from participating.

144. As described below, the trial court's denial of Petitioner's request to appoint new counsel was fundamentally flawed and violated the Sixth, Eighth and Fourteenth Amendments for a number of reasons. First, contrary to the trial court's determination, the relationship between Petitioner and counsel had degenerated to the point that Petitioner was denied his federal right to effective assistance of counsel as required by the Sixth, Eighth and Fourteenth Amendments. Second, contrary to the

59

court's and counsel's claims, the fault for the complete breakdown does not lie at Petitioner's feet and, instead, reflected animosity that began early on in the attorney/client relationship that was fueled by counsel's refusal to communicate with Petitioner, conduct the constitutionally required pretrial investigation, and failure to adequately consult with Petitioner on the critical issues in this capital case. Moreover, the "hearing" on Petitioner's request for new counsel failed to comply with the federal constitutional standards.

145. Finally, as described below and elsewhere in this *Petition*, Petitioner's sense that counsel was not performing effectively is born out by counsel's abject failure to conduct the constitutionally required investigation; utilize the evidence of innocence literally dropped in his lap; and, marshal the compelling legal arguments in favor of his client's defense. In short, what Petitioner feared is precisely what occurred, he was denied his right to counsel in violation of the Sixth, Eighth and Fourteenth Amendments.

146. In addition, the court further denied Petitioner his right to counsel by refusing to grant retained counsel's request for a short continuance or, in the alternative, a recess following jury selection. Despite the further evidence demonstrating the obvious total breakdown between Petitioner and appointed counsel, the court determined that it would be "full steam ahead," regardless of the

alternatives suggested by privately retained counsel. As described more fully below,

Petitioner was not dilatory in his efforts to obtain competent counsel. Instead, he

made extraordinary efforts to work within the schedule and procedures set up by the

court and counsel. As the court's conduct resulted in the denial of Petitioner's right

to counsel of his choice, for this reason as well, Petitioner was denied his Sixth

Amendment rights.

**A.    Introduction**

147.    Attorney Allen Welch was the court appointed counsel for Petitioner.

He was assisted during the trial by Attorney Anthony Thomas.[23] Throughout the time

Attorney Welch represented Petitioner, he also was running for District Attorney in

Perry County. The primary election was held on May 22, 2003. Thus, Welch was

laboring under a conflict of interest at the time or his representation.

148.    Samuel C. Stretton, Esquire, had been retained to represent Mr.

Randolph approximately one week before the trial. By letter sent on April 30, 2003,

and received by the Clerk of Court on May 1, 2003, Mr. Stretton entered his

appearance of record and filed a motion  for a continuance arising out of his recent

retention and conflicting prior obligations including:  attorney disciplinary trials and

---

[23] Mr. Thomas entered his appearance as second, 'standby' counsel shortly before trial.

61

a Commonwealth Court hearing scheduled during the following week.

149.   The case had been originally set for trial in December of 2002, but was continued at the request of Attorney Welch. NT 12/9/02 at 2 -4. Almost from the inception of Attorney Welch's appointment, it was obvious that the relationship between counsel and Petitioner was severely impaired and that counsel engaged in a pattern of "blaming the client" and "protecting himself from potential ineffectiveness claims," during pretrial proceedings before the trial court and in the presence of the prosecution.

150.   Indeed, during a pre-trial hearing on January 3, 2003, Petitioner complained that Welch was appointed in July and had been out to see Petitioner only once and that Welch was not preparing for trial. NT 1/3/03 at 6. Petitioner expressed concern that it appeared to him that counsel sought to pursue an insanity defense rather than his innocence. Id. When the court noted that Petitioner's requests may result in a continued date for the trial, Petitioner stated that he was aware of that and, so long as he received competent representation, was not concerned about the delay. Id. at 6-7.

151.   When Petitioner brought up the question of motions and why Welch had filed none, Welch responded defensively, notifying the court that Petitioner must be instructed that decisions on motions are the attorney's and that Petitioner's "choices"

were limited to a certain few rights. Id. at 8-9. Counsel further expressed concern for his position in a future PCRA proceeding raising his ineffectiveness. Id. at 8. Based on these exchanges, it's not surprising that Petitioner complained to the court that counsel was not acting in his (Petitioner's) interests. Id. at 6.

152.    Subsequent pretrial hearings did not go much better. On January 31, 2003, counsel acknowledged that he had failed to file an alibi notice, as Petitioner had requested. In the course of that admission, however, counsel also disclosed – in the presence of the court and the prosecution – that, in his opinion, the witnesses contradicted each other. NT 1/31/03 at 17.[24] Counsel also announced, in the presence of the court *and the prosecution*, discussions he had with Petitioner regarding Petitioner's refusal to present mitigation. NT 1/31/03 at 15. Most telling, counsel announced, again in the presence of the court and the prosecution, that he and Petitioner disagreed on motions and that, when he felt the requested motion had no merit, he provided Petitioner with a written description of his reasons for rejecting the motion in anticipation that Petitioner will "come in yelling somewhere that I was ineffective for not doing it." NT 1/31/03 at 16. Thus the mantra of protecting himself

---

[24] Putting the disclosure of privileged information aside, in light of subsequent admissions by counsel regarding his lack of investigation of alibi witnesses, see *infra*, it is, at the least, questionable, that counsel was in any position to make judgments about witnesses that he has not even interviewed.

for future ineffectiveness claims that began in the prior pretrial hearing continued.

153. Counsel noted that he was requesting funds for an investigator during this pretrial conference. Id. at 12. Two months later, however, on March 27, 2003, counsel notified the court that he was still unable to obtain approval for investigative funds. During the course of that exchange, counsel noted that in his experience, an investigator was necessary because in a capital case, counsel should not simply "accept everything that appears in the police report." NT 3/27/03 at 11. He further noted that it was necessary to interview every witness in the case. Id. at 12. Although counsel ultimately obtained funds for an investigator, he subsequently acknowledged that he never utilized these resources, despite Petitioner's repeated requests that he develop alibi and other evidence supporting his innocence. NT 9/5/03 at 16.[25]

154. It was during the 3/27/03 pretrial hearing that the breakdown in the

---

[25] Once again, counsel blamed Petitioner for his failure to utilize the investigative funds, claiming that, because the information Petitioner provided to counsel did not glean any results, he saw no need to conduct an independent investigation. NT 9/5/03 at 16. Apparently, in counsel's view, the need to test the prosecution's case counsel so vehemently argued as a basis for the need for the investigative funds evaporated. As described elsewhere, see Claim IV, counsel remains under a constitutional duty to conduct an adequate investigation. That obligation does not rise or fall on the perceived lack of cooperation of his client. Moreover, as described throughout this *Petition*, the evidence demonstrating Petitioner's innocence existed, was available and did not rise or fall on Petitioner's information. See Claim I.

communication, trust and relationship between Petitioner and counsel became palpable. Petitioner expressed his frustration with counsel's failure to communicate once again, noting that he was not even aware that counsel had filed pretrial motions. NT 3/27/03 at 34.

