the court.

235.    Thus for this reason as well, Petitioner was denied his Sixth, Eighth and Fourteenth Amendments.  Prior counsel's failure to object or request a mistrial or raise these issues at trial, during post-trial proceedings or on appeal constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.  Relief is required.

**CLAIM VIII.**        **PETITIONER IS ENTITLED TO A NEW SENTENCING PROCEEDING BECAUSE HIS WAIVER OF COUNSEL AT THE PENALTY-STAGE OF TRIAL WAS NOT KNOWING, VOLUNTARY, AND INTELLIGENT, IN VIOLATION OF HIS RIGHTS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

236.    The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

237.    The Sixth Amendment entitles a defendant to effective representation, unfettered by any conflict of interest or irreconcilable differences.  Strickland v. Washington, 466 U. S. 668, 686 (1984) (right to effective assistance of counsel); Holloway v. Arkansas, 435 U. S. 474, 481-82 (1978) (right to conflict-free counsel).

238.    Moreover, the duty of loyalty is "the most basic of counsel's duties." Strickland v. Washington, 466 U.S. 668, 692 (1984); Holloway v. Arkansas, 435 U. S. 474, 481-82 (1978); Government of Virgin Islands v. Zepp, 748 F.2d 125, 132 (3d Cir. 1984). "Counsel's function is to assist the defendant, and hence counsel owes the

client . . . a duty to avoid conflicts of interest." Strickland, 466 U.S. at 688 (citing Cuyler v. Sullivan, 446 U.S. 335, 346 (1980)). Indeed, controlling United States Supreme Court precedent has long-established that "[u]ndivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision." Von Moltke v. Gillies, 332 U.S. 708, 725 (1948).

239. Similarly, a defendant may not waive any constitutional right (including the right to counsel) unless the state can demonstrate that the relinquishment of the right is knowing and voluntary. Godinez v. Moran, 509 U.S. 389, 400-01(1993) ("In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary").

240. Moreover, in capital cases, "[b]ecause of [the] qualitative difference [between death and lesser punishments], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976). The Eighth Amendment also mandates *individualized* capital sentencing based upon a reasoned moral response to the personal culpability and the unique personal circumstances of the defendant. E.g., Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455

U.S. 104 (1982); <u>Sumner v. Shuman</u>, 483 U.S. 66 (1987).    The presentation and

consideration of mitigating evidence is a critical requirement to the constitutional

imposition of the death penalty. <u>Lockett</u>, 438 U.S. at 604 (citing <u>Woodson</u>, 428 U.S.

at 304).  For these reasons, any waiver of counsel or mitigation requires heightened

procedural safeguards.

241.  For the reasons described below, Petitioner's waiver of his right to

counsel was constitutionally invalid in violation of Petitioner's Sixth, Eighth and

Fourteenth Amendment rights.  To the extent that Petitioner waived mitigation, and

the record demonstrates that he did not, that waiver was similarly invalid in violation

of Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

**A.    Forcing Petitioner to chose between conflicted, ineffective counsel with whom there were unwavering irreconcilable attorney-client differences, and no counsel at all rendered Petitioner's waiver involuntary.**

242.  Where an accused is required to choose between proceeding *pro se* or

accepting conflicted counsel, unprepared counsel, or counsel with whom he has

irreconcilable differences, the waiver is not constitutionally voluntary. <u>See Culombe</u>

<u>v. Connecticut</u>, 367 U.S. 568, 602 (1961) (to be voluntary, waiver must be "the

product of an essentially free and unconstrained choice by its maker"); <u>Johnson v.</u>

<u>Zerbst</u>, 304 U.S. 456, 464 (1938) ("A waiver is ordinarily an intentional

relinquishment or abandonment of a known right or privilege.").  This is exactly the

scenario confronting Petitioner during his capital trial.

      *1.*     *Attorney Welch was laboring under a conflict of interest*

     243.    Throughout the time Attorney Welch represented Petitioner, he also was running for District Attorney in Perry County. The primary election was held on May 22, 2003. Thus, Welch was laboring under a conflict of interest at the time or his representation. A defendant's Sixth Amendment right to the effective assistance of counsel under <u>Strickland</u> is violated whenever a conflict of interest "adversely affect[s]" the representation. <u>Strickland</u>, 466 U.S. at 692 (quoting <u>Cuyler</u>, 446 U.S. at 350). As described below, that is precisely what occurred in this case.

      *2.*     *The disintegration of the attorney/client relationship*

     244.    As the record of the pretrial hearings demonstrates, the relationship between Petitioner and appointed counsel was, at best contentious and from, at least January, 2003 up until and including the trial, that relationship had degenerated to a complete breakdown in communications to the point that Petitioner had no confidence in counsel's performance and counsel engaged in conduct that was actually harmful to Petitioner's defense.

     245.    As the record demonstrates and as described elsewhere in this *Petition*, <u>see</u> Claim III, the breakdown in the relationship was the result of counsel's: refusal to meaningfully communicate with Petitioner; failure to conduct the constitutionally

required investigation and preparation; and, engage in a course of conduct intended to protect counsel to Petitioner's detriment.   During the January 3, 2003 pretrial conference,

- Petitioner complained (and counsel did not dispute) that counsel had been to see him only once since his appointment six months before, (NT 1/3/03 at 6);

- Petitioner noted, and counsel confirmed, that counsel told Petitioner that he took the appointment as a favor to the court, (id. at 11);

- Petitioner complained that he and counsel could not agree on how to proceed and that he believed his counsel was pursuing an insanity defense as opposed to his chosen defense that he was innocent, (id. at 6);[41]

- When Petitioner raised counsel's failure to file pretrial motions, counsel responded by informing Petitioner that his "choices" were limited to a certain few rights and noting his (counsel's ) concern for protecting his position for a future PCRA proceeding, (id. at 8-9);

- Petitioner expressed repeated concerns that counsel was not conducting the required investigation and preparation; that he believed that counsel was not protecting Petitioner's interests; and, that there was no way that he and counsel could reconcile their differences, (id. at 6, 16); and

- Petitioner became so frustrated that he inquired about proceeding *pro se*,

---

[41]   It is possible that Petitioner misunderstood counsel's bases for asking Petitioner to submit to psychiatric examinations and, as a result, believed counsel was pursuing an insanity defense.   Even if that were the case, however, it further substantiates the absence of meaningful communications between counsel and Petitioner.   Indeed, Petitioner told retained counsel that he would submit to mental health examinations and, in a later proceeding, denied refusing to cooperate with mental health evaluations. NT 5/1/03 at 11-13.

later rescinding that request noting that he "never did want to waive [his] lawyers. [He] never did want to do that," (id. at 25).

246.   During the January 31, 2003, conference,

•   Counsel acknowledged his failure to file alibi notice but offered as his defense his view that alibi witnesses he had interviewed were inconsistent, (NT 1/31/03 at 17);[42]

•   Counsel announced, in the presence of the court and the prosecution his conversations with Petitioner regarding presentation of mitigation, (id. at 15);

•   Counsel again expressed his desire to protect himself in the event that Petitioner raised his ineffectiveness in a later proceedings, (id. at at 16);

•   Counsel acknowledged that he had just recently sought funding for an investigator, (id. at 12).

247.   During the March 27, 2003 conference,

•   Counsel acknowledged he had still not obtained funding for an investigator, eight months after his appointment, (NT 3/27/03 at 11);[43]

•   Petitioner again expressed his frustration with counsel's lack of communication, noting that he was not aware that counsel had filed pretrial motions, (id. at 34);

•   Counsel acknowledged that he had not "gone out and . . . spent hours with [Petitioner] (id. at 35);

---

[42] In light of counsel's subsequent complaints that Petitioner failed to provide him with alibi witness names and addresses, the veracity of this statement is, at best, questionable.

[43] During post-trial proceedings, counsel acknowledged that he did not use the appointed investigator. NT 9/5/03 at 16.

- Counsel claimed an extensive conversation and consultation with Petitioner was not necessary for what he was presently working on (pretrial motions) and that such a meeting would not be fruitful until after the investigator was obtained, (id. at 34);

- Counsel diminished Petitioner's role and participation in the development of legal claims, telling Petitioner, "I'm doing the research in this case," (id. at 35);

- Petitioner again expressed his frustration with his and counsel's inability to agree on a how to proceed, (id. at 40);

- After yet another contentious exchange, Petitioner again stated that he wished to proceed *pro se*, stating that he was "being forced to go *pro se*," (id. at 35).