155. At one point in the exchange, Petitioner expressed his exasperation, asking whether he, the defendant, was permitted to participate in his defense. <u>Id.</u> Although the court assured Petitioner that he was, counsel's response to Petitioner's complaint about counsel's failure to communicate with him speaks volumes:

> I haven't gone out and I haven't spent hours with Sam because frankly, Your Honor, until I've gotten an investigator, that's not getting me anything. Research and preparing the motions is and that's - what I've been working on.

NT 3/27/02 at 34.

156. Following a disagreement over whether or not Petitioner could do research, counsel responded with "If you want to do your research, you can do your research, but I'm doing the research in this case." NT 3/27/03 at 35. It is at that point that Petitioner requested to proceed *pro se*. <u>Id.</u> The court initially summarily denied his request. After the prosecution noted that a colloquy was required, Petitioner stated: "I want to go *pro se* for the record. I'm being forced to go *pro se*. I'll go *pro se*." <u>Id.</u> The court ultimately told Petitioner that he should file a written petition to

65

proceed *pro se* and that the court would hold a hearing on that prior to trial.  In response, Petitioner once again stated: "We can't even agree on how to proceed to trial. I told you that January 3rd." Id. at 40.

157.   On April 3, 2003, Petitioner told the court that he did not want to proceed *pro se* but that he was seeking new counsel on the basis of his current counsel's deficiencies. NT 4/3/03 at 3. The court summarily denied that motion and refused to consider Petitioner's complaints about counsel's conduct, informing Petitioner that he can raise counsel's ineffectiveness later. Id. at 4-5.  When it became clear that his request for new counsel was denied, Petitioner began asking the court about the circumstances in which he would be permitted to proceed *pro se*. The exchange between the court and counsel demonstrates Petitioner's woeful lack of understanding as well as his frustration over the circumstances leading up to the hearing. Id. at 5-9.

158.   When the court finally told Petitioner that, in its view, it was Petitioner who was "pushing things back," Petitioner apologized and replied: "My whole thing was Mr. Welch's performance." Id. at 9.  When the court defended counsel's performance up until that point, Petitioner once again noted counsel's failure to file alibi notice.

159.   What followed was an exchange between Petitioner and the court that

reflected the court's apparent agreement with counsel's mantra, that it was Petitioner's fault that counsel failed to conduct the required investigation. Petitioner explained that he was at work at the time of the Todd and Pat's Bar shooting, that the witnesses existed to demonstrate that, and that counsel appeared to be focusing on the alibi for the other incidents.[26] When the court asked Petitioner if he had given the names and addresses to counsel, Petitioner once again expressed his frustration that counsel had not been out to see him. The court then chastised Petitioner, telling him that he could provide the names without a visit to which Petitioner responded that he had attempted to contact counsel through his counselor but was unsuccessful. At that point the court directed Petitioner to give counsel the names and addresses and noted that it concluded that Petitioner was, in the court's view, incredible.[27] NT 4/3/03 at 9-10.

160.    As described more fully elsewhere, Petitioner's alibi was that he was in the bar that his family owned. There were a number of "regulars" that were at the bar on the night of the Todd and Pat's shooting. The bar remained open following

---

[26] As the record of trial demonstrates, Petitioner was not far off the mark. See Claim IV.

[27] Notably, during this exchange, the court noted that there were names of witnesses reflected in the preliminary hearing. NT 4/3/03 at 10. Of course, those names were available to counsel as well as Petitioner.

Petitioner's arrest in these matters. At no time did counsel – or the appointed investigator – ever simply go to the bar to find out who was present when the shooting occurred. Nor did counsel – or the appointed investigator – ever interview Petitioner's mother or the other bar employees in person.[28] Thus, the court's and counsel's attempts to blame Petitioner aside, there was no question that counsel failed in his constitutional obligation to conduct an adequate investigation and counsel's failure was apparent even during this pretrial hearing.

161. In the next seven transcript pages, the exchange between the court and Petitioner demonstrates that Petitioner was ambivalent about proceeding *pro se* and that his true concern was the inadequate representation he had been receiving from counsel. After a recess and further exchange between Petitioner and the court regarding the conditions of proceeding *pro se*, Petitioner informed the court that he did not wish to proceed without counsel. NT 4/3/03 at 19.

162. Petitioner retained Samuel C. Stretton, Esquire during the last week of April, 2003. Mr. Stretton entered his appearance on May 1, 2003 and filed a motion for continuance. During the hearing (teleconference) on the motion to continue, Attorney Stretton informed the court that he had received communications from

---

[28] Indeed, even now, after the bar has been closed, current counsel have been able to locate bar patrons who verify Petitioner's defense that he was at work at the time of the shooting. See Claim IV.

Petitioner and his family as early as January 26, 2003. Petitioner's ability to retain Attorney Stretton was dependent on his mother's ability to sell the family bar. Although the family thought the sale would occur in February or March of 2003, it did not, and, as a result, the family was unable to obtain the funding to retain Attorney Stretton until the last week of April. NT 5/1/03 at 8-9.

163.   Attorney Stretton advised the court that Petitioner made it clear that his relationship with Welch was absolutely broken down and he no longer had confidence in appointed counsel. NT 5/1/03 at 9. Attorney Stretton noted his primary reason for requesting the continuance was that he was just retained and the relationship between Mr. Welch and Petitioner had broken down. NT 5/1/03at 3-5. Attorney Stretton also advised the court that Petitioner indicated his intent to cooperate with him (Attorney Stretton) in presenting mitigation evidence if the death penalty phase was reached and that Petitioner would also cooperate with defense experts. NT 5/1/03 at 11-12.