248.    During the hearing scheduled the following week to determine whether or not Petitioner would be permitted to proceed *pro se*,

- Petitioner informed the court that he did not wish to proceed *pro se* but that he was seeking appointment of new counsel on the basis of his current counsel's deficiencies and his failure to communicate with Petitioner, (NT 4/3/03 at 3-4);

- The court denied Petitioner's request and told Petitioner he could raise counsel's ineffectiveness later, (id. at 4-5);

- The court further told Petitioner that his choices were to proceed *pro se* or be represented by Attorney Welch, (id.);

- Backed into a corner, Petitioner decided to continue with Welch as his counsel, (id. at 14-19).

249.    At the next pre-trial conference on April 3, 2003, Petitioner again indicated his dissatisfaction with Welch and requested his counsel be changed. NT

4/3/03 at 3. The court again denied that request. Petitioner then complained that counsel's representation was deficient, explaining that Welch had failed to file a notice of alibi defense, id. at 3-4, and that Mr. Welch would not come to see him to discuss the case. Id. at 10. Petitioner repeated his desire to have someone other than Welch as counsel.

250. In the final pretrial proceeding, a phone conference between the court, Petitioner, Mr. Welch, the prosecution, and Samuel Stretton, Esquire,[44] Mr. Stretton advised the court that Petitioner had made it clear that his relationship with Welch was completely broken down and he no longer had confidence in his representation. NT 5/1/03 at 9. Mr. Stretton advised the court that Petitioner agreed to cooperate with him and allow the presentation of mitigating evidence if the death penalty phase was reached and that he would also cooperate with mental health experts. Id. at 11, 12. Petitioner advised the court that he never refused to submit to expert examinations but, instead, could not work with Welch. Id. at 13. On the morning of the first day of jury selection, the court noted that there was still no cooperation between Petitioner and Welch, but began the trial anyway. NT Vol. I at 13, 14.

3. *Counsel's Ineffective Failure to Conduct the Constitutionally Required*

---

[44] Mr. Stretton was the counsel who Petitioner retained to represent him but who was unable to proceed because the court denied Mr. Stretton a continuance. See Claim III, *supra*.

*Investigation and Preparation.*

251.    Had counsel conducted even a scintilla of investigation into Petitioner's

background, he would have learned of the plethora of evidence awaiting to be

presented in mitigation.[45]    Indeed, counsel was put on notice by the prosecution that

Petitioner had a juvenile record, yet counsel made no attempt whatsoever to obtain

Petitioner's juvenile files.  See Rompilla v. Beard, 545 U.S. 374, 379-386 (2005)

(counsel must make "reasonable effort" to obtain and review material when put on

notice by prosecution, regardless of whether client and family say no mitigation

exists).  Had counsel bothered to obtain these files, he would have learned of the

following significant evidence in mitigation:

- Petitioner's verbal reasoning skills fell within the borderline range;

- Petitioner had failing grades when attending public school but did excellent in the structured environment of Vision Quest and responded positively to structure and supervision;

- Petitioner is described in a psychological report as "a boy who frequently avoids reality in his thinking;"

- Petitioner was described as "immature," "silly," and "lacking self control," all of which are psychological buzzwords for impaired development;

- Petitioner was hospitalized twice between the ages 2-6 years because of

---

[45]    While counsel requested and was granted funding for an investigator, he
inexplicably failed to ever hire one.

seizures;

- Petitioner fell down the stairs as a young child, which was either the result of or a cause of his seizures;

- Petitioner took Phenobarbitol on a daily basis for several years to control his seizures;

- Petitioner's biological father was also prone to seizures and blackouts;

- Petitioner's biological father was incarcerated when Petitioner was twelve years old for the stabbing murder of Petitioner's step-grandfather in the family home and that this had a severe negative impact on Petitioner;

- Petitioner's mother left his biological father to escape the violence and abuse in the household; and

- Petitioner never accepted his stepfather.

252. Had counsel investigated, he also would have learned of Petitioner's abusive, violent, and chaotic childhood; the familial history of mental illness including bipolar disorder and schizophrenia; and, familial history of alcohol and drug abuse, which included a maternal aunt dying as the result of a cocaine overdose and Petitioner's own mother's bouts with addiction. Counsel would also have learned that, as a result of his dysfunctional upbringing and family history, Petitioner suffered from significant and severe cognitive, emotional and psychological disorders.

253. Nor can counsel rely on any perceived refusal on Petitioner's part to excuse his failure to conduct the constitutionally required investigation. Regardless

of whether or not Petitioner wanted counsel to present mitigating evidence (and there's no evidence that this was the case - the only evidence on the record is Petitioner's objection to counsel's presenting an "insanity" defense),[46] counsel still had an obligation to conduct a reasonable investigation. See Williams v. Taylor, 529 U.S. 362, 396 (2000) (citing ABA STANDARDS FOR CRIMINAL JUSTICE 4-4.1 cmt. at 4-55 (2d ed. 1980) for proposition that "trial counsel [in a capital case have  an] obligation to conduct a thorough investigation of the defendant's background," and concluding that defense counsel performed deficiently in failing to conduct a diligent investigation into his  client's background); see also ABA STANDARDS FOR CRIMINAL JUSTICE 10.7(A)(2) (revised ed. 2003) ("The investigation regarding penalty should be  conducted regardless of any statement by the  client that evidence bearing upon penalty is not to be collected or presented.").  As the above demonstrates, that investigation would have uncovered a wealth of mitigation.

> 4.  *Requiring Petitioner to Choose Between Proceeding Pro Se and Representation by Conflicted, Ineffective Counsel and Where the Attorney/Client Relationship was Irreversibly Impaired Violated*

---

[46] The record demonstrates that Petitioner did not refuse to present mitigation, but, instead, objected to an insanity defense. Retained counsel noted that Petitioner had agreed to the presentation of mitigation evidence and to cooperate with mental health experts. Moreover, Petitioner did not object when the judge instructed the jury to consider the age and "catchall" mitigating factor. Thus, Petitioner's decision was less a desire to forego mitigation as it was an impaired and involuntary decision to forego conflicted, ineffective counsel.

*Petitioner's Sixth, Eighth and Fourteenth Amendment Rights.*

254.   The waiver of counsel in this case was not voluntary because, in effect and in fact, that waiver presented nothing more than a "Hobson's choice" between proceeding *pro se* or accepting counsel who refused to investigate or prepare guilt or penalty stage defenses and who was laboring under a conflict of interest. Indeed, Petitioner's waiver of counsel was not the result of free will but instead the result of Petitioner's frustration with counsels' abject failure to investigate, prepare and present any viable guilt or penalty phase defenses, as well as his failure to communicate in even a minimal fashion with Petitioner in regards to his case.[47] The "decision," therefore, was no decision at all and the waiver of his right to counsel violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

**B.   Petitioner's Impairments Rendered His Waiver of His Right to Counsel Invalid.**

255.   Whether a waiver of a constitutional right is knowing and voluntary is judged against all of the facts and circumstances of a given case. Johnson v. Zerbst, 304 U.S. at 464 ("The determination of whether there has been an intelligent waiver of [constitutional rights] must depend, in each case, upon the particular facts and

---

[47] ABA Standard 10.5(C) also mandates that "[c]ounsel at all stages of the case should engage in a  continuing interactive dialogue with the client  concerning all matters that might reasonably be  expected to have a material impact on the case."

circumstances surrounding that case, including the background, experience, and conduct of the accused."). A waiver of rights is constitutionally valid only if, under the circumstances at the time of the waiver, "he had capacity to appreciate his position and make a *rational* choice with respect to continuing or abandoning [his rights] or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity." Rees v. Peyton, 384 U.S. 312, 314 (1966). Thus, consideration of the totality of the circumstances includes consideration of an individual's mental impairments and the impact of those impairments on the individual's ability to make a voluntary decision. Accord, United States v. Hollis, 569 F.2d 199, 207, n.13 (3d Cir. 1977) ("To say that it is essential that a guilty plea be voluntary is to presuppose that a defendant must be in control of his mental faculties and capable of an act of volition"); Wilkins v. Bowersox, 143 F.3d 1006, 1012 (8th Cir. 1998) ("the mental health of a defendant is also a relevant consideration in assessing whether a waiver of counsel was knowing, intelligent, and voluntary"); Shaffer v. Bowersox, 329 F.3d 637, 652 (8th Cir. 2003) (noting that failure to consider the impact of an individual's "mental disorders on his ability to make knowing and intelligent choices" was contrary to Godinez).[48]

---

[48] While the Supreme Court has upheld waivers offered by mentally ill defendants, it has done so only where the record demonstrates that those defendants' decisions were not the product of mental illness. See e.g., Gilmore v. Utah, 429 U.S.