164.   Petitioner then advised the court that he never refused to submit to expert examinations but that he did not want to work with Mr. Welch. Petitioner further indicated that he wanted to work with Mr. Stretton and felt comfortable doing so. NT 5/1/03 at 13. What followed was proof of what Attorney Stretton had described:  that the relationship between Petitioner and appointed counsel had

completely broken down. Welch claimed that no alibi notice had been filed because Petitioner's family would not help him. NT 5/1/03 at 14. Petitioner contradicted counsel's characterization and insisted that he had given Welch the alibi information months before. Id.[29] Welch and Petitioner then argued about whether or not Petitioner was cooperating. Mr. Randolph then got into an argument on the record where Mr. Welch stated Mr. Randolph was not cooperating. Petitioner denied that he was uncooperative, but did note that he believed that Welch sought to coerce Petitioner into pleading insanity. NT 5/1/03 at 17-18.

165.   When it became clear that the court would deny the request for a continuance, Attorney Stretton asked the Court if it would consider a recess after jury selection to give him the time to adequately prepare. The court refused to make that decision. NT 5/1/03 at 19. As a result, Attorney Stretton advised the court that he was reluctant to come into the case unprepared. Id. at 20. Attorney Stretton again advised the Court he had a disciplinary hearing Monday, May 5, 2003 and attorney disciplinary trials took priority. He noted he also had a scheduled Commonwealth Court hearing and a second attorney disciplinary trial on Wednesday. Id. at 21.

---

[29] Once again, Welch began the mantra that it's Petitioner and his family's fault that counsel had failed to conduct the constitutionally required investigation. As described elsewhere, regardless of the cooperation or non-cooperation of Petitioner or the family, evidence of Petitioner's innocence and alibi were readily available at the time of trial. See Claim I; Claim II; Claim IV.

70

166.   The court denied the requested continuance and pressed forward without Attorney Stretton.  During the beginning of trial and jury selection, on May 5, 2003, Mr. Chardo indicated he received a  telephone call from Attorney Stretton that he (Stretton) did not have the discovery material on file and could not be prepared since he had not received discovery.  NT 5/5/03 at 3.  The court indicated that the case was going to go forward with or without Attorney Stretton.  Id. at 7.  Mr. Chardo again indicated Attorney Stretton had called him and told him he could not get the discovery from Mr. Welch and, as a result, could not be prepared without the discovery.  Id. at 8.  Attorney Thomas also informed the court that Attorney Stretton said he would be willing to participate and select a jury, but was not available that morning.  Again, the court denied any delay.  Id. at 9.  Even Mr. Welch requested that the Court reconsider, and allow Attorney Stretton to enter and continue the case:

> I think, as I told you privately this morning, I think it is an appropriate request given the fact that I am court appointed, that I have at this point absolutely at this point a complete breakdown of communication with my client, which is largely why Mr. Thomas is here, so someone . . . he acts as a translator for us I guess is the best way to put it.  It is a very difficult situation.  And I think having Mr. Stretton there weighing any delay that would accrue, I just think it is a mistake on the part of the Court.

NT 5/5/03 at 11.  Nevertheless, the court refused and Petitioner was forced to proceed with appointed counsel.

71

1.   *The failure to appoint different counsel where it was apparent that the relationship between Petitioner and appointed counsel had completely broken down, that counsel was ineffective, and where counsel was laboring under a conflict of interest denied Petitioner his Sixth, Eighth and Fourteenth Amendment rights.*

167.   The Sixth Amendment entitles a defendant to effective representation, unfettered by any conflict of interest or irreconcilable differences. Strickland v. Washington, 466 U. S. 668, 686 (1984) (right to effective assistance of counsel); Holloway v. Arkansas, 435 U. S. 474, 481-82 (1978) (right to conflict-free counsel). Thus, while the right to counsel does not guarantee an accused appointment of counsel of choice, he is entitled to effective representation, unfettered by any irreconcilable differences or conflict of interest. Accordingly, an accused is entitled to appointment of counsel may reject assigned counsel and have new counsel appointed "for good cause shown."[30]

168.   When a defendant requests new counsel because of ineffective assistance of counsel or irreconcilable differences, the court must hold a careful and complete hearing regarding the allegations in order to ensure the Sixth Amendment right to

---

[30]   E.g. United States v. Young, 482 F.2d 993, 995 (5th Cir. 1973); United States v. Welty, 674 F. 2d 185, 187 (3d Cir. 1982); Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985); United States v. Allen, 789 F. 2d 90 (1st Cir. 1986).

counsel.[31] In cases where the counsel in question takes an adversarial or antagonistic

position against the defendant, appointment of counsel for purposes of conducting

that hearing is required. See United States v. Wadsworth, 830 F.2d 1500 (9th Cir.

1987); United States v. Weaver, 882 F.2d 1128, 1143, n.9 (7th Cir. 1989).

169.   Despite the existence of serious questions of a conflict of interest,

ineffective assistance of counsel and irreconcilable attorney-client differences, the

trial court did not hold a hearing to consider whether new counsel should be

appointed.  Nor did the court appoint counsel to represent Petitioner in this inquiry,

although the record clearly shows that -- during the limited and insufficient inquiry

conducted by the court -- Petitioner's counsel shifted from the role of advocate to that

of adversary.  Petitioner was thereby denied his federal constitutional rights to due

process and effective assistance of counsel.

170.   Indeed, as described above, during pretrial proceedings, Petitioner

repeatedly requested new counsel, alleging that counsel was ineffective and that there

was no working attorney-client relationship.  Counsel several times acknowledged

---

[31]   Brown v. Craven, 424 F.2d 1166, 1169-1170 (9th Cir. 1970); Sawicki v.
Johnson, 475 F.2d 183, 184 (6th Cir. 1973); United States v. Welty, 674 F.2d 185,
187 (3d Cir. 1982); United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986); McMahon
v. Fulcomer, 821 F.2d 934. 942 (3d Cir. 1987); United States v. D'Amore, 56 F.3d
1202,1204 (9th Cir. 1995); United States v. Moore, 159 F.3d 1154, 1158 (9th Cir.
1998).

facts supporting Petitioner's view that he was unprepared and agreed that the attorney-client relationship had deteriorated. Counsel, however, did not request a hearing on Petitioner's allegations, did not request that new counsel be appointed to represent Petitioner at such a hearing, and did not otherwise make any legal argument as to why such steps were needed to adequately protect Petitioner's rights.

171. Thus, it is clear that, by the time the trial began, the attorney-client relationship was so shattered that failure to provide new counsel denied Petitioner his federal rights to due process and counsel. Petitioner had no faith that his attorney was prepared to try his capital case, that counsel would endeavor to become prepared, or, that counsel was in any way working in Petitioner's interests. Throughout the pretrial proceedings, Petitioner repeatedly and consistently expressed his doubts about counsel's performance.

172. In short, Petitioner "was forced into a trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate." Brown v. Craven, 424 F.2d at 1169.