256.   As described above, at the time of his waiver of his right to counsel,

Petitioner suffered from severe and debilitating cognitive, emotional and

psychological impairments arising out of his dysfunctional background and history

and family history of major mental illness.  Also as described above and elsewhere

in this *Petition*, the record demonstrates that these impairments impacted and

impaired Petitioner's decision-making.   Indeed, the colloquy demonstrates

Petitioner's complete mental decompensation and abject lack of understanding.  NT

Vol. VII at 22-23.

257.   Moreover, counsel was ineffective for failing to investigate, develop and

present evidence that Petitioner lacked the competence and capacity to enter a

knowing, intelligent and voluntary waiver.  Counsel's role as an advocate for his

client does not end when that client expresses a desire to proceed *pro se*.  See Appel

v. Horn, 250 F.3d 203, 216-17 (3d Cir. 2001) ("Nor do we believe it would impose

an undue burden on defense counsel to require some investigation into the defendant's

---

1012, 1015 & n.5 (1976) (Burger, C.J., concurring) (effective waiver when decision
was "product of an organized thought process" and defendant had "the mental
capacity and the emotional stability to make the necessary decision . . . and to
understand the consequences"); Whitmore v. Arkansas, 495 U.S. 149, 165 (1990)
(finding that the prerequisite for "next friend" standing in state court capital appeal
was not satisfied where "an evidentiary hearing shows that the defendant has given
a knowing, intelligent, and voluntary waiver of his right to proceed, and his access
to court is otherwise unimpeded").

competency, especially in a capital murder case . . ."); id. ("under the circumstances in this case, [defense] counsel should have investigated, advocated, or otherwise acted to ensure that there was 'meaningful adversarial testing.'").

258. As described above, had counsel conducted the constitutionally required investigation, he would have learned of Petitioner's background and history of mental illness, his cognitive impairments and the history of family mental illness. Counsel did not, and, therefore, did not present this evidence prior to Petitioner's waiver. Counsel's performance was deficient. Where, as here, counsel's failures resulted in an invalid and unconstitutional waiver of the right to counsel, prejudice is demonstrated and relief is required.

## C. To the Extent Petitioner Waived Presentation of Mitigation, That Waiver was Not Knowing, Intelligent or Voluntary.

259. The record bears against any conclusion that Petitioner knowingly or voluntarily waived mitigation. Indeed, the record of the pretrial proceedings demonstrates that Petitioner did not refuse to present mitigation evidence or cooperate with mental health experts. As described above, any lack of cooperation was the result of the appointed counsel's ineffectiveness, conflict of interest and the complete breakdown in the attorney/client relationship. Indeed, Petitioner expressed no reservations about cooperating with retained counsel in the investigation,

development and presentation of mitigation, including mental health mitigation. Indeed, Petitioner offered no objection when the trial court instructed the jury to consider two statutory mitigating factors. Thus, any perceived "waiver" of mitigation was no waiver at all.

260. Moreover, to the extent Petitioner's waiver was also a waiver of mitigation, it was constitutionally invalid for a number of reasons. First, as described above, Petitioner was forced to proceed with conflicted, ineffective counsel with whom he had no reasonable attorney/client relationship. Similarly, also as described above and elsewhere in this *Petition*, see Claim IX, counsel failed to conduct the constitutionally required investigation and development of mitigation evidence. As Petitioner was not aware of what evidence was available, he can hardly have knowingly, intelligently or voluntarily waived that evidence.

261. Accordingly, any perceived waiver of presentation of mitigation evidence violated Petitioner's Sixth, Eighth and Fourteenth Amendment rights.

**D.   The Trial Court's Defective Colloquy Rendered Petitioner's Waiver Constitutionally Invalid.**

262. Axiomatic to determining whether counsel's conflict or unpreparedness necessitates new counsel or poisons a waiver, the trial court "must conduct an inquiry adequate to create a 'sufficient basis for reaching an informed decision.'" United

116

States v. D'Amore, 56 F.3d 1202, 1205 (9th Cir. 1995) (citation omitted).[49]

263.    The court is obligated to conduct sufficient inquiry into the nature of the allegations and the propriety of the request in order to ensure the Sixth Amendment right to counsel. McMahon v. Fulcomer, 821 F.2d 934 (3d Cir. 1987); United States v. Welty, 674 F.2d 185 (3d Cir. 1982).[50]

264.    The waiver of counsel in this case was not voluntary because, in effect and in fact, that waiver presented nothing more than a "Hobson's choice" between proceeding *pro se* or accepting counsel who refused to investigate or prepare guilt or penalty stage defenses and who was laboring under a conflict of interest. Indeed, Petitioner's waiver of counsel was not the result of free will but instead the result of Petitioner's frustration with counsels' abject failure to investigate, prepare and

---

[49] An accused entitled to appointment of counsel may reject assigned counsel and have new counsel appointed for good cause shown. United States v. Young, 482 F.2d 993 (5th Cir. 1973); United States, ex rel. Martinez v. Thomas, 526 F.2d 750 (2nd Cir. 1975); United States v. Welty, 674 F. 2d 185 (3d Cir. 1982); Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985); United States v. Allen, 789 F. 2d 90 (1st Cir. 1986); McMahon v. Fulcomer, 821 F. 2d 934 (3d Cir. 1987). The determination of whether an accused has established the requisite "good cause" for change of counsel is left to the discretion of the trial court. United States v. Williams, 594 F.2d 1258 (9th Cir.); United States v. Allen, 789 F.2d 90 (1st Cir. 1986); United States v. Golden, 102 F.3d 936 (7th Cir. 1996).

[50] See also United States v. Moore, 159 F.3d 1154 (9th Cir. 1998); United States v. D'Amore, 56 F.3d 1202 (9th Cir. 1995); United States v. Allen, 789 F.2d 90 (1st Cir. 1986); Sawicki v. Johnson, 475 F.2d 183 (1973); Brown v. Craven, 424 F.2d 1166 (9th Cir. 1970).

present any viable guilt or penalty phase defenses, as well as his failure to communicate in even a minimal fashion with Petitioner in regards to his case.[51]   The "decision," therefore, was no decision at all and the waiver of his right to counsel was constitutionally invalid.

265.   Moreover, the court's colloquy failed to include the required probing inquiry necessary to ensure that Petitioner understood the nature and extent of his rights and the consequences of waiving his counsel and the presentation of mitigating evidence at the sentencing and counsel ineffectively failed to ensure that the proper colloquy was conducted. After the prosecutor finished read the statutory aggravating and mitigating circumstances that could be presented in his case, the legal burdens of proof, and how a verdict would be reached, he asked Petitioner the following:

| Mr. Chardo: | Do you understand? |
| --- | --- |
| Petitioner: | I'm not even paying none of this no attention. |
| Mr. Chardo: | Is that intentional sir? |
| Petitioner: | No.  I mean, the Judge clearly abused his discretion all through this trial. Now all of a sudden it seems like . . . |
| Mr. Chardo: | Let me ask you this.  Is there anything that I just outlined for you that you didn't understand? |

---

[51]   ABA Standard 10.5(C) also mandates that "[c]ounsel at all stages of the case should engage in a  continuing interactive dialogue with the client  concerning all matters that might reasonably be  expected to have a material impact on the case."

Petitioner:      I'm not even paying it no intention (sic).

Mr. Chardo:    You're intentionally disregarding my explanation?

Petitioner:      *I don't even understand it.*

NT Vol. VII at 22.

266.  The court then interjected:

The Court:  Do you want another explanation of what was given to you? You're saying you don't understand?

Petitioner:  Do what you got to do.

The Court:  Do you want another explanation, because you're conveying to the Court very clearly you don't want to understand, whether you answer affirmatively or not. When you're saying I don't understand what's been explained to you, if there's something you don't understand, I will explain it to you or have the D.A. explain it to you.

Petitioner:  The only thing I said I didn't understand is that how you abuse your discretion, now all of a sudden - -

Mr. Chardo: That's why we're here, sir.