173. Moreover, this was not simply a matter of a lack of communication. The disagreements between counsel and Petitioner went to the very core of the constitutional right to counsel. Counsel acknowledged that the attorney/client

74

relationship had disintegrated before trial. Indeed, the record establishes that the already damaged relationship elevated from irreconcilable differences to open hostility and a complete conflict of interest. Communication between Petitioner and counsel had become, at best, disparaging. Petitioner was voicing his objections to counsel at every available opportunity. Counsel, on the other hand, felt compelled to make representations to the court which served to Petitioner's detriment. Under these circumstances, it can hardly be said that forcing Petitioner to stand trial with this lawyer preserved Petitioner's rights to due process, a fair trial, or effective assistance of counsel.

174. Similarly, the trial court was obligated to conduct a thorough and adequate hearing to explore the bases for Petitioner's allegations. In order to pass constitutional muster, the court must conduct a probing inquiry into the basis for the objections to present counsel and withhold any ruling until these reasons are made known. McMahon, 821 F.3d at 942. In short, the court must engage in a careful inquiry sufficient to allow the court to "understand the extent of the breakdown." Moore, 159 F.3d at 1160. The court is not relieved of its duty to make such a careful inquiry even when it suspects that the request for change of counsel is motivated by improper considerations. See McMahon, 821 F.2d at 942 ("Even when the trial judge suspects that the defendant's contentions are disingenuous, and motives

impure, a thorough and searching inquiry is required")

175.    While the record reflects that the trial court "heard" some of Petitioner's complaints, there was no "hearing" in a constitutional sense in which both counsel and Petitioner aired their views and responded to their respective claims. Instead, the court curried favor with counsel's representations and views – including those representations that served to Petitioner's detriment – each time Petitioner objected to trial counsel's conduct and effectiveness.    In order to conform with due process, a hearing must necessarily include presence of the parties and a reasonable opportunity to be heard. Powell v. Alabama, 287 U.S. 45, 67 (1932); Armstrong v. Manzo, 380 U.S. 545, 550 (1948). Neither occurred in Petitioner's case. Thus the trial court's determination of this important matter did not comport with due process standards.

176.    Moreover, when Petitioner raised his complaints about counsel's performance, appointed counsel responded by advocating against his client.    The Sixth Amendment right to counsel requires that appointed counsel "owes the client a duty of loyalty." Frazer v. United States, 18 F.3d 778 (9th Cir. 1994). Indeed, counsel's loyalty to his client is "perhaps the most basic of counsel's duties." Strickland, 466 U.S. at 692. Here, however, Petitioner's own counsel changed from advocate to adversary in violation of Petitioner's federal constitutional rights.

177.   It is well-settled that the right to counsel attaches at all "critical stages" of the proceedings. E.g., Coleman v. Alabama, 399 U.S. 1, 6 (1970). A proceeding involving a defendant's right to counsel during trial is clearly "critical" to the proceedings. Where, as in the present case, trial counsel takes "an adversary and antagonistic position on a matter concerning his client's right to counsel and to prepare for trial," the court should appoint different counsel for purposes of determining the accused's request for new counsel. United States v. Wadsworth, 830 F.2d 1500, 1511 (9th Cir. 1987). Accordingly, in addition to depriving Petitioner of his right to an adequate hearing on his motion to change counsel, the lower court also erred when it deprived Petitioner of his right to counsel at the hearing on that motion.

178.   Finally, as described throughout this *Petition*, the court's failure to grant Petitioner's request for new counsel resulted in prejudice. Counsel's ineffectiveness permeated every aspect of Petitioner's capital trial. Thus, prejudice is established and, for each of these reasons, relief is required.

2.   *The trial court's denial of Petitioner's request for a short continuance or recess after jury selection to permit retained counsel to prepare violated Petitioner's right to retained counsel.*

179.   As the United States Supreme Court recently re-affirmed, included within the Sixth Amendment right to counsel is the right of a defendant who does require appointed counsel to choose who will represent him. United States v.

Gonzales-Lopez, 126 S. Ct. 2557, 2561 (2006) (citing Wheat v. United States, 486

U.S. 153 (1988)).  Where the Sixth Amendment right to counsel of choice has been

denied, prejudice is presumed. Id. 126 S.Ct. at 2563.

180.  As described above, Petitioner began attempting to retain Attorney

Stretton in January, 2003.  Due to circumstances beyond his control, he was unable

to obtain the necessary funds until late-April. Moreover, Petitioner's retained counsel

did not ask for a lengthy continuance.  Instead, he requested either a short

continuance or a recess after the jury was selected in order to properly prepare.  Under

these circumstances, Petitioner was duly diligent and the court's denial of the short

continuance of brief recess denied Petitioner of his Sixth Amendment right to counsel

of his choice.

181.  While prejudice is presumed and, on the record, Petitioner has met his

burden entitling him to relief, even if Petitioner were required to prove prejudice, the

claims and allegations in this *Petition* more than satisfy that burden.  Accordingly, for

each of these reasons, relief is required.

### CLAIM IV.  PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

182.  The matters set forth in all other sections of this *Petition* are repeated and

realleged as if set forth entirely herein.

183.   As described previously, "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty." American Bar Association Standards for Criminal Justice, The Defense Function, § 4.1 (2d ed. 1980);[32] Strickland v. Washington, 466 U.S. 668, 691 (1984) (same); United States v. Bayne, 622 F.2d 66, 69 (3d Cir. 1980).[33] This duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." Williamson v. Ward, 110 F.3d 1508, 1514 (10th Cir. 1997). Counsel must do this investigation and preparation *significantly prior to the trial*.

184.   Also as described previously, counsel failed to conduct the constitutionally required investigation and, as a result, evidence of Petitioner's innocence was never presented to the jury. See Claim I. As described below, even the "defense" presented by counsel at trial was plagued by counsel's woeful lack of investigation and preparation.  Indeed, as a result of their inadequate preparation, counsel presented evidence that was actually harmful to the defense.  Relief is

---

[32]   The United States Supreme Court has long referred to the professional norms set forth in the ABA performance guidelines and standards "as 'guides to determining what is reasonable'" attorney conduct. Wiggins v. Smith, 539 U.S. 510, 524 (2003); Rompilla v. Beard, 545 U.S. 374, 387 (2005); Strickland v. Washington, 466 U.S. 688, 691 (1984).

[33]   See also Williams v. Taylor, 529 U.S. 362, 395 (2000).

required.