Petitioner:  Let me explain what I don't understand. Please don't cut me off. That's what I don't understand, how I was being railroaded all through this, you know, and you clearly keep abusing your discretion and now all of a sudden that's what I don't understand.

The Court:  I'm not exercising any discretion right now. I'm making a record.

Petitioner:  All through the trial, you kept violating my rights time and time again all through the trial. Why do you want to stop violating them now?

119

The Court:   All right.  I'm going to take your response as that you're not going to understand or you don't want to understand what was explained to you.

Petitioner:   Let's go to the phase, whatever we're going to, let's go.

Id. at 23.

267.   The above exchange demonstrates that Petitioner's fragile mental and emotional state, undisclosed by counsel because counsel failed to conduct the constitutionally adequate investigation, had completely decompensated to the point that Petitioner was incapable of making a reasoned, rational decision.

268.   Moreover, while the Commonwealth read the statutory mitigating factors to Petitioner, (most of which could not be presented in Petitioner's case even with the assistance of counsel because of counsel's complete failure to investigate), neither the court or anyone else ever ensured that Petitioner had a *meaningful understanding* of what mitigation is.  The absence of any clear explanation was further compounded by counsels' failure to consult with Petitioner pretrial on what mitigation is and how it could be presented.  Indeed, as the record demonstrates, any discussions counsel had with Petitioner about mitigation led Petitioner to believe counsel sought to pursue an insanity defense, not that counsel was investigating or preparing mitigation evidence.  Accordingly, Petitioner had neither a factual nor a legal understanding of what mitigation is and, therefore, could not knowingly, intelligently or voluntarily

waive the presentation of mitigation.

**E.     Conclusion.**

269.   For the reasons described above, Petitioner's waiver of counsel and any waiver of mitigation presentation violated his Sixth, Eighth and Fourteenth Amendment rights.  Relief is required.

**CLAIM IX.   TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE, PREPARE, AND DEVELOP MITIGATING EVIDENCE, RESULTING IN THE DEPRIVATION OF PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

270.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

271.   The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of the Supreme Court's capital jurisprudence.  Perry v. Lynaugh, 492 U.S. 302, 307 (1989); Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978).  It is critical to the reliability of the capital sentencing proceeding that the jury render an individualized decision. Gregg v. Georgia, 428 U.S. 153, 206 (1976).  A jury cannot make that decision in a reliable, individualized, and constitutional way without mitigating evidence about the defendant.  Reasonable investigation of the mitigation in a capital case is therefore an absolute prerequisite to constitutional representation.

272.   The core Eighth Amendment principle that "respect for humanity" requires consideration of information about the offender, Lockett, 438 U.S. at 602 (quoting Woodson v. North Carolina, 428 U.S. 280, 304 (1976)), allows for no less. "It is critical to the reliability of a capital sentencing proceeding that the jury render an individualized determination." Harris v. Dugger, 874 F.2d 756, 763 (11th Cir. 1989) (citing Gregg v. Georgia, 428 U.S. 153, 206 (1976)); Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987). As a result of trial counsel's abject failure to investigate, develop and present any meaningful aspects of Petitioner's background and family history, Petitioner's sentence of death is constitutionally unreliable.

## A.   Introduction.

273.   Petitioner's life was plagued with violence, medical and mental health issues, domestic dysfunction, and substance abuse from birth. Petitioner's mother, Beverly Watt was one of ten children. All of her siblings except she shared the same birth father. Beverly never did learn the identity of her father. Beverly and all but two of her siblings have had addictions to illegal substances. Beverly's brother, Michael, is of low intellectual functioning. Another brother was murdered.

274.   Alcoholism, drug abuse, and mental health problems have a strong genetic component in Petitioner's family. Beverly and her sister Brenda were frequently in and out of rehab centers for treatment. Brenda also suffered from bipolar

disorder and schizophrenia and was a lifelong intravenous drug abuser whose drug of choice was cocaine. She ultimately perished from a drug overdose in 1993.

275.   As a result of her own dysfunctional upbringing and physically abusive marriage to Petitioner's father, Samuel Randolph, III, Beverly herself has also battled a long time addiction to cocaine and alcohol.

276.   Petitioner's father was a physically abusive husband to Petitioner's mother, and also acted out violently in other ways as well. His violent outbursts culminated in the stabbing death of Petitioner's step-grandfather. Petitioner's father pled guilty to third degree murder and went to prison. He did not remember the events surrounding the murder because he had suffered a blackout and a seizure, conditions which he was susceptible to his entire life. Petitioner also has a history of seizures and was medicated on daily doses of Phenobarbitol to control them as a child and adolescent.

277.   Petitioner's mother eventually left Petitioner's father to escape the daily beatings and other violence suffered at his hands. She remarried Jerry Watt, a Harrisburg bar owner, and relocated the family from Lancaster to Harrisburg. Beverly helped run the bar, which only served to fuel her own alcohol addiction. When she was there, she was constantly drinking. After Jerry Watt died of a heart attack, Beverly's despair made her drinking and drug abuse even worse.

278. Beverly drank all day, every day. She also started abusing drugs, which she initially tried to hide from the kids. But it didn't take Petitioner and his sisters long to figure out that their mother was using. Sometimes Beverly and her daughter Sara would even use crack cocaine together. Ultimately, all of Petitioner's sisters became addicted to drugs.

279. Petitioner was not able to escape the adverse effects of his violent and chaotic upbringing and familial history of intellectual and mental health impairments. Like his father, Petitioner also suffered from seizures and was hospitalized twice between the ages of 2-6 years for incidents resulting from seizures. An EEG performed on Petitioner as a teenager was determined to be abnormal.

280. Petitioner's neurological problems manifested in other ways besides seizures. His verbal reasoning skills fell within the borderline range, and he had failing grades in school until his placement in Vision Quest, where the structured environment and close supervision resulted in a positive turnaround for him.

281. Petitioner was described in a psychological report from his juvenile records as "a boy who frequently avoids reality in his thinking." Petitioner was also described as "immature," "silly," and "lacking self control," all of which are psychological buzzwords for impaired development. He was also described by some witnesses as paranoid.

282.   Because Petitioner's mother and stepfather worked so often at the bar, Petitioner and his sisters were often left unsupervised, especially at night. Petitioner eventually got caught up in the street life, and was adjudicated delinquent for theft offenses. However, all of his crimes were non-violent, and the staff at the juvenile facilities where he was committed reported excellent progress on Petitioner's part.

283.   As a result of his dysfunctional background, family history of mental illness and his history of trauma and organic brain dysfunction, Petitioner suffers from, and suffered from at the time of the incident, pretrial, trial and post-trial proceedings significant and compelling cognitive, emotional and psychological impairments. Expert testimony will demonstrate that these impairments impacted and impaired all aspects of Petitioner's functioning.

284.   None of this compelling mitigating evidence was presented to Petitioner's jury, because of counsel's complete and total failure to investigate.

**B.     The Federal Standard.**

285.   The importance of mitigating evidence in capital sentencing proceedings is a fundamental tenet of capital jurisprudence.[52] A capital defendant has "a right –

---

[52] Rompilla v. Beard, 545 U.S. 374 (2005); Wiggins v. Smith, 539 U.S. 510 (2003); Williams v. Taylor, 529 U.S. 362 (2000); Perry v. Lynaugh, 492 U.S. 302, 307 (1989); Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978).

indeed, a constitutionally protected right," <u>Williams v. Taylor</u>, 529 U.S. 362, 393

(2000) – to present mitigating evidence to the capital sentencing jury. This evidence

is critical to the reliability of the capital sentencing proceeding, and without it the jury

cannot render the individualized decision that the Eighth Amendment constitutionally

requires. <u>Gregg v. Georgia</u>, 428 U.S. 153, 206 (1976).

286.   Sixth Amendment ineffective assistance of counsel claims are

evaluated under the two-prong test of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

Petitioner must show: (a) counsel's deficient performance, <u>i.e.</u>, that his attorney's

performance fell below "an objective standard of reasonableness," <u>id.</u> at 688; and (b)

prejudice, <u>i.e.</u>, that confidence in the result of the original sentencing proceeding is

undermined due to counsel's deficiencies, <u>id.</u> at 694.

287.   <u>Strickland's</u> "prejudice" prong is *not* an outcome-determinative test.