## A.   Counsel's failure to adequately investigate and develop Petitioner's alibi defense.

185.   As described previously, throughout the pretrial proceedings, Petitioner told the court, counsel and anyone else that would listen that, at the time of the Todd and Pat's shooting, Petitioner was working in the family bar and nowhere near the location of the crime. See Claim III. Also as described more fully elsewhere, counsel requested and received funding for an investigator, but failed to avail himself of those resources.

186.   Throughout the pretrial proceedings, counsel placed the blame for failing to develop the readily available alibi evidence on Petitioner's and Petitioner's family's failure to give counsel names and addresses.   However, counsel's constitutional obligation does not rise or fall on the information his client is able to provide. Instead, counsel is required to conduct a full and independent investigation.

187.   As Petitioner will demonstrate at an evidentiary hearing, counsel had very few face to face meetings with Petitioner. As of January, 2003, counsel had been to visit Petitioner in the jail only once. Following that, counsel claimed that he saw no need to visit Petitioner before an investigator was obtained. Even after counsel received that funding he did not meet with client in any meaningful manner

in order to obtain the necessary information to develop Petitioner's alibi defense, nor did he request that his investigator do so. Instead, counsel had various phone conversations with Petitioner and Petitioner's counsel that were brief and hardly comprehensive enough to develop an adequate defense.

188.   Indeed, Petitioner's alibi was simple: he was at work in the family bar at the time of the murders. The bar had regular patrons whom Petitioner and his family knew by nicknames or first names only. The bar remained open after Petitioner's arrest. Yet, counsel did not go to the bar to speak with the bar patrons or the employees, nor did counsel send the appointed investigator to do that. Instead, counsel began a mantra of "client must give me names and addresses" and continued that mantra up until and including the time of trial.

189.   Counsel's failure to take even the most basic steps to properly and adequately investigate and develop Petitioner's alibi defense constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

190.   Undersigned counsel has conducted the constitutionally required investigation and, even though the bar has since closed, has located witnesses, available at the time of Petitioner's trial, who will testify that Petitioner was at the bar during the critical times on September 19th. Counsel's failure to conduct the required investigation and presentation of these witnesses constitutes prejudicially deficient

performance in violation of Petitioner's Sixth, Eighth and Fourteenth Amendments rights.

191. Moreover, even those witnesses that counsel did obtain and present were woefully unprepared and fodder for the prosecution's traps. See NT Vol. VI at 40-46.

192. Nor did counsel adequately consult with and prepare Petitioner for his testimony. Indeed, by that point in the trial, the attorney/client relationship had broken down to the point that there were little, if any, meaningful discussions on the presentation of the defense. By the time Petitioner took the stand, he was virtually alone.

193. For this reason as well, counsel's performance was prejudicially deficient in violation of the Sixth, Eighth and Fourteenth Amendments.

**B.    Counsel's Ineffective Presentation of Witnesses Who Provided Testimony Harmful to the Defense.**

194. In addition to inadequately and ineffectively failing to investigate and develop evidence supporting Petitioner's alibi defense, as described above, and disputing the prosecution's theory and evidence, as described in Claim I, counsel also presented witness evidence that was actually harmful to the defense.

195. It was the defense theory that Petitioner was not present on any of the dates of the three shootings. Counsel cross-examined the prosecution witnesses on

their ability to observe and identify the perpetrators in all three incidents. The prosecution witnesses, specifically Gary Waters and Syreeta Clayton testified that the perpetrator in the McClay Street shooting drove a blue station wagon and that Petitioner was in the car. The defense presented witnesses who described the car as red (matching the description of the car used by Quendell Oliver, see Claim I).

196. Despite counsel's defense theory that the car was not a blue station wagon as Waters and Clayton claimed and that Petitioner was not in the vicinity of the McClay Street shooting, counsel also presented Robert Peterson. On direct Peterson described various gun deals he had made with Jerome "Stony" Britton at various undetermined times prior to the shootings. Presumably, counsel intended to then argue that it was likely "Stony" who had committed the shootings.

197. The problem with this testimony, of course, was that Mr. Peterson had given a statement to the police on March 6, 2002, indicating that he saw Petitioner in a blue station wagon with "Stony" and Shariff Clayton in the vicinity of McClay Street on the date of the McClay Street Shooting. Thus, counsel elected to present a witness who gave, at best, weak evidence supporting the defense theory and also gave corroboration for the very witnesses counsel claimed were either lying or mistaken about their identification of Petitioner as the perpetrator in the McClay Street Shooting. Not surprising, the prosecution capitalized on this testimony in

83

closing.  See NT Vol. VI at 89-90.

198.  As Peterson's statement was provided in the pretrial discovery, there is no question that counsel was aware that he had told the police he saw Petitioner in the very car Waters and Clayton claimed contained the shooter on the very day that the shootings occurred.  Nor could counsel have any reasonable strategy for presenting a witness counsel knew would provide harmful testimony.  Counsel's presentation of this testimony constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. See Freeman v. Class, 95 F.3d 639, 642-32 (8th Cir. 1996) (counsel ineffective for presenting evidence that his own client stole a police car); Berryman v. Morton, 100 F.3d 1089, 1100 (1996) (defense counsel in a rape trial ineffective for eliciting evidence that co-defendant was a suspect in a robbery/homicide investigation).

C.    Conclusion.

199.  As described above, counsel did little or nothing to adequately prepare Petitioner's defense.  Indeed, Petitioner's counsel's performance was so deficient "that counsel was not merely incompetent but inert." Childress v. Johnson, 103 F.3d 1221, 1228 (5th Cir. 1997). Moreover, prejudice is palpable. As a result of counsel's failure to conduct the constitutionally required investigation and preparation, the defense evidence was inadequate, ill-prepared, easily challenged and actually resulted

in the presentation of evidence supporting the prosecution's theory. The Petitioner has demonstrated prejudice and the denial of his Sixth, Eighth and Fourteenth Amendment rights. Relief is required.

**CLAIM V.   PETITIONER IS ENTITLED TO RELIEF BECAUSE THE COURT PRECLUDED PETITIONER AND HIS COUNSEL FROM BEING PRESENT DURING COMMUNICATIONS WITH THE JURY REGARDING POSSIBLE OUTSIDE INFLUENCES IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

200. The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

201. Prior to commencing trial, the court spoke with the jury, without counsel or Petitioner present, to determine whether or not jurors had been exposed to outside influences that would impair their ability to be fair and impartial. See NT Vol. IV at 4-5; id. at 97-103; NT Vol. V at 16-18. Counsel objected to the court's colloquies in the absence of counsel and Petitioner. The trial court overruled that objection.