<u>Strickland</u>, 466 U.S. at 693-94. The question is *not* whether representation by

effective counsel would have actually changed the jury's ultimate sentencing verdict,

nor even whether representation by effective counsel would "more likely than not"

have changed the sentence. <u>Id.</u> Instead, prejudice is established when *confidence in*

*the outcome is undermined* because of counsel's deficiencies. <u>Id.</u> at 694. This

"undermines confidence" standard for prejudice "is not a stringent one. It is less

126

demanding than the preponderance standard."[53]

288.    As explained in <u>Strickland</u> and the trilogy of capital-case ineffectiveness cases recently decided by the Supreme Court,[54] prejudice is present whenever "there is a ***reasonable*** probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694; <u>Williams</u>, 529 U.S. at 371; <u>Wiggins</u>, 539 U.S. at 534; <u>Rompilla</u>, 545 U.S. at 390. The Supreme Court has stressed that "the adjective is important." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995).

289.    *"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."* <u>Id</u>.; <u>see also</u> <u>Strickland</u>, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). The reasonable probability standard is met when the capital sentencer

---

[53] <u>Hull v. Kyler</u>, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986); <u>Baker v. Barbo</u>, 177 F.3d 149, 154 (3d Cir. 1999)); <u>accord</u> <u>Williams</u>, 529 U.S. at 405-06 (requiring proof of prejudice by a preponderance of the evidence would be "contrary to" <u>Strickland</u>).

[54] <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

reasonably might have returned a life verdict.[55]   In a weighing state such as

Pennsylvania, this occurs prejudice if there is a reasonable probability that even one

juror who was presented all the available evidence and was accurately informed of

the sentencing options would have struck a different balance between aggravating and

mitigating circumstances, Wiggins, 539 U.S. at 537; Williams, 529 U.S. at 394-95;

Marshal v. Cathel, 428 F.3d 452, 472 (3d Cir. 2005); Marshall v. Hendricks, 307 F.3d

36, 103 (3d Cir. 2002); Jermyn v. Horn, 266 F.3d 257, 309 (3d Cir. 2001).

290.   Where, as here, counsel does not adequately investigate, develop, and

present compelling mitigating evidence, and/or otherwise makes errors that

undermine confidence in the sentencing decision, counsel is ineffective.

### A.   Counsel's Performance Was Deficient.

291.   Counsel's performance at capital sentencing must be evaluated in

light of the fundamental principle set forth above that a capital defendant has "a right

– indeed, a constitutionally protected right – to provide the jury with the mitigating

evidence" that actually exists. Williams v. Taylor, 529 U.S. 362, 393 (2000).  Under

Strickland and its progeny, the adequacy of counsel's mitigation investigation is

---

[55]   Williams v. Taylor, 529 U.S. at 398 (prejudice established where unpresented mitigating evidence "might well have influenced the jury's appraisal of his moral culpability"); Rompilla, 545 U.S. at 393; Wiggins, 539 U.S. at 538; see also Glenn v. Tate, 71 F.3d 1204, 1210 (6th Cir. 1995).

"measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" Rompilla, 545 U.S. at 380 (quoting Strickland, 466 U.S. at 688); Wiggins, 539 U.S. at 521.  The Court has long referred to professional standards of conduct – such as the American Bar Association (ABA) Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases – in assessing the reasonableness of counsel's conduct.  The same ABA investigative standards have been in place at least since 1971 and clearly apply to this case.[56]

292.    As one would expect, what the professional norms say about the nature of counsel's investigation dovetails with the broad scope of the evidence the Constitution says the defendant must be able to present.  Lockett v. Ohio, 438 U.S. 586, 602-05 (1978); Eddings v. Oklahoma, 455 U.S. 104, 110 (1982).  Accordingly, both the caselaw and the professional norms recognize that capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for mitigating evidence.  Williams, 529 U.S. at 396 (citing 1 ABA STANDARDS FOR

---

[56]  See ABA STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO THE DEFENSE FUNCTION § 4.1 (1971); ABA STANDARDS FOR CRIMINAL JUSTICE, THE DEFENSE FUNCTION § 4-4.1 (2d ed. 1980); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (rev. ed. 2003); see also Hamblin v. Mitchell, 354 F.3d 482 (6th Cir. 2003) (2003 ABA Standards simply articulated already extant national norms).

CRIMINAL JUSTICE 4-4.1, commentary, at 4-55 (2d ed. 1980)), quoted in Wiggins v. Smith, 539 U.S. 510, 522 (2003). Thus, the Sixth Amendment requires that counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor," Wiggins v. Smith, 539 U.S. at 524 (quoting ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C), at 93 (1989) (emphasis in Wiggins), quoted in Rompilla, 545 U.S. at 387 n.7.

293.    Without question, the duty to thoroughly investigate all reasonably available mitigating evidence was also already an accepted professional norm at the time of this trial. E.g., Outten v. Kearney, 2006 WL 2773076 (3d Cir. Sept. 28, 2006) (page citations not yet available) (applying 1989 ABA Guidelines to 1993 capital trial; counsel required to make investigative efforts "to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor"); Marshall v. Cathel, 428 F.3d 452, 467 (3d Cir. 2005) (the 1982 version of the ABA STANDARDS, "coupled with *Strickland*'s explicit language requiring a thorough investigation into facts relevant to both guilt and sentencing clearly show that a separate penalty phase investigation was the very foundation of reasonable representation in 1986"); Jermyn v. Horn, 266 F.3d 257 (3d

Cir. 2001) (finding that counsel's failure to adequately investigate background and mental health mitigation in preparation for August 1985 trial constituted deficient performance, even without reference to ABA norms). Accordingly, anything less than the required thorough investigation for all reasonably available mitigating evidence constitutes deficient performance.

294.    Counsel's duty to thoroughly investigate and present all reasonable mitigating evidence has several distinct components:

- an obligation to collect all reasonably available institutional records that may contain relevant mitigating evidence.[57]

- an obligation to interview all witnesses who might provide relevant mitigation;[58]

---

[57] ABA GUIDELINES 11.4.1, Investigation, §§ 2C & 2D (counsel should obtain hospital, treatment, school and mental health records); Williams v. Taylor, 529 U.S. at 395-96 (failure to obtain juvenile and social services records "graphically describing Williams' nightmarish childhood" and prison records describing his good conduct and favorable adjustment to prison); see also Outten, 2006 WL 2773076, at *__ (page cites not yet available) (counsel ineffective where, inter alia, "they neither acquired nor reviewed readily available school and medical health records"); Carter v. Bell, 218 F.3d 581 (6th Cir. 2000) (failure to obtain prison, welfare and mental health records); Clabourne v. Lewis, 64 F.3d 1373, 1385 (9th Cir. 1995) (failure to obtain institutional records from mental hospital and prison treatment facility); Hill v. Lockhart, 28 F.3d 832, 845 (8th Cir. 1994) (failure to obtain records from mental hospital).

[58] ABA GUIDELINES, 11.4.1, Investigation, §§ D.2.C, D.3.B & D.3.C (counsel should seek out information regarding "family and social history (including physical, sexual or emotional abuse)" by interviewing family and others familiar with defendant's life); Guideline 11.8.3 § F (same); Williams, 529 U.S. at 415-16

131

- an obligation to prepare all witnesses to testify to all relevant mitigating evidence within their knowledge, and at trial, to elicit all relevant mitigating evidence that the witness is able to present, whether the witness is an expert or lay witness;[59]

- an obligation to investigate and present evidence to rebut aggravation presented.[60]

- an obligation to present a closing argument that actually informs the jury how it can give effect to the available mitigating evidence to spare the defendant's life.[61]

295.  Counsel managed to breach *all* of the professional obligations described above and provided deficient performance in this case.  In addition to counsel's failure to interview a single one of Petitioner's family members, hire a mental health

---

(O'Connor, J., concurring) (counsel failed to fully interview and present evidence from all relevant friends, neighbors, and family); Jermyn v. Horn, 266 F.3d 257, 306-07 (3d Cir. 2001).

[59] E.g., Wallace v. Stewart, 184 F.3d 1112, 1115-18 (9th Cir. 1999) (counsel has duty to provide mental health expert with necessary background information); Collier v. Turpin, 177 F.3d 1184, 1199-1204 (11th Cir. 1999) (counsel failed to elicit all of the mitigating evidence from the ten witnesses that were called).

[60] ABA Guideline 11.4.1(C) (counsel should investigate *evidence to rebut any aggravating evidence* that may be introduced by the prosecutor).