202. Precluding Petitioner and his counsel from these proceedings to determine whether or not jurors were unduly influence or incapable of rendering a fair and impartial verdict violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights for a number of reasons. First, it violated Petitioner's due process rights to presence and an opportunity to be heard. Powell v. Alabama, 287 U.S. 45, 67 (1932); Armstrong v. Manzo, 380 U.S. 545, 550 (1948).

85

203.   Moreover, it is clearly established federal constitutional law that the right to counsel attaches at all "critical stages" of the proceedings. E.g., Coleman v. Alabama, 399 U.S. 1, 6 (1970).   There is no question that a hearing to determine potential juror bias or outside influence is a "critical stage" of the proceedings. Accordingly, precluding Petitioner and his counsel also violated Petitioner's right to counsel.

204.   Similarly, the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury. Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961).   Where a juror harbors prejudice against the defendant or in favor of the prosecution the impartiality of a jury is violated.[34]   In order to adequately protect the right to an impartial jury, there must be "an adequate voir dire to identify unqualified jurors" -- "[w]ithout an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."[35]   Accordingly, denying adequate voir dire violates the accused's rights to

---

[34]   E.g. Turner v. Murray, 476 U.S. 1 (1973) (court must allow voir dire on racial prejudice); Ristiano v. Ross, 424 U.S. 589, 596 (1976) (same); United States v. Evans, 917 F.2d 800, 809 (4th Cir. 1990) (court must allow voir dire on bias in favor of police officer testimony).

[35]   Morgan v. Illinois, 504 U.S. 719, 729-30 (1992) (citing Dennis v. United States, 339 U.S. 162, 171-172 (1950); Morford v. United States, 339 U.S. 258, 259

an impartial jury, due process, and effective assistance.

205. Moreover, the requirement of adequate voir dire takes on even greater importance in a capital case, because of the "the qualitative difference of death from all other punishments," <u>California v. Ramos</u>, 463 U.S. 992, 998-99 (1983), and because capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves,'" <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 340-41 n.7 (1985). Because of the heightened protections due capital defendants and the "unique opportunity [which] exists for bias to operate undetected," at capital sentencing, <u>King v. Lynaugh</u>, 828 F.2d 257, 259 (5th Cir. 1987), adequate voir dire of potential jurors becomes even more important.

206. By precluding Petitioner and his counsel from attending the morning proceedings wherein the court inquired about outside influence, the court deprived Petitioner of each of these fundamental rights. Moreover, as the record demonstrates, a number of jurors described exposure to various outside influences. <u>See e.g.</u> NT Vol. IV at 5; Vol. V at 16-17. Yet, counsel and Petitioner were deprived of the constitutionally required voir dire in order to ensure that, despite that exposure, the

---

(1950); and quoting <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 188 (1981)); <u>see also</u> <u>Ingber</u>, 516 Pa. at 2, 531 A.2d at 1102 (adequate voir dire" is crucial to the preservation of that right" to an impartial jury).

jurors would render a fair and impartial verdict.[36]

207.   Indeed, one juror, Juror Number 3, expressed concern about recognizing persons seated with Petitioner's family that the Juror had contact with as a result of her employment with Children and Youth.  The circumstances involved removing a child from the home and animosity directed towards that juror as a result of agency decisions.  NT Vol. IV at 97-103.  Although the court notified counsel of the issue, it nevertheless, conducted inquiries of that juror without the presence of counsel or Petitioner.  Id.  Thus, counsel was precluded from conducting voir dire of a juror that expressed concern as a result of her contacts with persons associated with Petitioner's family.  Under these circumstances, Petitioner has demonstrated prejudice and that the court's constitutional errors were not harmless.  Relief is required.

**CLAIM VI.   AS A RESULT OF COURT ERROR AND INEFFECTIVE ASSISTANCE OF COUNSEL, JURORS WHO WERE BIASED AND INCAPABLE OF RENDERING A FAIR AND IMPARTIAL VERDICT WERE NOT DISMISSED IN VIOLATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

208.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

209.   "It is well settled that the Sixth and Fourteenth Amendments guarantee

---

[36] That the trial court asked jurors who acknowledged exposure to press reports general questions about bias does not remedy the error.

a defendant on trial for his life the right to an impartial jury." <u>Ross v. Oklahoma</u>, 487

U.S. 81, 85 (1988); <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961) ("In essence, the right

to jury trial guarantees to the criminally accused a fair trial by a panel of impartial,

'indifferent' jurors"); <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 188 (1981)

(juror must "be able impartially to follow the court's instructions and evaluate the

evidence").  As Chief Justice Marshall noted over a century ago:

> The great value of the trial by jury certainly consists in its fairness and
> impartiality.  Those who most prize the institution, prize it because it
> furnishes a tribunal which may be expected to be uninfluenced by an
> undue bias of the mind.

<u>United States v. Burr</u>, 25 F. Cas. 49, 50 (1807).[37]  here a single juror harbors a

prejudice against the defendant or in favor of the prosecution, the impartiality of the

entire jury is compromised.  <u>Ross v. Oklahoma</u>, 487 U.S. 81, 85 (1988); <u>Irvin v.

Dowd</u>, 366 U.S. 717, 722 (1961); <u>Turner v. Murray</u>, 476 U.S. 28 (1986); <u>Ristaino v.

Ross</u>, 424 U.S. 589, 596 (1976); <u>United States v. Evans</u>, 917 F.2d 800, 809 (4th Cir.

---

[37] <u>See also</u>, <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961):

In the ultimate analysis, only the jury can strip a man of his liberty or his
life. In the language of Lord Coke, a juror must be as 'indifferent as he
stands unsworne.' Co.Litt. 155b. His verdict must be based upon the
evidence developed at the trial. Cf. Thompson v. City of Louisville, 362
U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654. This is true, regardless of the
heinousness of the crime charged, the apparent guilt of the offender or
the station in life which he occupies.