[61] E.g., Kubat v. Thieret, 867 F.2d 351, 369 (7th Cir. 1989) (counsel must make a significant effort to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors); Buehl v. Vaughn, No. 95-CV-5917, 1997 WL 752959, at 40 (E.D. Pa. Dec. 31, 1996) (Padova, J.) (failure to present reasoned argument for life at penalty phase was "a very serious and inexcusable lapse"); cf. Herring v. New York, 422 U.S. 853, 862 (1975) ("[n]o aspect of [trial] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment").

expert, or order a single record, counsel also failed to obtain compelling mitigating

evidence that was practically handed to him on a silver platter by the prosecution.

Early in the proceedings of Petitioner's case, the prosecution discussed the possibility

of admitting Petitioner's juvenile offenses at trial.  Having received that notice from

the prosecution, counsel was obliged to obtain and review the juvenile records.  Here,

counsel needed to do nothing more than review the files of the convictions, including

the public record, to obtain evidence <u>See Rompilla</u>, 545 U.S. at 385-86.  Yet counsel

did nothing to try to obtain them.  These records contained a plethora of critical and

compelling mitigating evidence.  <u>See</u> Claim VIII.

296.  Counsel also failed to investigate any other aspects of Petitioner's

background and history.  While counsel requested and was granted funds to hire an

investigator, he inexplicably failed to obtain such services.  Nor did he undertake

such investigation on his own.  In short, counsel did nothing to prepare for the

penalty phase of Petitioner's case.  While Petitioner's purported waiver of counsel at

this stage of the proceedings was clearly invalid, <u>see</u> Claim VIII, it was also not

surprising given counsel's complete and absolute failure to represent his client.

Counsel had no reasonable tactic or strategy for not doing his job.

297.    As described above, a proper and thorough mitigation investigation and preparation would have provided the jury with substantial mitigation in favor of a life sentence. Indeed, the United States Supreme Court has repeatedly and explicitly recognized that the type of evidence developed during post-conviction proceedings (outlined above) describing Petitioner's history of chaos, dysfunction, and violence is compelling mitigation warranting imposition of a sentence less than death and that counsel's failure to develop that evidence constitutes deficient performance. See Williams, 529 U.S. at 394-95 (ineffective assistance for failing to investigate, develop and present mitigating evidence of defendant's difficult childhood); Penry v. Lynaugh, 492 U.S. 303, 322 (1989) ("because of [defendant's] history of childhood abuse, [the sentencer] could also conclude that [defendant] was less morally culpable than defendants who have no such excuse").

298.    Children such as Petitioner who are raised in an environment of abuse and domestic violence suffer life-long debilitating psychological problems. The available psychiatric/psychological literature, as well as case law uniformly document the fact that children such as Petitioner who endure dysfunctional, abusive, or neglectful childhoods will be psychologically impaired. As these children become adults, they cannot trust; they develop paranoia, suspiciousness, difficulties with interpersonal relationships and self image problems; they have poor judgment,

134

depression, and panic attacks; and they have difficulty understanding their place in the world. Helfer & Kempe, THE BATTERED CHILD chs. 9-10, 17-20 (4th ed. University of Chicago Press); Kaplan & Sadock, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, at 1365-67 (5th ed.) (schizoid and paranoid disorders have direct correlations to childhood abuse); id. at 1964-66 (childhood abuse results in cognitive and developmental impairment; post-traumatic stress disorder; pathological object relationships; primitive defense mechanisms; impaired impulse control; poor self-concept and depression; masochistic and self-destructive behavior; difficulties in school adjustment; and central nervous system impairment).    Had trial counsel bothered to investigate his client's life and provided his life history information to a mental health professional, the defense would have been able to present this emotionally powerful information to the jury that -- ignorant of his difficult and traumatic life experiences -- sentenced Petitioner to death.

299.    All of this information was readily available to counsel at the time of Petitioner's trial. But because trial counsel made no effort to investigate Petitioner's dysfunctional upbringing, that included violence, drug addiction and neglect -- let alone the psychological ramifications of these factors -- the jury never learned of any of the constellation of emotional deficits that are associated with such a history, including developmental impairment, impaired impulse control, poor self-concept,

135

and depression, masochistic and self destructive behavior, and difficulties in school adjustment. Kaplan & Sadock, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, at 1965 (5th ed.).

300.   This type of evidence often makes the difference between the capital defendant who receives a sentence of life and those who are condemned to die.  But none of this information was presented to the jury that sentenced Petitioner to death without finding a single mitigating circumstance.

301.   The overwhelming evidence of Petitioner's dysfunctional and violent family environment and family history of mental illness and substance abuse was, in and of itself, mitigating.  See, e.g., Williams v. Taylor 529 U.S at 396 (defendant prejudiced by counsel's failure to present evidence of dysfunctional childhood and possible mental health problems); Penry v. Lynaugh, 492 U.S. 302, 322-24 (1989) (unconstitutional sentence where jury does not give mitigating effect to evidence of traumatic childhood); Mills v. Maryland, 486 U.S. 367, 370 n.1 (1988) (same for history of substance abuse); Hitchcock v. Dugger, 481 U.S. 393, 397 (1987) (same for history of substance abuse and childhood poverty); Eddings v. Oklahoma, 455 U.S. 104, 113 (1982) (same for troubled family background and personality disorder).

302.   Similarly, had counsel retained  forensic expert assistance, he would have learned that the combined impact of Petitioner's dysfunctional upbringing

136

during a critical developmental period in his life resulted in debilitating psychological and emotional impairments that impacted every facet of his life. Yet, none of this constitutionally significant mitigating evidence was investigated or presented to the jury that sentenced Petitioner to death. See e.g., Blake v. Kemp, 758 F.2d 523, 529 (11th Cir. 1985); Antwine v. Delo, 54 F.3d 1357, 1366 (8th Cir. 1995) (finding counsel ineffective for failing to investigate mental issues and adequately prepare mental health expert).

**E.     Petitioner was Prejudiced.**

303.   A jury cannot possibly make its sentencing decision in a reliable and individualized manner unless it has the opportunity to evaluate the actual mitigating evidence about the defendant. Therefore, a thorough investigation into mitigating evidence is a prerequisite to constitutionally acceptable capital-case representation.

304.   Prejudice is *not* an outcome-determinative test. Strickland, 466 U.S. at 693-94. The question is *not* whether representation by effective counsel would have actually changed the jury's ultimate sentencing verdict, nor even whether representation by effective counsel would "more likely than not" have changed the sentence. Id. Instead, prejudice is established when *confidence in the outcome is undermined* because of counsel's deficiencies. Id. at 694. This "undermines confidence" standard for prejudice "is not a stringent one. It is less demanding than

the preponderance standard."[62]

305.    As explained in <u>Strickland</u> and the trilogy of capital-case ineffectiveness cases recently decided by the Supreme Court,[63] prejudice is present whenever "there is a ***reasonable*** probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694; <u>Williams</u>, 529 U.S. at 371; <u>Wiggins</u>, 539 U.S. at 534; <u>Rompilla</u>, 545 U.S. at 390. The Supreme Court has stressed that "the adjective is important." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995): "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Id.</u>; <u>see also</u> <u>Strickland</u>, 466 U.S. at 693 ("a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). The reasonable probability standard is met when the capital sentencer reasonably might

---

[62] <u>Hull v. Kyler</u>, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986); <u>Baker v. Barbo</u>, 177 F.3d 149, 154 (3d Cir. 1999)); <u>accord</u> <u>Williams</u>, 529 U.S. at 405-06 (requiring proof of prejudice by a preponderance of the evidence would be "contrary to" <u>Strickland</u>).

[63] <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005).

have returned a life verdict.[64] In a weighing state such as Pennsylvania, this occurs if there is a reasonable probability that **even one juror** presented with all the available evidence and accurately informed of the sentencing options, would have struck a different balance between aggravating and mitigating circumstances, Wiggins, 539 U.S. at 537; Williams, 529 U.S. at 394-95; Marshal v. Cathel, 428 F.3d 452, 472 (3d Cir. 2005); Marshall v. Hendricks, 307 F.3d 36, 103 (3d Cir. 2002); Jermyn v. Horn, 266 F.3d 257, 309 (3d Cir. 2001).

306. In Wiggins v. Smith, 539 U.S. 510 (2003), the United States Supreme Court reaffirmed this basic principle of capital jurisprudence, and ordered a new sentencing hearing because counsel's investigation into Wiggins' background was not thorough or reasonable. Id.