1990).[38]

210.    Bias may be actual or presumed.  Actual bias is demonstrated when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985) (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)).  <u>See also</u>, <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982); <u>United States v. Wood</u>, 299 U.S. 123, 133-34 (1936); <u>United States v. Torres</u>, 128 F.3d 38, 43 (2d Cir. 1997); <u>Hunley v. Godinez</u>, 975 F. 2d 316, 318 (7th Cir. 1992); <u>United States v. Nell</u>, 526 F.2d 1223, 1229 (5th Cir. 1976); <u>United States v. Haynes</u>, 398 F. 2d 980, 984-85 (2d Cir. 1968).  Where actual bias is at issue, due process is satisfied so long as the trial court conducts a probing inquiry into the nature of the bias, and the record supports the conclusion that the juror can set the beliefs or experiences aside and consider the matter on the basis of the evidence alone.  <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980)

---

[38] <u>See also</u>, <u>Simmons v. United States</u>, 142 U.S. 148, 154 (1891):

There can be no condition of things in which the necessity for the exercise of [the power to discharge a jury] is more manifest, in order to prevent the defeat of the ends of public justice, than when it is made to appear to the court that, either by reason of facts existing when the jurors were sworn, but not then disclosed or known to the court, or by reason of outside influences brought to bear on the jury pending the trial, the jurors, or any of them, are subject to such bias or prejudice as not to stand impartial between the government and the accused.

("unless [the juror's] views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," due process is not violated); <u>Smith v. Phillips</u>, 455 U.S. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it").

211.    Where, however, a juror has a close relationship with a participant or the issues in the trial, there exists a "conclusive presumption of implied bias." <u>Smith v. Phillips</u>, 455 U.S. at 222 (O'Connor, J. concurring).  Under these circumstances, regardless of the existence of an actual bias, the juror must be struck as a matter of law in order to preserve a defendant's rights to due process and a fair and impartial jury. <u>E.g.</u> <u>Leonard v. United States</u>, 378 U.S. 544 (1964) (per curiam) (automatic disqualification required where prospective jurors heard the defendant's guilty verdict in another trial); <u>Taylor v. Louisiana</u>, 379 U.S. 466, 473-74 (1965) (juror's association with deputy sheriffs who were also key prosecution witnesses deprived the defendant of his rights to due process and a fair and impartial jury).[39]

212.    The rationale behind this rule is well-settled.  A juror "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from

---

[39] <u>See also</u>, <u>Gonzales v. Beto</u>, 405 U.S. 1052 (1972) (*Per curiam* reversal on the basis of <u>Taylor v. Louisiana</u> where the sheriff who was the key prosecution witness also served as bailiff during the trial); <u>Tumey v. Ohio</u>, 273 U.S. 510, 523 (1927) (mayor who received benefit of fines and costs disqualified from determining defendant's guilt in trial for unlawfully possessing intoxicating liquors).

serving on the jury because it suspects prejudice, because in general persons in a similar situation would feel prejudice" United States v. Burr, 25 F. Cas. 49, 50 (1807). Indeed, as Justice O'Connor aptly recognized, "partly because a juror may have an interest in concealing his own bias and partly because the juror may be unaware of it" a finding of implied bias is justified in order to avoid a miscarriage of justice where a juror has a close relationship with the participants or the issues in a trial. Smith v. Phillips, 455 U.S. at 221-22 (O'Connor, J. concurring). See also, Irvin v. Dowd, 366 U.S. at 728 (recognizing that under certain circumstances, the "psychological impact requiring [a declaration by the juror that he or she can be fair] before one's fellows is often its father" and, as a result, "such a statement of impartiality can be given little weight").

213. Finally, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." California v. Ramos, 463 U.S. 992, 998-99 (1983). Capital juries are required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves'." Caldwell v. Mississippi, 472 U.S. 320, 340-341, n.7 (1985). Where a juror's bias is of the nature that it precludes him or her from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as

a basis for a sentence less than death the resulting verdict violated the Eighth and Fourteenth Amendments. Lockett v. Ohio, 438 U.S. 586, 604 (1978).

214. As described below, the court permitted a number of jurors to remain on the jury despite clear evidence of presumed and actual biases. Likewise, counsel was ineffective in failing to object to the court's failure to dismiss these jurors and, in failing to raise and litigate these claims at trial, during post-trial proceedings and on direct appeal. Relief is required.

**A.     The failure to dismiss Juror Number 3.**

215. After the trial began, Juror Number 3 notified the court that she had contact with persons associated with Petitioner's family, Roger and Marilyn Colbreth, through her employment at Children and Youth. The juror told the court (without counsel or Petitioner present) that she knew that their son was incarcerated and that the agency had determined that the Colbreth's were not appropriate care-givers for their son's child. The juror also told the court that Roger Colbreth was very angry about the agency's finding. NT Vol. IV at 98-100. When asked, the juror acknowledged that she had concerns because these individuals knew how to contact her. Id. at 101. Rather than requesting counsel and Petitioner's presence for purposes of conducting voir dire, the court merely asked the juror to "think about it over the weekend." Id. When the juror returned on Monday, she told the court, (this time in

the presence of counsel), that she thought she could be fair, but felt uncomfortable and that it made her feel uneasy. NT Vol. V at 5. Counsel failed to ask any questions of the juror. The court told the juror it would make a decision on dismissal at a later date. Id. at 5-6.

216.   Although not a direct participant in the trial, the juror's relationship with persons who were closely associated with Petitioner's family placed the inquiry in the presumed bias context of the constitutional inquiry. Nevertheless, the court failed to dismiss the juror in violation of Petitioner's Sixth, Eight and Fourteenth Amendment rights.

217.   Even if bias is not presumed, the juror's relationship with the Colbreths required dismissal. Although the juror said that she could be impartial, that was qualified with her fear and concerns arising out of the contentious relationship between her, her agency and the Colbreths. Thus, although she may have articulated the "buzzwords" every aspect of her answers bears against any conclusion that her determination would not be impacted and impaired. Accordingly, even under the actual bias standard, Petitioner has demonstrated that he was denied his Sixth, Eighth and Fourteenth Amendment rights.

218.   Moreover, counsel was ineffective for failing to pursue the concerns clearly expressed by this juror. Rather than clarifying what the juror meant when she

94

stated that she felt uncomfortable and uneasy, counsel remained silent.[40] Where, as here, the issue involved a juror's bias in a capital trial, counsel could have no reasonable strategic basis for failing to inquire further and object to the juror's remaining. Accordingly, counsel's conduct constituted prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Relief is required.

**B.    The failure to dismiss Juror Number 5.**

219. Juror Number 5 notified the court that she saw Petitioner in the hallway of the courthouse surrounded by guards. NT Vol. V at 7-12. Permitting the juror to observe Petitioner surrounded by guards denied him of his rights to a fair and reliable trial and jury because there is a danger that juror will perceive Petitioner as "bad," worthy of severe punishment or dangerous. See Holbrook v. Flynn, 475 U.S. 560, 568-569 (1986) ("In the presence of the jury, [the defendant] is ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man.").