307. In finding Wiggins' counsel ineffective, the Court observed that Wiggins' counsel, like Petitioner's counsel, "[a]bandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." The Court added that:

> In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known

---

[64] Williams v. Taylor, 529 U.S. at 398 (prejudice established where unpresented mitigating evidence "might well have influenced the jury's appraisal of his moral culpability"); Rompilla, 545 U.S. at 393; Wiggins, 539 U.S. at 538; see also Glenn v. Tate, 71 F.3d 1204, 1210 (6th Cir. 1995).

to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.

Id. at 527.

308.    In Petitioner's case, a reasonable attorney learning of Petitioner's juvenile record, which revealed  familial involvement with the criminal justice system, Petitioner's history of seizures, intellectual impairments and difficulties in school, would have conducted a further investigation. Counsel failed to obtain Petitioner's juvenile files, and thus never learned of the critical and substantial mitigating evidence contained within.

309.    Like Petitioner's trial counsel, Wiggins' counsel failed to discover and present powerful mitigating evidence long recognized as relevant to the jury's sentencing determination. Id. at 534. Because of counsel's inadequate investigation, the Court concluded "[t]hat the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of Wiggins' moral culpability." Id. at 537.

310.    The Court's decision in Wiggins does not represent a break in its prior capital jurisprudence.   Rather, it represents a continuing line of United States Supreme Court cases recognizing the duty of capital defense counsel to conduct reasonable and thorough investigations given the severity of the penalty facing the capital defendant, and represents a vigilance on the part of the Court to strictly

enforce the right to effective counsel.

311. Several years ago, the United States Supreme Court granted penalty phase relief in a capital case, <u>Terry Williams v. Taylor</u>, 529 U.S. 362 (2000), on the grounds that trial counsel rendered ineffective assistance of counsel. In so doing, the Court reaffirmed the basic principles governing the assessment of a claim of ineffective assistance of counsel articulated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

312. A comparison between Petitioner's case and <u>Terry Williams</u> demonstrates that if the efforts of trial counsel in <u>Williams</u> was constitutionally deficient, then without question the efforts of Petitioner's counsel also fail to meet the minimum standards of competency required of a capital defense attorney. In <u>Williams</u>, counsel had the client evaluated by three mental health experts (who concluded that Williams did not have mental problems) – counsel called one at sentencing to describe his view that Williams lacked intent to injure others during his crimes. <u>Williams</u>, 529 U.S. at 369. Counsel interviewed Williams' mother, Williams himself and several other family members about Williams' life, asking if they had any evidence that would help (the witnesses did not disclose neglect or abuse). <u>Id</u>.; <u>Terry Williams v. Taylor</u>, 163 F.3d 860, 872 (4th Cir. 1998); <u>Williams v. Warden</u>, 487 S.E.2d 194, 196 (Va. 1997).

313.    Unlike the lawyer found to have rendered ineffective assistance in <u>Terry Williams</u>, Petitioner's trial attorney did *nothing*.    Thus, Terry Williams' trial counsel's preparation for sentencing was considerably *more extensive* than that of Petitioner's counsel's.

314.    The United States Supreme Court ruled that Terry Williams' counsel's performance was deficient and prejudice was established because counsel did not "thoroughly" seek out, discover, and present evidence of Williams' difficult childhood and evidence indicating that Williams "*might* have mental impairments." <u>Terry Williams</u>, 529 U.S. at 370.    If counsel's representation was prejudicially deficient in <u>Williams</u>, as the Supreme Court held, counsel's representation in Petitioner's case was deficient.    As was the Appellant in <u>Terry Williams</u>, Petitioner is entitled to relief.

**F.    Relief is Required.**

315.    The mitigating evidence described above and proffered herein was clearly sufficient to convince at least one juror that the mitigating factors outweighed the aggravating factors.    Upon review of the totality of the evidence – as  <u>Wiggins</u> and <u>Williams</u> mandate that the reviewing court must – it is clear that there is more than a reasonable likelihood that, had counsel performed effectively, the outcome of the trial would be different.    A new sentencing hearing is required.

CLAIM X.   PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT DID NOT INSTRUCT THE SENTENCING JURY THAT A CAPITAL DEFENDANT WHO IS SENTENCED TO LIFE IN PRISON IS INELIGIBLE FOR PAROLE.

316.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

317.   Under Pennsylvania law, a defendant convicted of first degree murder must be sentenced either to death or to life imprisonment. 42 Pa. C.S. § 9711; 18 Pa. C.S. § 1102(a)(1) ("A person who has been convicted of a murder of the first degree shall be sentenced to death or to a term of life imprisonment in accordance with 42 Pa. C.S. § 9711 (relating to sentencing procedure for murder of the first degree)."). A life sentence is statutorily defined as life without possibility of parole. 42 Pa. C.S. § 9756(c); 61 Pa. C.S. § 331.21; Carpenter v. Vaughn, 296 F.3d 138, 156 (3d Cir. 2002); Meyers v. Gillis, 142 F.3d 664, 667 (3d Cir. 1998); Cross v. Price, 2005 WL 2106559, *2 (W.D. Pa. Aug. 30, 2005); Bronshtein v. Horn, 2001 WL 767593, *18 (E.D. Pa. July 5, 2001); Christy v. Horn, 28 F. Supp. 2d 307, 314 n. 13 (W.D. Pa. 1998).[65]

---

[65]   See also Commonwealth v. Galloway, 433 Pa. Super. 222, 235 n.13, 640 A.2d 454, 460 n.13 (1994); Commonwealth v. Szczesniewski, 404 Pa. Super. 617, 591 A.2d 1055, 1057 (1991), allocatur denied, 530 Pa. 654, 608 A.2d 29 (1992).

318.   Petitioner was sentenced to death by a jury that was never informed that a capital defendant who is sentenced to life in prison in Pennsylvania will never be eligible for parole.

**A.     The Record.**

319.   Petitioner, Samuel Randolph, was sentenced to death by a jury that was never informed that a capital defendant who is sentenced to life in prison in Pennsylvania will never be eligible for parole.

320.   This failure occurred after the Commonwealth had inherently made Petitioner's future dangerousness an issue at both the guilt[66] and penalty phases of trial by arguing that Petitioner killed the victims "in a murderous attempt at revenge," NT Vol. III at 20, that Petitioner is "not a person who lets things go," NT Vol. VI at 78, and that Petitioner "had an axe to grind with these fellows." Id. at 82. The prosecutor's use of the term "overkill" to refer to the use of two guns and the multiple victims in the shooting also implicates Petitioner's future dangerousness. Id. at 81.

321.   During the sentencing hearing, the prosecutor continued in this vein, arguing to the jury that "[Petitioner] was out running around shooting up the town at times when he said he was working." NT Vol. VIII at 33.

_____

[66]   At the request of the Commonwealth, the court incorporated the record of trial into the sentencing hearing.  NT Vol. VIII at 27-28.

322.   These arguments by the prosecutor constituted improper references to Petitioner's future dangerousness.  Yet, the trial court failed to instruct the jury regarding Petitioner's parole ineligibility.

323.   Instead of giving an appropriate instruction concerning the meaning of a life sentence, the court instructed the jury that it was to apply the law as given by the court, and went on to provide an instruction in which it advised the jury that its sentencing options were life or death, but did not provide any instruction on the actual meaning of the life-sentencing option or tell the jury that this option carried with it the statutory ineligibility for parole.

324.   The absence of a life without parole instruction violated Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments, and international law, as indicated more fully below.

**B.   The Court's Failure to Instruct the Jury Concerning Petitioner's Statutory Ineligibility for Parole from a Life Sentence Violated the Eighth Amendment.**

325.   The trial court's failure to provide a life without parole instruction constituted at least three independent violations of the Eighth Amendment.  First, the trial court's failure to inform the jury of Petitioner's ineligibility for parole prevented the jury from giving full effect to mitigating evidence.  Second, the court's failure to provide a life without possibility of parole instruction produced an unconstitutionally

arbitrary and capricious death sentence by denying the jury accurate sentencing

information, presenting the jury with a false choice of sentencing options, and

denying Petitioner the heightened procedural safeguards required in capital cases.

Third, the imposition of a death sentence by a jury that had not been instructed that

a life sentence means life without possibility of parole offended the evolving

standards of decency that form the underpinnings of the Eighth Amendment.