220. As described elsewhere, see Claim VII, the taint does not end with this

---

[40] Of course, counsel's determination was hampered by the court's preclusion of counsel and Petitioner during the first inquiry where the juror described the nature of the contacts with the Colbreths and the animosity from Mr. Colbreth. See Claim VII.

juror. Contrary to the juror's assurances to the court, undersigned has learned that she disclosed her observations to the rest of the jury. Nevertheless, no inquiry was made of those jurors to determine whether or not their knowledge of Juror Number 5's observations impaired their ability to be fair and impartial.

221.    Moreover, the juror's lack of candor regarding her disclosure to the rest of the jury renders her assurance to the court that she can be impartial despite her observations incredible. For this reason as well, the court's failure to dismiss this juror violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

## C.    Counsel was Ineffective.

222.    Counsel's failure to raise these issues at trial, during post-trial proceedings and on direct appeal constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Counsel could have no reasonable strategic basis for failing to ensure that Petitioner's jury was fair and impartial. As the court's error in failing to dismiss these jurors goes to the heart of Petitioner's right to a fair trial and sentencing determination, prejudice is demonstrated and relief is required.

## CLAIM VII. AS A RESULT OF JUROR MISCONDUCT, PETITIONER'S FIRST, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED.

223.    The matters set forth in all other sections of this *Petition* are repeated and

realleged as if set forth entirely herein.

224. Clearly established Sixth and Fourteenth Amendment law "guarantee[s] a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961).

225. Similarly, federal due process has long required that trial courts ensure that jury verdicts are based only on the relevant evidence and the law, and not information received from outside sources. Chandler v. Florida, 449 U.S. 560, 575 (1981). The jury's exposure to improper influences from outside sources violates due process and is especially prejudicial because the jury's receipt of such information is not accompanied by procedural safeguards. Shepard v. Maxwell, 384 U.S. 333, 351 (1966); Marshall v. United States, 360 U.S. 310, 313 ( 1959).

226. "A juror is impartial if he or she can lay aside any previously formed 'impression or opinion as to the merits of the case' and can 'render a verdict based on the evidence presented in court.'" United States v. Polan, 970 F.2d 1280, 1284 (3d Cir.1992) (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)), cert. denied, 507 U.S. 953 (1993)); Kirk v. Raymark, 61 F.3d 147, 153 (3d Cir. 1995). However, the Third Circuit has made clear that "the [trial] court should not rely simply on the jurors' subjective assessments of their own impartiality." Kirk, 61 F.3d at 153; Waldorf v. Shuta, 3 F.3d 705, 710 (3d Cir. 1993) (district court relied too heavily on jurors'

assurances of impartiality); <u>Government of the Virgin Islands v. Dowling</u>, 814 F.2d

134, 139 (3d Cir.1987) (though a juror swears that he could set aside any opinion he

might hold and decide the case on the evidence, a juror's protestation of impartiality

should not be credited if other facts of record indicate to the contrary), aff'd, 493 U.S.

342 (1990).

227.   In this case, the jury's deliberations and verdicts were tainted with juror

misconduct and outside influences in violation of Petitioner's Sixth, Eighth and

Fourteenth Amendment rights.

228.   The first instance took place when Juror Number Five, disclosed that

she had seen Petitioner in the hallway surrounded by Sheriff's deputies. NT Vol. V

at 7-11. When queried as to whether this sighting of Petitioner in custody would

affect her ability to be fair and impartial as a juror, the juror answered in the negative.

The juror also assured the court that she had not told the other jurors about this

encounter. <u>Id.</u> at 9. The court and counsel took her at her word and did not question

the other jurors about their knowledge of this incident. In arguing against dismissal,

the prosecution expressed concern that the court's dismissal might result in depleting

the jury. NT Vol. V at 33.

229.   The court should have dismissed this juror for a number of reasons.

First, as described below, the juror was less than candid with the court when she told

the court that she had not informed other jurors of her sighting. Instead, she told the other members of the jury and they encouraged her to notify the court.

230. Moreover, regardless of the prosecution's concern that because they "may lose a couple of other jurors," he "d[id]n't want to end up with less than 12," NT Vol. V at 33, Petitioner is still entitled to a fair and impartial jury. Violations of Petitioner's right to a fair trial and due process are not overcome by concerns for losing too many jurors for cause. At the very least, the court should have conducted further inquiry into the potential prejudicial effect of seeing Petitioner in custody may have had on Juror Number Five.

231. Aside from the fact that seeing Petitioner in custody, surrounded on all sides by Sheriff's deputies like a dangerous criminal was inherently prejudicial and violative of his Sixth and Fourteenth Amendment rights, Petitioner was further prejudiced because, contrary to the juror's response in chambers, she did, in fact, tell other jurors about the incident. Indeed, as a result of that disclosure, the other jurors encouraged Juror Number 5 to notify the court.

232. Putting aside for the moment any motivations for the lack of candor, the result is that the rest of the jury was not colloquied on this extraneous information and its impact on the rest of the jurors' ability to be fair and impartial in violation of Petitioner's Sixth, Eighth and Fourteenth Amendments.

233.   In addition, Petitioner will present testimony at an evidentiary hearing demonstrating that the jurors prayed during the deliberations, particularly during the sentencing deliberations. The Bible and Biblical law are extraneous, improper factors for the jury to consider.  Sandoval v. Calderon, 231 F.3d 1140, 1150-51 (9th Cir. 2000) (reference to Biblical law diverts the jury from careful focus on legitimate factors, in violation of the Eighth Amendment); Jones v. Kemp, 706 F. Supp. 1534, 1560 (N.D. Ga. 1989) ("Extraneous materials, whether they be dictionaries, law books, or Bibles, unless properly received in evidence, are not allowed in the jury room for use by a deliberating jury"); Ex parte Troha, 462 So. 2d 953 (Ala. 1984) (juror's consultation during course of trial with brother who was minister and provided juror with guidance and scripture references was misconduct that may have influenced verdict); State v. Harrington, 627 S.W. 2d 345, 350 (Tenn. 1981) (jury foreman's use of Biblical passages to support his arguments to other jurors in favor of death sentence was reversible error).

234.   "[R]eligious law as an additional factor for the jury's consideration... neither flows from the evidence or any legitimate inference to be drawn therefrom." Commonwealth v. Chambers, 528 Pa. 558, 586, 599 A.2d 630, 644 (1991), see also, Tanner v. United States, 483 U.S. 107 (1987).  Praying during deliberations is a classic example of extraneous information interfering with a jury's instructions from