      **1.**   **The trial court's failure to provide an instruction on the statutory impossibility of parole prevented the jury from considering and giving full effect to relevant mitigating evidence.**

    326.   The trial court's failure to provide an instruction that, if sentenced to life,

Petitioner would be statutorily ineligible for parole violated the hallmark Eighth

Amendment requirement that a capital sentencing jury must be permitted to consider

and give full effect to all relevant mitigating evidence.  Lockett v. Ohio, 438 U.S.

586, 605 (1978); Eddings v. Oklahoma, 455 U.S. 104, 110 (1982).[67]  This doctrine

prohibits a State from preventing the consideration in mitigation of *any* evidence "the

sentencer could reasonably find . . . warrants a sentence less than death."  Tennard v.

---

    [67] See also Tennard v. Dretke, 542 U.S. 274, 285 (2004);  Penry v. Johnson, 532 U.S. 782, 797 (2001); McKoy v. North Carolina, 494 U.S. 433, 442 (1990); Penry v. Lynaugh, 492 U.S. 302, 319 (1989); Sumner v. Schuman, 483 U.S. 66 (1987); Hitchcock v. Dugger, 481 U.S. 393, 394 (1987); Skipper v. South Carolina, 476 U.S. 1, 4 (1986); Bell v. Ohio, 438 U.S. 637 (1978); see also Osborn v. Shillinger, 861 F.2d 612, 628 n.16 (10th Cir. 1988).

Dretke, 542 U.S. 274, 285 (2004); McKoy v. North Carolina, 494 U.S. 433, 441 (1990).

327.   A capital defendant's ineligibility for parole is itself a mitigating factor.[68] Moreover, "there is no question but that . . . inferences [that a life sentenced defendant would not pose a future danger to society] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) (quoting Lockett, 438 U.S. at 604); Blystone v. Horn, No. 99-CV-490, 2005 U.S. Dist. LEXIS 40922, *92-93, 106-07, 131, 153-54 (W.D. Pa. Mar. 31, 2005).[69] Therefore, "evidence that the defendant would not pose a danger if spared (but incarcerated) *must be considered potentially mitigating*." Skipper, 476 U.S. at 4.  The parole ineligibility of a life-sentenced defendant "is indisputably relevant" to whether he will pose a future danger to society. Simmons

---

[68]  E.g., State v. Henderson, 109 N.M. 655, 666, 789 P.2d 603, 606-07, 614 (1990); Turner v. State, 645 So.2d 444, 448 (Fla. 1994).

[69]  Cf. Christy v. Horn, 28 F.Supp.2d 307, 318 (W.D. Pa. 1998) (prosecutor's improper suggestion of parole eligibility "undermined the jury's deliberative process and unconstitutionally tainted the jury's death finding" by leaving the jury "with the misimpression that, if Christy was sentenced to life imprisonment, he might later be released because of his manipulative powers and pose a future danger to society"). In the same way that the implication of release affirmatively injects concerns of future dangerousness that infect the jury's penalty phase deliberations, the absence of information about parole *ineligibility* prevents the jury from considering the lack of danger to society at large if the defendant is incarcerated for life.

147

v. South Carolina, 512 U.S. 154, 163-64 (1994). "Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." Id.

328.   In this case, the court's sentencing-stage instructions informed the jury that it had the choice of sentencing Petitioner to life or death, but did not make any mention of either the possibility or impossibility of parole.   On this issue, the instruction amounted to "no instruction at all, . . . le[aving] the jury to speculate whether 'life imprisonment' means life without parole or something else." Simmons, 512 U.S. at 165.

329.   As has been held by the Pennsylvania Supreme Court, the jury is presumed to follow the court's instructions. Commonwealth v. Steele, 522 Pa. 61, 78, 559 A.2d 904, 913 (1989).   The court told the jury its sentencing options were death and life, not death and life without possibility of parole.   The court told the jury that it should not be swayed by anything other than the evidence, as to which nothing had been presented establishing the impossibility of parole.   The court told the jury that it was to consider the facts through the prism of the applicable law as defined by the court, which said nothing about any life without parole sentencing option.

330.   The impairment of mitigation resulting from the absence of a life without parole instruction went far beyond mitigating inferences of lack of future

dangerousness inherent in the mere fact of parole ineligibility. In determining whether evidence warrants a sentence less than death, capital sentencing juries are entitled to consider whether the sentence they may impose will be sufficient to protect society from an offender they view as violent. Consequently, what is considered mitigating if a defendant will spend the rest of his life in prison may not be the basis for "a sentence less than death" if the defendant may be released on parole.[70]

---

[70] While evidence of future dangerousness is not inherently unconstitutionally, Pennsylvania law "limit[s] the admission of evidence at the penalty stage to only that which is specifically relevant to an enumerated aggravating or mitigating factor," Commonwealth v. Fisher, 545 Pa. 233, 681 A.2d 130, 146 (1996), and capital sentencing juries are not permitted to consider non-statutory aggravating circumstances. Commonwealth v. Edmiston, 578 Pa. 284, 307, 851 A.2d 883, 897 (2004) ("injecting non-statutory aggravating circumstances into a capital jury's sentencing determination is reversible error"); Commonwealth v. Hughes, 581 Pa. 274, 865 A.2d 761, 798 (2004); Commonwealth v. DeJesus, 580 Pa. 303, 325-27, 860 A.2d 102, 116-17 (2004). See, for example, Commonwealth v. Brown, 711 A.2d 444 (Pa. 1998) (biblical arguments for death); Commonwealth v. Chambers, 528 Pa. 558, 586-87, 599 A.2d 630, 644 (1991) (same); Commonwealth v. Morales, 549 Pa. 400, 425-26, 701 A.2d 516, 528-29 (1997) (argument for death based upon fear that "liberal judges" will release defendant on parole in response to "perceived failing[s] of the criminal justice system"); Commonwealth v. Hall, 523 Pa. 75, 90-91, 565 A.2d 144, 152 (1989) (arguments based upon fear of future killing if defendant paroled); Commonwealth v. Floyd, 506 Pa. 85, 95, 484 A.2d 365, 370 (1984) (argument as to "chance that a defendant might receive parole"); Commonwealth v. Marrero, 546 Pa. 596, 610 n.19, 687 A.2d 1102, 1108 n.19 (1996) (future dangerousness); Commonwealth v. Fisher, 545 Pa. 233, 266, 681 A.2d 130, 146 (1996) (victim-impact evidence and argument); Commonwealth v. LaCava, 542 Pa. 160, 666 A.2d 221, 237 (Pa. 1995) (attempts to "expand the jury's focus from the punishment of [the defendant] on the basis of . . . aggravating circumstance[s]" is improper; argument on "society's victimization at the hands of drug dealers"); Commonwealth v. Jasper, 558 Pa. 281, 286, 737 A.2d 196 (1999) (Zappala, J., concurring) (improper for prosecutor

331. But that is not all. Every aspect of whether and how jurors consider particular aggravating and mitigating evidence – whether they consider a particular fact to be a potential reason to spare a defendant's life and the weight they accord mitigating evidence once they determine it to be a potential reason to spare his life – is affected by their beliefs concerning a defendant's parole eligibility. E.g., People v. LaValle, 3 N.Y.3d 88, 817 N.E.2d 341, 783 N.Y.S.2d 485 (2004); Mackbee v. State, 575 So. 2d 16, 41 (Miss. 1990); see also Part C.3, infra, and studies cited therein. As a result, the failure to provide a life without possibility of parole instruction prevented the jury from considering and giving full effect to any other mitigating evidence that was present in this case, separate and apart from the fact that he would not pose a future danger to society because of his ineligibility for parole.

332. Told the truth about its life-sentencing option, the jury would have had before it additional mitigating evidence of Petitioner's lack of future dangerousness;

---

to "attempt[ ] to expand the jury's focus from the punishment of appellant on the basis of aggravating circumstances"; argument on supposed amenities and perks of life without parole sentence). The consideration of aggravation beyond that which is statutorily authorized is also constitutionally significant. "In a weighing state [such as Pennsylvania,] . . . there is Eighth Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence." Sochor v. Florida, 504 U.S. 527, 532-33 (1992); Hameen v. Delaware, 212 F.3d 226, 247 (3d Cir. 2000); Flamer v. Delaware, 68 F.3d 736, 748 (3d Cir. 1995) (en banc). Reliance on non-statutory aggravating factors in a weighing state also violates a defendant's due process liberty interest in a sentence based upon appropriate statutory considerations. Hicks v. Oklahoma, 477 U.S. 343 (1980).