the other mitigating evidence would have been more mitigating; the *other* aggravating evidence would have been less aggravating; and there would have been no non-statutory consideration of future dangerousness. In these circumstances, there is a reasonable probability at least one juror would have felt that life without parole was punishment enough for a person of Petitioner's level of moral culpability. In fact, at least one juror who served in this case – Juror Michelle Payne – has confirmed to Petitioner's present counsel that had she known about the availability of a sentence of life without possibility of parole for Petitioner, she would have selected that option.

333. As a result of the court's instructions, the jury was prevented from giving full effect to mitigating evidence, in violation of the Eighth Amendment.

> **2.      The court's failure to instruct the jury concerning the statutory impossibility of parole from a life sentence presented the jury with a false choice of sentencing options, denied petitioner the heightened procedural safeguards required in capital cases, and produced an unconstitutionally arbitrary and capricious sentence.**

334. A sentence of death is "cruel and unusual" in violation of the Eighth Amendment if it is imposed arbitrarily and capriciously. Furman v. Georgia, 408 U.S. 238 (1972); Gregg v. Georgia, 428 U.S. 153, 189 (1976). The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether

death, rather than some lesser sentence, ought to be imposed.  Simmons, 512 U.S. at 172 (Souter, J. concurring).[71]

335.   Because of the unparalleled severity and irreversibility of the death penalty, the Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion); see also Mills v. Maryland, 486 U.S. 367, 383-84 (1988); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); California v. Ramos, 463 U.S. 992, 998-99 (1983); Beck v. Alabama, 447 U.S. 625, 637-38 (1980); Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980). This principle is so central to the Eighth Amendment that within a decade of Furman every Justice of the Court had written or joined at least one opinion endorsing the proposition that because death is different, death sentences must be accompanied by commensurate procedural safeguards.  See Spaziano v. Florida, 468 U.S. 447, 468 (1984) (Stevens, J., concurring in part & dissenting in part).

336.   This heightened need for reliability requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination

---

[71]   Although the full Court did not decide Simmons on Eighth Amendment grounds, Justice Souter's thoughtful concurrence carefully lays out the already clearly established Eighth Amendment law that compels a determination that the failure to instruct a capital sentencing jury that life means life without parole also violates that Amendment.

of whether a defendant shall live or die," Gregg v. Georgia, 428 U.S. 153, 190 (1976), and invalidates "procedural rules that ten[d] to diminish the reliability of the sentencing determination," Beck v. Alabama, 447 U.S. 625, 638 (1980).

337.   As part of the requirement that capital juries must receive accurate sentencing information, the jury must be properly instructed as to all material elements in its sentencing-stage deliberations, including the meaning of legal terms such as "life imprisonment." See Walton v. Arizona, 497 U.S. 639, 647 (1990) ("When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process."); see also Simmons, 512 U.S. at 172 (Souter, J., concurring) ("That same need for heightened reliability also mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences (or sentencing recommendations) a jury is required to consider, in making the reasoned moral choice between sentencing alternatives."); Russell v. State, 607 So. 2d 1107, 1118 (Miss. 1992) ("The knowledge that the alternative to death is a life sentence, without the possibility of probation or parole is the type of relevant and accurate sentencing information to which our cases speak and which every jury faced with the determination of life or death is entitled to consider."); cf. Commonwealth v. Peterkin, 513 A.2d 373, 379, 511 Pa. 299, 311 (1986) (justifying excusing juror for

cause when juror understood sentencing option of "death" to mean "a term used to give life imprisonment[,] evinc[ing] a misunderstanding of the law which could have led him to misapply the court's instructions").

338.   It is indisputable that the possibility (or impossibility) of parole is a fact that is material to capital sentencing juries, a common sense belief borne out by actual experience.   <u>See</u> Part C.3, *infra* (discussing court observations and results of numerous studies, including the Capital Jury Project).[72]   Accordingly, when the actual sentencing options faced by a capital sentencing jury are life without possibility of parole and death, but the jury is not informed that life means "life without possibility of parole," the jury is denied "accurate information regarding petitioner's parole ineligibility."   <u>Simmons</u>, 512 U.S. at 162.

339.   As a result, the jury is presented with "a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration,"[73] and is

---

[72] <u>See also</u> Bowers & Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing,* 77 Tex. L. Rev. 605, 648 (1999); Eisenberg & Wells, *Deadly Confusion: Juror Instructions in Capital Cases,* 79 Cornell L. Rev. 1, 4 (1993); Note, *The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing*, 75 VA. L. REV. 1605, 1620 (1989).

[73] <u>See also</u> Bowers & Foglia, *Still Singularly Agonizing:  Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIMINAL LAW BULLETIN 51, 83 (2003) (capital sentencing juries who are not told about the ineligibility of parole from a life sentence are "going to be making 'false choices' and voting for death because they underestimate the alternative").

left with a "grievous misperception" of its sentencing options. Id. at 161-62. This sentencing scenario, in which the trial court "effectively withh[olds] from the jury the life-without-parole alternative, . . . diminishe[s] the reliability of the jury's decision that death, rather than that alternative, was the appropriate penalty in this case." Simmons, 512 U.S. at 174 (Souter, J., concurring).

340. The Third Circuit has already determined that the suggestion that a Pennsylvania defendant "would become eligible for parole sometime in the future despite [conviction for] a crime that carried a mandatory period of life imprisonment as the only authorized sentence" is "grossly misleading." Meyers v. Gillis, 142 F.3d 664, 666-67 (3d Cir. 1998); see also Christy v. Horn, 28 F. Supp. 2d 307, 314 n.13 (W.D. Pa. 1998) (Ziegler, C.J.) ("Under Pennsylvania law, a sentence of life imprisonment carries no possibility of parole."). The trial court's failure to instruct Petitioner's jury that, in Pennsylvania, "life imprisonment" means life without possibility of parole," misleadingly withheld essential and accurate sentencing information from the jury.

341. Moreover, the sentencing options provided to the jury were not only materially inaccurate, but the absence of a life without parole instruction results in "harsher penalty options," Fontenot v. State, 881 P.2d 69, 74 n.2 (Okla. 1994) (reversing death sentence where jury informed of sentencing choices of life or death,

but not informed of intermediate option of life without possibility of parole),[74] and

"unquestionably tips the scales in favor of a death sentence that a fully informed jury

might not impose." Brown v. Texas, 522 U.S. 940, 942 (1997) (Stevens, J.,

dissenting from denial of certiorari); cf. Commonwealth v. Peterkin, 513 A.2d 373,

379, 511 Pa. 299, 311 (1986) (sustaining challenge to venireman for cause when

juror "expressed his view that the death penalty is an academic question since it is not

carried out"; juror's response "that he was in favor of the death penalty as a term used

to give life imprisonment evinced a misunderstanding of the law which could have

led him to misapply the court's instructions, possibly to the defendant's prejudice").[75]

342. By failing to provide a life without possibility of parole instruction, the

trial court "effectively withh[olds] from the jury the life-without-parole alternative,

---

[74]    See also Taylor v. State, 1995 WL 571320, *25 (Miss. Sept. 28, 1995)
("Had the jury in the present case been informed that Taylor, as an habitual offender,
would not have the opportunity for parole, they might have opted for life
imprisonment rather than imposing the death penalty."); State v. Henderson, 109
N.M. 655, 659, 789 P.2d 603, 606-07 (1990) ("We cannot believe that, had the jury
known ahead of time that a life sentence actually meant a minimum of twenty-five
years and nine months (assuming all meritorious deductions), plus another thirty
years before Henderson even would be eligible for parole, it would not have been
more likely to impose a life sentence instead of a death sentence.").

[75]    See also Deathly Errors, supra, 18 COL. HUM. RTS .L. REV. at 212 ("The
option of life to a typical juror means disproportionately little punishment for the
convicted capital murderer. A juror, then, laboring under the misperception that a
sentence of 'life' is a ticket to 'get out of jail free' on parole, feels constrained to vote
for a penalty of death.").

[and] ... diminishe[s] the reliability of the jury's decision that death, rather than that

alternative, was the appropriate penalty in this case." Simmons, 512 U.S. at 174

(Souter, J., concurring).    Consequently, Petitioner's death sentence "should be

vacated as having been 'arbitrarily or capriciously' and 'wantonly and . . . freakishly

imposed'" in violation of the Eighth Amendment. Simmons, 512 U.S. at 174 (Souter,

J., concurring) (quoting Furman v. Georgia, 408 U.S. 238, 249 (1972) (Douglas, J.,

concurring); and id. at 310 (Stewart, J., concurring)).[76]

343.    Petitioner's death sentence violated the requirement of truth in capital

sentencing, denied Petitioner the heightened procedural safeguards required in a

capital case, and undermined any pretense as to the reliability of the jury's penalty

---

[76]    See also Tate v. State, 896 P.2d 1182, 1193 (Okla. 1995) (death sentence
imposed by a jury that has not been informed that one of its sentencing options is life
without possibility of parole "renders the sentencing stage fundamentally unfair");
Fontenot v. State, 881 P.2d 69, 74 (Okla. 1994); Humphrey v. State, 864 P.2d 343,
344 (Okla. 1993); Hain v. State, 852 P.2d 744, 753 (Okla. 1993); Salazar v. State, 852
P.2d 729 (Okla. 1993); Taylor v. State, 1995 WL 571320, *25 (Miss. Sept. 28, 1995)
(overturning death sentence when capital sentencing jury not instructed that "life"
sentence for defendant adjudicated as an habitual criminal meant "life without
possibility of parole"); Russell v. State, 607 So. 2d 1107, 1118 (Miss. 1992); Ladner
v. State, 584 So. 2d 743, 759 (Miss. 1991); Mackbee v. State, 575 So. 2d 16, 38-41
(Miss. 1990); Berry v. State, 575 So. 2d 1, 13 (Miss. 1990); Turner v. State, 573 So.
2d 657, 674 (Miss. 1990); State v. Henderson, 109 N.M. 655, 658-59, 789 P.2d 603,
606-07 (1990) (vacating death sentence on eighth amendment grounds when jury had
not been instructed that a person sentenced to life imprisonment in New Mexico
would be ineligible for parole for thirty years, and that, in this particular case, the
defendant would not be eligible for parole for at least fifty-five years).

verdict.  His death sentence must be reversed.

> **3.    The imposition of a death sentence by a jury that had not been instructed that its sole non-capital sentencing option carried the statutory impossibility of parole offended the evolving standards of decency that underlie the Eighth Amendment.**

344.    A sentencing process that offends "the evolving standards of decency that mark the progress of a maturing society" violates the Eighth Amendment.  Roper v. Simmons, 543 U.S. 551, 560 (2005) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)); Atkins v. Virginia, 536 U.S. 304, 311-12 (2002) (same); Gregg v. Georgia, 428 U.S. 153, 173 (1976) (same).  The doctrine applies both to the substance of who may be subject to the death penalty *and* to the sentencing procedures employed in meting out the punishment.  See Gardner v. Florida, 430 U.S. 349, 357 (1977) ("this Court has acknowledged its obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society").[77]  Petitioner's death sentence, which was imposed by a jury that was not informed that, in Pennsylvania, "life imprisonment" means "life without possibility of parole," was

_____

[77] See Beck v. Alabama, 447 U.S. 625, 636-37 (1980) ("the nearly universal acceptance of the rule [that a defendant is entitled to a lesser included offense instruction] as a matter of due process, in both state and federal courts establishes the value to the defendant of this procedural safeguard"); Spaziano v. Florida, 468 U.S. 447, 464 (1984) (applying evolving standards analysis but determining that judicial override of jury sentencing not unconstitutional:  "The fact that a majority of jurisdictions have adopted a different practice, however, does not establish that contemporary standards of decency are offended by the jury override").

a product of such a process.

345.   The evolving standards of decency that give content to the Eighth Amendment are measured by objective indicia of community values, including legislative judgments, sentences imposed by juries, public opinion, and international practices and opinion. See, e.g., Roper, 543 U.S. 551 (2005); Atkins, 536 U.S. 304 (2002); Thompson v. Oklahoma, 487 U.S. 815 (1988); Ford v. Wainwright, 477 U.S. 399 (1986); Enmund v. Florida, 458 U.S. 782 (1982); Coker v. Georgia, 433 U.S. 584 (1977).   The imposition of a death sentence, returned by a jury that has been presented a materially false and harsher sentencing choice, offends every one of these indicia of community values.

346.   The Supreme Court has placed great weight upon legislative judgments as a primary indicator of community values. E.g., Atkins, 536 U.S. at 312 ("the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures'" (quoting Penry v. Lynaugh, 492 U.S. 302, 331 (1989))); Gregg v. Georgia, 428 U.S. 153, 174-75 & n.19 (1976).

347.   Today, Pennsylvania is the only State in the country that provides capital sentencing juries a binary choice between sentences of life without possibility of parole and death but refuses to inform those juries that a life sentence means life without parole.   And today, every legislative body that has spoken on this subject has

rejected Pennsylvania's approach.[78]

348.   By Petitioner's count, twenty-two (22) of the other twenty-three (23)

states that provide the jury an option between life without possibility of parole and

death now inform the sentencing jury of the defendant's parole ineligibility, either by

instructing the jury to choose between the sentencing alternatives of death and life

without parole, or by giving the jury the power to specify whether the defendant

should or should not be eligible for parole.[79]   After the <u>Simmons</u> trilogy of South

---

[78]   Indeed, no Pennsylvania statute requires the withholding of information concerning parole ineligibility. The Commonwealth's current refusal to provide a life without parole instruction is a *court-made rule*. The rule initially arose during an era in which parole was available for life-sentenced inmates, and it was initially designed to *protect defendants* against harsher punishment caused by jury speculation about the possibility of discretionary acts of leniency by the executive branch that could result in early release from prison. E.g., <u>Commonwealth v. Johnson</u> 368 Pa. 139, 81 A.2d 569 (1951). The Pennsylvania Supreme Court later interpreted these decisions as removing the *subject matter* of parole – as opposed to harmful speculation as to when a defendant might be released on parole – from the jury. <u>Commonwealth v. Strong</u>, 522 Pa. 445, 563 A.2d 479 (1989); <u>Commonwealth v. Henry</u>, 524 Pa. 135, 569 A.2d 929 (1990).

[79]   ALA. CODE § 13A-5-46(e) (1982); ARK. CODE ANN. § 5-4-603(b) (Supp. 1993); CAL. PEN. CODE §190.3 (West 1988); CONN. GEN. STAT. §53a-46a(f) (West 1985); DEL. CODE. ANN. tit. 11, 4209(a) (1987); 1993 Fla. Sess. Law Serv. 93-406, S.B. 26-B, § 16; FLA. STAT. 775.0823(1) (effective 1/1/94), FLA. STAT. 921.142 (West 1992) & Standard Jury Instructions-Criminal Cases, 603 So.2d 1175, 1205 (Fla. 1992); LA. CODE CRIM. PROC. ANN. art. 905.6 (West Supp. 1993); MO. ANN. STAT. § 565.030.4 (Vernon Supp. 1993); N.H. REV. STAT. ANN. § 630:5 (IV) (Supp. 1992); WASH. REV. CODE ANN. § 10.95.030(1), 95.050 (West 1990). Case law in four other states requires that capital sentencing juries be informed whenever a life sentence means the defendant will be ineligible for parole. See COLO. REV. STAT. §

Carolina cases, South Carolina so instructs and Pennsylvania is the only remaining state that fails to provide an accurate life without parole instruction.[80] This "nearly universal acceptance" that juries should be advised when "life" means "life without parole," "establishes the value to the defendant of this procedural safeguard." Beck v. Alabama, 447 U.S. 625, 636-37 (1980).

349.   The strength of the national consensus in favor of telling capital sentencing juries the truth about the meaning of a life sentence whenever they have a choice of life without parole or death rivals the *strongest* instances of an evolved

---

16-11-103(1)(b) (Supp. 1993); ILL. REV. STAT. ch. 38, ¶ 1005-8-1 (Smith-Hurd Supp. 1992); MISS. CODE ANN. § 47-7-3(1)(a) (Supp. 1992); Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999).   Nine states give the jury the power to specify when the defendant should be eligible for parole.   See GA. CODE § 17-10-31.1(a) (Supp. 1993); IND. CODE § 35-50-2-9 (Supp. 1993); MD. ANN. CODE art. 27, § 413(c)(3) (1987); NEV. STAT. 182; NEV. REV. STAT. ANN. § 175.554(2)(c)(2), - (4) (1992); N.Y. CORRECT. Ch. 43, art. 22-B, Historical & statutory notes (McKinney 1995); OKLA. STAT. ANN. tit. 21, 701.10(A) (West 1993); OR. REV. STAT. § 163.105 (Supp. 1992); TENN. CODE ANN. § 39-13-204(a), -(f)(2) (Supp. 1993); UTAH CODE ANN. § 76-3- 207(4) (Supp. 1993).

Two of the remaining life-without-parole jurisdictions -- South Dakota and Wyoming -- have not considered the question of whether jurors should be instructed concerning the unavailability of parole.   See S.D. CODIFIED LAWS ANN. § 24-15-4 (1988); WYO. STAT. §§ 6-2- 101(b), 7-13-402(a) (Supp. 1992).

[80] For Virginia, see VA. CODE § 18.2-10, -31; VA. CODE ANN. § 53.1- 151(B); Eaton v. Commonwealth, 240 Va. 236, 397 S.E.2d 385 (1990), cert. denied, 502 U.S. 824 (1991); O'Dell v. Commonwealth, 364 S.E.2d 491, 507, cert. denied, 488 U.S. 871 (1988).   The Virginia courts mandated a life without parole instruction in Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999).

consensus against an unconstitutional death penalty practice. E.g., Ford v. Wainwright, 477 U.S. at 408 (execution of insane violates Eighth Amendment, in part because no state legislature permits execution of insane); Coker v. Georgia, 433 U.S. at 594 (death penalty for non-homicidal rape of adult woman violates Eighth Amendment, in part because no other state legislature authorizes death penalty in those circumstances); Beck, 447 U.S. at 635 ("Alabama's failure to afford capital defendants the protection provided by lesser included offense instructions is unique in American criminal law" and violates Eighth Amendment); cf. Trop v. Dulles, 356 U.S. 86, 103 (1958) (punishment of loss of citizenship for war time desertion was held to violate the evolving standards of decency where only two other nations of the world permitted denationalization as a penalty for desertion). In Enmund v. Florida, 458 U.S. 782, 792 (1982), the evolving standards were held to bar the application of the death penalty against robbers who neither took life nor intended that a killing occur, where "only a small minority of jurisdictions – eight – allow the death penalty to be imposed solely because the defendant somehow participated in a robbery in the course of which a murder was committed."

350. And the near-universal practice of requiring a life without parole instruction whenever a capital sentencing jury is faced with a binary choice between life without parole and death evidences a far clearer national consensus than in Atkins

v. Virginia, 536 U.S. 304 (2002), and Roper v. Simmons, 543 U.S. 551 (2005), the two most recent evolving standards cases in which the Court has held death penalty practices to violate the Eighth Amendment. In those cases, an identical total of thirty States prohibited the death penalty for persons with mental retardation and for juveniles, respectively, "comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles [or the mentally retarded] from its reach." Roper, 543 U.S. at 563; Atkins, 536 U.S. at 313-15. There, "the consistency in the trend toward abolition of the practice" provided the decisive evidence of an evolved consensus.

351.    Here, the consensus is clear and all jurisdictions but Pennsylvania have evolved. Moreover, the direction of change favors Petitioner's analysis. Since Simmons was decided, *every* jurisdiction that has adopted a binary choice between life without parole and death requires informing the sentencing jury that the life option is life without parole. Thus, a powerful national consensus exists that Pennsylvania's practice of withholding material information concerning the "life without possibility of parole" sentencing option, offends the evolving standards of decency that prevail in this Nation, and therefore violates the Eighth Amendment.

352.    Although the legislative and judicial rejection of Pennsylvania's approach is alone sufficient to require relief under this Eighth Amendment theory, it

is also noteworthy that the sentencing practices Pennsylvania employed in this case also draw no support from any other of the indicia of community values employed by the courts to assess the constitutionality of a penal sanction under the Eighth Amendment.   This includes the judgments of juries,[81] public opinion,[82] and

---

[81]   The United States Supreme Court has made clear that "a jury that must choose between life imprisonment and capital punishment can do little more -- and must do nothing less -- than express the conscience of the community on the ultimate question of life or death." Witherspoon v. Illinois, 391 U.S. 510, 519 (1968). Indeed, "one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system -- a link without with the determination of punishment would hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" Id. at 519 n.15 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion)). Pennsylvania's refusal to inform jurors as to the true nature of their sentencing options severs that vital link between contemporary community values and the penal system, distorts the community's expression of its contemporary values, and, in so doing, offends the Eighth Amendment. Indeed, the distortion is so serious that it effectively denies a capital defendant an impartial sentencing jury. See infra Part D.

[82]   The courts also have looked both to general expressions of public opinion and the opinion of professional associations to determine whether a challenged punishment comports with contemporary community values. E.g., Thompson v. Oklahoma, 487 U.S. 815, 830 & nn. 32 & 33 (1987); Woodson v. North Carolina, 428 U.S. 280, 298 n.34 (1976). General public opinion surveys provide evidence that the public does not support Pennsylvania's capital sentencing scheme. Polling data from the Simmons case reveals that only 7.1% of eligible jurors believed that a person who was sentenced to life would actually spend his entire life in prison -- and therefore that 92.9% of respondents were unaware of the jury's actual sentencing options. Petitioner's Brief, Simmons v. South Carolina, 1993 WL 657673 at *154a, Table 2. Yet, if they were faced with a decision between sentencing a defendant to life or death, 86.8% of the jurors polled said it would be important to them to know "how much time the person would have to spend in prison before they would have a chance to be released, if you sentenced them to life imprisonment." Id. at *155a

international law and practice.[83] This Court should grant Petitioner relief and a new sentencing hearing because American constitutional justice has unquestionably evolved beyond Pennsylvania's unconstitutional practice.

---

(Table 3). Additionally, Pennsylvania practice is squarely at odds with the long-standing positions of the American Law Institute that capital sentencing juries should be informed "of the nature of the sentence of imprisonment that may be imposed, *including its implication with respect to possible release upon parole*, if the jury verdict is against the sentence of death." See ALI MODEL PENAL CODE § 210.6 (Prop. Off. Draft 1962).

[83] Roper, 543 U.S. 551, 574-577 (2005) (considering international law and practices in evolving standards inquiry); Atkins v. Virginia, 536 U.S. 304, 316 n.21 (2002); Thompson v. Oklahoma, 487 U.S. 815, 830-31 & nn.31 & 34 (1988); Enmund v. Florida, 458 U.S. 782, 788, 796 n.22 (1982); Coker v. Georgia, 433 U.S. 584, 596 n.10 (1977); Trop v. Dulles, 356 U.S. 86, 102-03 (1958). Pennsylvania's death-penalty of withholding from jurors material information concerning the "life without possibility of parole" sentencing option draws no support from international law and practices, and not one international or regional human rights treaty envisions that death sentences would be imposed by a jury that has based its judgment on a materially inaccurate and harsher view of its sentencing options.

Indeed, the evolving international consensus is that "the death penalty can no longer be regarded as an acceptable form of punishment from a human rights perspective," *Brief of Amicus Curiae The European Union in Support of The Petitioner*, McCarver v. North Carolina, No. 00-8727, 2001 WL 648609, *5-*6 (U.S. June 8, 2001), and so much so that deportation of a defendant *to Pennsylvania* from a country that has abolished the death penalty has specifically been adjudicated to be a violation of international human rights treaties. See Judge v. Canada, U.N. Comm. Hum. Rts. CCPR/C/78/D/829/1998, Communication No. 829/1998, ¶ 10.7 (Aug. 13, 2003) ("the protection of human rights evolves" and now prohibits returning a fugitive from death to a death-penalty state to be executed). See also Ring v. Arizona, 536 U.S. 584, 618 (2002) (Breyer, J., concurring) (noting data that "other nations have increasingly abandoned capital punishment").

353. The evolving standards doctrine has been a linchpin of Eighth Amendment law for nearly half a century, <u>Trop v. Dulles</u>, 356 U.S. 86, 101 (1958), that had been applied to invalidate unconstitutional capital sentencing *procedures* well before the date of Petitioner's trial. <u>E.g.</u>, <u>Gardner v. Florida</u>, 430 U.S. 349, 357 (1977) ("this Court has acknowledged its obligation to re-examine capital-sentencing procedures against evolving standards of procedural fairness in a civilized society"); <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980). Moreover, the national consensus against Pennsylvania's sentencing practice had already developed by the time of Petitioner's trial.

## C.  The Failure to Provide a Life Without Possibility of Parole Instruction Violated Petitioner's Due Process Rights.

354. The trial court's failure to provide the jury with an instruction that a life sentence in Pennsylvania means "life without possibility of parole" also constituted four distinct and independent violations of Petitioner's due process rights: (1) it violated the clear command of <u>Simmons v. South Carolina</u>, which required that the jury be instructed that life imprisonment means life without possibility of parole; (2) it violated the due process proscription against being sentenced to death based upon information the defendant had no opportunity to rebut or explain (<u>Gardner v. Florida</u>, <u>Skipper v. South Carolina</u>); (3) it violated the due process proscription against

166

sentences imposed by a sentencer acting under a material misapprehension of law or fact relating to the sentencing decision (Townsend v. Burke, United States v. Tucker); and (4) it violated Petitioner's due process liberty interest to sentencing by a jury deciding between the choices of life without possibility of parole and death (Hicks v. Oklahoma).

1.  **The failure to provide a life without possibility of parole instruction deprived Petitioner of his due process protections under Simmons v. South Carolina.**

355.   In a capital case, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons v. South Carolina, 512 U.S. at 156. Under clear United States Supreme Court precedent, the Commonwealth unquestionably and inevitably placed Petitioner's future dangerousness at issue in this case, but the court failed to inform the sentencing jury of Petitioner's parole ineligibility. Accordingly, Petitioner's due process rights were violated and he is entitled to relief from his death sentence.

356.   The prosecution's trial and penalty phase evidentiary presentation and argument squarely injected issues relating to Petitioner's future dangerousness.

357.   Under Simmons, "[e]vidence of future dangerousness . . . is evidence with a tendency to prove dangerousness in the future; its relevance to that point does

not disappear merely because it might support other inferences or be described in other terms." Kelly v. South Carolina, 534 U.S. 246, 254 (2002); id. (all "evidence of dangerous 'character' [tending to] show 'characteristic' future dangerousness").

358.   Nonetheless, despite its "duty . . . to give instructions sufficient to explain the law, Kelly, 534 U.S. at 256, the court failed to provide an accurate instruction on the statutory definition of the jury's life-sentencing option. Its "death or life" instruction amounted to "no instruction at all" on the question of parole eligibility, and "left the jury to speculate whether 'life imprisonment' means life without parole or something else."[84] Simmons, 512 U.S. at 166.

**2.   The failure to provide a life without possibility of parole instruction deprived Petitioner of his due process protections against being sentenced to death based upon inaccurate information he had no opportunity to rebut or explain concerning his supposed parole eligibility.**

359.   Due process prohibits the execution of a person "on the basis of information which he had no opportunity to deny or explain." Gardner v. Florida, 430 U.S. 349, 362 (1977); Skipper v. South Carolina, 476 U.S. 1 (1986).

---

[84] Data collected by the Capital Jury Project documents that this misperception is greater in Pennsylvania than in any other life-without-parole sentencing state. Bowers & Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 TEX. L. REV. 605, 648 n.200 (1999) (fully half of Pennsylvania's jurors questioned believed a life sentence was *twelve* years or less).

360. Here, Petitioner was sentenced to death by a jury that was not instructed that he would be parole ineligible if sentenced to life. Permitting the jury to speculate as to the nature of the life sentence created a false set of sentencing options that left jurors who believed Petitioner should spend the rest of his life in custody with the false Hobson's choice between death and parole eligibility.

> **3.  The failure to provide a life without possibility of parole instruction violated Petitioner's due process rights by subjecting him to a sentence imposed on the basis of inaccurate information that was material to the sentencing decision.**

361. Due process has long proscribed the imposition of a harsher sentence on the basis of inaccurate information that is material to the sentencing decision. Townsend v. Burke, 334 U.S. 736, 741 (1948); Roberts v. United States, 445 U.S. 552, 556 (1980); United States v. Tucker, 404 U.S. 443, 447 (1972); Hicks v. Oklahoma, 447 U.S. 343 (1980); United States v. Levy, 865 F.2d 551, 559-60 (3d Cir. 1989) (en banc) (vacating sentence imposed because "sentencing on the basis of materially untrue assumptions violates due process"); United States v. Baylin, 696 F.2d 1030, 1042 (3d Cir. 1982) (Becker, J.) (due process violated when sentencer may have imposed increased sentence based upon unreliable factual inference).[85]

---

[85] See also United States v. Curran, 926 F.2d 59, 61 (1st Cir. 1991) ("It is well settled . . . that a defendant has a due process right to be sentenced upon information which is not false or materially incorrect."); United States v. McDavid, 41 F.3d 841,

362.   This proscription applies whether the sentencer is a judge (e.g., Townsend) or, as here, a jury (e.g., Hicks). Johnson v. Rosemeyer, 117 F.3d 104, 112 (3d Cir. 1997).

363.   A number of Circuit Courts – including the Third Circuit *en banc* – have already applied this clearly established principle to vacate sentences imposed under a material misapprehension concerning a defendant's parole eligibility. E.g., Levy, 865 F.2d at 559-60 ("sentencing on the basis of materially untrue assumptions" concerning parole eligibility "violates due process" (quoting United States v. Katzin,

---

844 (2d Cir. 1995) ("A sentence based in part on material misinformation may not stand"); King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987) ("It is well established that . . . material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process."); United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970) ("material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process . . . especially when imposed in a context of other aggravating circumstances"); United States v. Tobias, 662 F.2d 381, 388 (5th Cir. 1981) ("Sentences based upon erroneous and material information or assumptions violate due process."), cert. denied, 457 U.S. 1108 (1982); United States v. Espinoza, 481 F.2d 553, 555 (5th Cir. 1973) ("a defendant retains the right not to be sentenced on the basis of invalid premises"); United States v. Musa, 946 F.2d 1297, 1306 (7th Cir. 1991) ("There is no question but that a criminal defendant has a due process right to be sentenced on the basis of accurate information"); United States v. Kerley, 838 F.2d 932, 940 (7th Cir. 1988) ("a sentence predicated on misinformation cannot stand"); United States v. Ruster, 712 F.2d 409, 412 (9th Cir. 1983) (due process violated when sentencer "relies on materially false or unreliable information in sentencing a defendant"); United States v. Lemon, 723 F.2d 922, 933 (D.C. Cir. 1984) ("the sentencing judge may not rely on mistaken information or baseless assumptions").

824 F.2d 234, 240 (3d Cir.1987) and citing <u>United States v. Tucker</u>, 404 U.S. 443

(1972))); <u>cf</u>. <u>Meyers v. Gillis</u>, 142 F.3d 664, 666-67 (3d Cir. 1998) (trial counsel's

advice that defendant "would become eligible for parole sometime in the future

despite pleading guilty to a crime that carried a mandatory period of life

imprisonment as the only authorized sentence" was "grossly misleading"); <u>Carpenter</u>

<u>v. Vaughn</u>, 296 F.3d 138, 158 (3d Cir. 2002) (noting the "highly prejudicial impact

of the false impression that Carpenter might be paroled if he was not executed" that

resulted from counsel's failure to request a life without parole instruction). <u>Levy</u>, 865

F.2d at 560 (sentence reversed when the sentencer may have imposed a harsher

sentence because he incorrectly believed the defendant would be eligible for parole);

<u>King v. Hoke</u>, 825 F.2d 720, 724 (2d Cir. 1987) (sentencing judge's incorrect

understanding of defendant's minimum statutory parole eligibility date deprived

defendant of due process at sentencing); <u>United States v. Stewart</u>, 779 F.2d 538, 541

(9th Cir. 1985) (Kennedy, J.) (sentence under pending criminal enterprise statute

vacated when sentencer "may have acted on mistaken advice from the Government

that sentencing defendant to life imprisonment without possibility of parole would not

necessarily preclude his eventual parole release"); <u>cf</u>. <u>Meyers v. Gillis</u>, 142 F.3d 664,

666-67 (3d Cir. 1998) (trial counsel's advice that defendant "would become eligible

for parole sometime in the future despite pleading guilty to a crime that carried a

mandatory period of life imprisonment as the only authorized sentence" was "grossly misleading").

364.    Petitioner need not prove "actual reliance [by the jury] on the erroneous information" concerning parole eligibility to be granted relief. King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987). He need only show that there was an "unacceptable risk" that the sentence was "the result of a misconception" that he would be eligible for parole. United States v. Levy, 865 F.2d at 560 (3d Cir.) (en banc). As Justice Kennedy made clear while he was a judge of the Ninth Circuit court of appeals, this occurs when the sentencer "*may have relied* on misinformation" suggesting that the defendant could be eligible for parole. United States v. Stewart, 779 F.2d 538, 541 (9th Cir. 1985); see also King, 825 F.2d at 724 (sentence set aside when the sentencer's "reliance on an improper factor [the defendant's supposed parole eligibility] was 'quite probable'").[86]

365.    Here, for all of the reasons stated above, it is highly likely that the jury believed Petitioner could be paroled from a life sentence – and as a result there was an unacceptably high risk that the sentencing jury relied upon this misperception in

---

[86] United States v. Lemon, 723 F.2d 922, 933 (D.C. Cir. 1984) ("courts must be concerned not merely when a sentencing judge has relied on demonstrably false information, but 'when the sentencing process created a significant possibility that misinformation infected the decision.'").

imposing the sentence in this case. Indeed, Juror Michelle Payne admitted as much.

This conclusion also draws substantial support from the observations of the United

States Supreme Court, as well as numerous social science studies concerning juror

misunderstanding of the meaning of a life sentence.

366.    The Supreme Court has repeatedly acknowledged as "common sense"

the fact that "most juries lack accurate information about the precise meaning of 'life

imprisonment' as defined by the States," Simmons, 512 U.S. at 169-70, and that

"'many jurors might not know whether a life sentence carries with it the possibility

of parole,'" Kelly, 534 U.S. at 257 (quoting Simmons, 512 U.S. at 177-78

(O'Connor, J., concurring)); Shafer v. South Carolina, 532 U.S. at 52.

367.    What was common sense to the Court has been borne out by polls and

research studies.[87] As the New York Court of Appeals has explained:

---

[87] Simmons, 512 U.S. at 170 n.9 ("Public opinion and juror surveys support the
common sense understanding that there is a reasonable likelihood of juror confusion
about the meaning of the term 'life imprisonment.' See Paduano & Smith, *Deathly
Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death
Penalty*, 18 COLUM. HUMAN RIGHTS L. REV. 211, 222-225 (1987); Note, *The
Meaning of 'Life' for Virginia Jurors and Its Effect on Reliability in Capital
Sentencing*, 75 VA.L.REV. 1605, 1624 (1989); Eisenberg & Wells, *Deadly Confusion:
Juror Instructions in Capital Cases*, 79 CORNELL L.REV. 1 (1993); Bowers, *Capital
Punishment & Contemporary Values: People's Misgivings and the Court's
Misperceptions*, 27 Law & Society 157, 169-170 (1993)."). These studies show that
"the typical juror at the sentencing phase of a capital trial perceives the imposition of
a sentence of 'life imprisonment' to mean there is a good chance that the capital
defendant will in fact be released from prison on parole." Paduano & Smith, *supra*,

Studies have found that jurors tend to "grossly underestimate how long capital murderers not sentenced to death usually stay in prison" (Bowers and Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 648 [Feb. 1999]). Jurors' beliefs with respect to the actual number of years a defendant will serve in prison are compelling and can even be decisive. As the study concluded, the "sooner jurors think a defendant will be released from prison, the more likely they are to vote for death. . ." (*id.* at 703). Thus, jurors might impose the death penalty on a defendant whom they believed did not deserve it simply because they fear that the defendant would not serve a life sentence.

People v. LaValle, 3 N.Y.3d 88, 117, 817 N.E.2d 341, 357, 783 N.Y.S.2d 485, 501

(2004).[88]

---

*Deathly Errors*, 18 COLUM. HUM. RIGHTS L. REV. at 211; see also Bennack, *The Public, the Media and the Judicial System*, 7 STATE CT. J. 4, 10 (1983) (70 percent of Americans in national survey believed that criminals sentenced to "life imprisonment" would not spend rest of life in prison); *Deathly Errors, supra*, 18 COLUM. HUM. RIGHTS L. REV. at 222 n.33 (randomly selected capital jury veniremen in Cobb County, Georgia believed, on average, that " life sentence" meant imprisonment for 8.1 years); id. at 223-25 n.35 (summarizing results of countywide survey in Georgia and of jury venire survey in Mississippi, which both showed that estimates of anticipated "life sentence" duration averaged ten years or less); Hood, *The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing*, 75 VA. L. REV. 1605, 1624 n.101 (1989) (median estimate by jury-eligible residents of Prince Edward County, Virginia of time that capital murderer would actually spend in prison on "life imprisonment" sentence was 10 years); Dayan et al., *Searching for an Impartial Sentencer Through Jury Selection in Capital Trials*, 23 LOY. L.A. L. REV. 151, 171 (1989) (post-trial interviews of 30 Maryland capital jurors showed that half believed life term inmates would typically serve no more than 10-15 years in prison).

[88] See also Brown v. Texas, 522 U.S. 940, 940 n.2 (1997) (Stevens, J., Souter, Ginsberg and Breyer, JJ.) (dissent from denial of certiorari). The Court in LaValle thoroughly explained the prejudicial effects on a sentencing jury of the material

368.   Moreover, data collected by the Capital Jury Project documents that the risk of juror misunderstanding as to the meaning of the life-sentencing option is particularly great in Pennsylvania.  Wanda D. Foglia, Nathan M. Schenker, *Arbitrary and Capricious After All These Years: Constitutional Problems With Capital Jurors' Decision Making*, 25 THE CHAMPION 26, 30 (July 2001) (Pennsylvania is "one of the states in which the difference between juror assumptions [about the length of a life sentence] and reality is most dramatic.") (hereinafter *Foglia & Schenker*).   The Pennsylvania portion of the study disclosed the following juror estimates in five-year intervals of the time usually served by capital defendants who were not sentenced to death in Pennsylvania:

| 0-9 | 10-14 | 15-19 | 20-24 | 25+ | Life | No Answer |
|------|-------|-------|-------|------|-------|-----------|
| 21.6% | 17.6% | 6.8% | 21.6% | 6.8% | 12.2% | 13.5% |
| (n=16) | (n=13) | (n=5) | (n=16) | (n=5) | (n=9) | (n=10) |

Median* est. =15-19 yrs. (n=64)

*Median estimate was calculated by excluding "no answers" and including "life," although life often reflects uncertainty or unwillingness to estimate in years rather than a belief defendant will spend rest of life in prison. Median for those who gave numerical estimates, or excluding life, would be 10-14 years.

Wanda D. Foglia, *They Know Not What They Do:   Unguided and Misguided*

differences between a life sentence and a sentence of life without parole.  That discussion is highly relevant to the unacceptability of the risk that Petitioner's sentencing jury imposed a death penalty even though it may have believed a sentence of life *without* possibility of parole would have been sufficient.

175

*Decision-Making in Pennsylvania Capital Cases*, 20 JUSTICE QUARTERLY, No. 1, at 187-211, *Table 1* (2003); id. at 196 ("[M]ost of the jurors who were interviewed in [Pennsylvania] did not think a life sentence truly meant life in prison. Over a fifth thought that the defendant would be out of prison in 9 or fewer years, and the median estimate was 15-19 years."); *Foglia & Schenker*, 25 THE CHAMPION at 30.[89]

369.   During juror interviews, "[m]any of the CJP jurors volunteered that they believed they had to vote for death to ensure that the defendant would not get back on the streets." See William J. Bowers and Wanda D. Foglia, *Still Singularly Agonizing:  Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 CRIMINAL LAW BULLETIN 51, 83 (2003) (hereinafter *Bowers & Foglia*).  The data from the study confirmed that "[t]he jurors' lack of faith that life really means life makes them more likely to vote for death." *Foglia & Schenker*, 25 THE CHAMPION at 30.   The researchers singled out the Pennsylvania results as particularly "disturbing."  *Bowers & Foglia*, 39 CRIMINAL LAW BULLETIN at 83; *Foglia &*

---

[89] In the early articles on the Capital Jury Project, Bowers & Steiner, *Death by Default:  An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 648 n.200 (1999), the researchers excluded non-numeric estimates (i.e., "life" answers) from their estimates of the length of life sentence and calculated a twelve-year median estimate for a life sentence in Pennsylvania.  But whether using this estimate or Dr. Foglia's more conservative estimate, jurors in Pennsylvania were – as a group – the least informed of all the life-without-parole jurisdictions covered in the study.

*Schenker*, 25 THE CHAMPION at 30.   The data unequivocally demonstrated that

"capital jurors in Pennsylvania are more likely to vote for death because they do not

believe the alternative to the death penalty is truly life in prison." *Foglia & Schenker*,

25 THE CHAMPION at 30.  For Pennsylvania, they show that

> ***38.6% of those who actually voted for death said that they would have
> preferred life without parole if it had been the alternative***, as it indeed
> was in the cases they decided.  Jurors are actually voting for death
> because of their mistaken assumption that it is the only way to keep
> people they see as dangerous out of society.

*Bowers & Foglia*, 39 CRIMINAL LAW BULLETIN at 83.

370.   Reliable research data, public opinion polls, and the commonsense

understanding of judges all point inexorably to the conclusion "that there [was] a

reasonable likelihood of juror confusion about the meaning of the term "life

imprisonment," Simmons, 512 U.S. at 170 n.9, in this case and that there was a

substantial likelihood that the jurors' mistaken belief that Petitioner would be eligible

for parole weighed heavily in their sentencing decision. This is exactly what occurred

with Juror Michelle Payne.  Ms. Payne confirmed that had she known that a life

sentence in Pennsylvania meant *life without parole*, she would have sentenced

Petitioner to life rather than death.

371.   When they are not told about the ineligibility of parole from a life

sentence, capital sentencing jurors are "going to be making 'false choices' and voting

for death because they underestimate the alternative." *Bowers & Foglia*, 39 CRIMINAL LAW BULLETIN at 83.

372.   The trial court's sentencing instructions – which provided the jury with no guidance on the question of parole – amounted to "no instruction at all, . . . le[aving] the jury to speculate whether 'life imprisonment' means life without parole or something else." Simmons v. South Carolina, 512 U.S. 154, 166 (1994). But jury speculation as to parole eligibility has no basis in reality in Pennsylvania. Both under Pennsylvania law and the actual practices of the Commonwealth, a life sentence amounts to a natural lifetime in prison -- life *without* parole. Whether examined *de jure* or *de facto*, there is no parole from a Pennsylvania life sentence.

373.   The notion that Petitioner "would become eligible for parole sometime in the future despite [conviction for] a crime that carried a mandatory period of life imprisonment as the only authorized sentence" is "grossly misleading," Meyers v. Gillis, 142 F.3d 664, 666-67 (3d Cir. 1998), and Petitioner's death sentence – imposed without an instruction curing that misperception – violated due process.

374.   Because life without possibility of parole is a "radically different third alternative" from sentences of "life" and "death," Salazar v. State, 852 P.2d 729, 744 (Okla. 1993) (Johnson, J., specially concurring); see also People v. LaValle, 3 N.Y.3d at 119, 783 N.Y.S.2d at 502, 817 N.E.2d at 359 (describing the choice between death

178

and life with parole as "a Hobson's choice" for "jurors who are inclined toward life without parole"), this jury's deliberations were based upon a prejudicially inaccurate view of its sentencing options. See also Brown v. Texas, 522 U.S. 940, 942 (1997) (1997) (Stevens, J., joined by Souter, Ginsburg, & Breyer, JJ., opinion respecting denial of certiorari) (failing to explain to the capital sentencing jury that a defendant if sentenced to life would be ineligible for parole for 35 years "unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose").

375.   Given Pennsylvania's requirement that a death-sentence be unanimous, the risk that even *one* juror *may have* imposed death believing that the alternative sentence was life with parole, which is precisely what happened with Juror Michelle Payne, establishes that the court's failure to instruct the jury that "life" means "life without possibility of parole" violated the due process protections of the Fourteenth Amendment.  E.g., Townsend v. Burke, 334 U.S. 736, 741 (1948); United States v. Tucker, 404 U.S. 443, 447 (1972); United States v. Levy, 865 F.2d 551, 559-60 (3d Cir. 1989) (en banc); United States v. Kerley, 838 F.2d 932, 940 (7th Cir. 1988) (Posner, J.); King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987); United States v. Stewart, 779 F.2d 538, 541 (9th Cir. 1985) (Kennedy, J.).

    **4.    The failure to provide a life without possibility of parole instruction deprived Petitioner of his due process life and liberty interests in having his punishment fixed by a jury that would choose between the lawful sentencing options of "life without possibility of parole" and "death."**

376.  The failure to instruct the jury that its sentencing options were life without possibility of parole and death also violated due process by denying Petitioner his due process life and liberty interests in having his punishment fixed by a jury that would choose between the legally mandated sentencing options of death and life without possibility of parole.

377.  The federal constitution does not command that Pennsylvania adopt any particular approach to capital sentencing. However, when a state mandates certain sentencing procedures or establishes the right to particular appellate, post-conviction, or post-sentencing review in capital cases, it creates Fourteenth Amendment life and liberty interests in those procedures. Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); see Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in meaningful state proceedings to adjudicate competency to be executed); Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 288-89 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right

to capital clemency proceedings); id. at 1254-55 (Stevens, J., concurring).[90]

378.   By statute in Pennsylvania, a convicted capital defendant is entitled to have his punishment fixed by the jury in "a separate sentencing hearing *in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.*" 42 Pa. C.S. § 9711(a)(1). The term "life imprisonment" as employed in Pennsylvania's capital sentencing statute is statutorily defined as "life without possibility of parole."

379.   The jury in this case had the duty to consider whether the evidence properly introduced in the sentencing proceedings was aggravating or mitigating in light of the available sentencing options.  In assessing the mitigating value of evidence, it was obligated to determine whether the evidence constituted "a basis for a sentence less than death," Lockett v. Ohio, 438 U.S. 586 (1978)[91] – in this case, meaning life without parole. Upon finding aggravating and mitigating circumstances, the jury was then obligated to balance whether the reasons for death outweighed the

---

[90]  See also Griffin v. Illinois, 351 U.S. 12, 20 (1956) (state-created right to appeal protected by due process; refusal to provide transcript to indigent criminal appellant "would deny adequate review to the poor" in violation of due process); Yates v. Aiken, 484 U.S. 211, 218 (1988) (state-created right to post-conviction review protected by due process; when court "has considered the merits of the federal claim, it has duty to grant the relief federal law requires").

[91]  See also Eddings v. Oklahoma, 455 U.S. 104 (1982); Skipper v. South Carolina, 476 U.S. 1 (1986); Mills v. Maryland, 486 U.S. 367 (1988).

reasons to sentence Petitioner to life without possibility of parole. Had the jury been correctly instructed, it then would have had the obligation to decide between the statutorily mandated sentencing options of life without possibility of parole or death, and it would have had the discretion to return a sentence of life without possibility of parole. Indeed, it would be legally required to do so, so long as any juror believed any mitigating factor could justify such a sentence.

380.   Petitioner's absolute right to have a jury exercise its discretion to fix his punishment between life without possibility of parole and death vested in him a constitutionally protected due process life and liberty interest in a sentence resulting from the exercise of that discretion. Hicks, 447 U.S. at 346 (federal due process interest in adherence to mandated sentencing procedures); Williams v. Cain, 125 F.3d 269, 281 (5th Cir. 1997) ("capital defendant . . . has a constitutional liberty interest in having his sentence imposed by a jury instructed to act within the bounds of its statutory discretion"); Toney v. Gammon, 79 F.3d 693, 699-700 (8th Cir. 1996) (due process interest in particular sentencing options); Dupuy v. Butler, 837 F.2d 699, 703 (5th Cir. 1988) (due process interest in exercise of sentencing options). Thus, in Sattazahn v. Pennsylvania, the Commonwealth took the position in the United States Supreme Court that a Pennsylvania capital defendant "has a liberty interest in the jury's being informed of all the sentences which it can impose." *Brief of Respondent*

*Commonwealth of Pennsylvania*, 2002 WL 1885050, *40 (U.S. Aug. 2, 2002); <u>cf</u>.

<u>Hunt v. Nuth</u>, 57 F.3d 1327, 1335 (4th Cir. 1997) (liberty interest in sentencing

instruction on life without possibility of parole not vested when defendant was

convicted *prior to* statutory adoption of life without parole sentencing option).

381.   In <u>Hicks v. Oklahoma</u>, 477 U.S. 343 (1980), the Supreme Court held that

the trial court's failure to instruct the jury that it had the option to impose an

alternative sentence violated the state-created liberty interest (and thus federal due

process) in having the jury select his sentence from the full range of alternatives

available under state law. The United States Court of Appeals for the Fifth Circuit

has succinctly summarized the holding in <u>Hicks</u> in terms especially applicable here:

to establish a valid <u>Hicks</u> claim, the defendant must show "that the sentencing

authority lacked knowledge and understanding of the range of sentencing discretion

under state law . . . [and that] a substantial *possibility* exists that the sentencer, if

properly informed, would have chosen one of the less severe sentencing options."

<u>Dupuy v. Butler</u>, 837 F.2d 699, 703 (5th Cir. 1988) (footnotes omitted).

382.   Here, if only one juror, after weighing the aggravating and mitigating

evidence in this case, decided that the defendant should be sentenced to "life without

possibility of parole" instead of death, the court would have been required to impose

a life sentence.  42 Pa. C.S. § 9711(c)(1)(iv).  Juror Michelle Payne acknowledged

that she would have voted for a sentence of life without parole had the jury been accurately instructed as to its sentencing obligations under Pennsylvania law.

383. Petitioner's liberty interest in the exercise of jury discretion to fix his punishment between life without possibility of parole and death was arbitrarily denied when accurate and material information concerning the jury's sentencing options – that the life sentence-option carried with it automatic ineligibility for parole – was withheld from the jury, and the jury instead was forced to choose between the undefined alternatives of death and life. In these circumstances, Petitioner's death sentence violated due process.

### D. The Court's Failure to Provide a Life Without Possibility of Parole Instruction Resulted in a Capital Sentencing Hearing in Front of a Jury Uncommonly Willing to Condemn Petitioner to Die.

384. The Sixth Amendment right to an impartial jury guarantees that a capital defendant not be sentenced before a jury "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968). However, the trial court's failure to provide a life without possibility of parole instruction resulted in a sentencing hearing before a jury that could not possibly fairly evaluate what evidence was legitimately aggravating, what evidence was legitimately mitigating, and how much weight to give each factor in deciding whether life was an appropriate sentence.

385.  As discussed above in the sections on material misapprehensions of law and fact and the impairment of mitigation, the effect of this misinformation on the jury was endemic and powerful.  As a result, the jury gave greater weight to the Commonwealth's evidence in aggravation and gave impermissible consideration to non-statutory factors as reasons for death, in derogation of its obligations under Pennsylvania's capital sentencing statute. This additional and "stronger" aggravating evidence would make the jury more likely to impose a death sentence than if it were properly instructed on Petitioner's parole ineligibility.  The jury was ignorant of Petitioner's ineligibility for parole – and therefore prevented from considering and giving effect to relevant mitigating evidence that, by virtue of his parole ineligibility, he would pose no future danger to society at large.

386.  Similarly, the jury was prevented from treating other evidence in the record as mitigating and giving full weight to evidence that might have justified a sentence of life without possibility of parole but which might not be enough to justify a life sentence if parole were a possibility. The denigration of mitigation would make factfindings supporting a life sentence less likely and undervalue those findings that did support a life sentence, artificially increasing the prospects of a death verdict.

387.  And finally, the absence of a life without parole instruction provided the jury with a materially false sentencing instruction that "would result in harsher

penalty options," <u>Fontenot v. State</u>, 881 P.2d 69, 74 n.2 (Okla. 1994), that once again tipped the scales in favor of a death sentence that a fully informed jury might not impose.

388.   Each of these factors substantially impaired the jurors' performance of their capital sentencing duties in accordance with Pennsylvania law and the Constitution of the United States in violation of Petitioner's Sixth Amendment right to an impartial capital sentencing jury. <u>See</u> <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980); <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985); <u>Morgan v. Illinois</u>, 504 U.S. 719, 730 (1992). Cumulatively, there can be no doubt that the absence of a life without parole instruction made it impossible for the jury to fairly find the facts and follow the applicable law. As a consequence, Petitioner was sentenced by a jury that was "oriented impermissibly toward the death penalty even before it began its deliberations," <u>State v. Henderson</u>, 109 N.M. 655, 659, 789 P.2d 603, 606-07 (1990), and therefore "uncommonly willing to condemn a man to die." <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 521 (1968).

389.   Accordingly, Petitioner's death sentence must be vacated.

**E.   Counsel was Ineffective.**

390.   For the reasons described above, the failure to provide a life without parole instruction violated Petitioner's Sixth, Eighth, and Fourteenth Amendment

rights. The prosecution injected the issue of Petitioner's future dangerousness into the guilt phase proceedings. Regardless of the fact that Petitioner proceeded *pro se* during the penalty phase,[92] counsel should have objected during the prosecution's closing argument at trial, and requested such an instruction at that point in time in anticipation of the penalty proceedings. Counsel was ineffective for failing to request such an instruction and for failing to raise these issues at trial, in post-verdict motions, and on direct appeal.

391. Here, "there is no question" about the law, <u>Skipper v. South Carolina</u>, 476 U.S. 1, 4 (1986): "evidence that the defendant would not pose a danger if spared (but incarcerated) ***must be considered potentially mitigating*.*" <u>Id</u>. at 4. There is also no question how to go about doing this: "there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." <u>Simmons</u>, 512 U.S. at 163-64.

392. There were numerous legal theories available, all of which would have required the court to provide a life without parole instruction. All of these theories were well established at the time of trial and appeal, and counsel could have had no reasonable basis for being unaware any of them – let alone *all* of them.

---

[92] <u>See</u> Claims VIII and IX *supra*.

393.   Accordingly, trial and appellate counsel's failure to raise and litigate these issues and to present proper evidence was objectively unreasonable and constitutes prejudicially deficient performance in violation of the Sixth Amendment. Strickland v. Washington, 466 U.S. 668 (1984).  This deficient performance was unquestionably prejudicial because the appellate courts would have been required to reverse Petitioner's death sentence, if presented with these issues.  Accordingly, appellate counsel was ineffective in violation of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387 (1985).

394.   In this capital case, the court's and counsel's failures also violated Petitioner's Eighth Amendment rights to a reliable capital trial and sentencing and to meaningful appellate review of his capital conviction and death sentence.  Relief is required.

**CLAIM XI.  PETITIONER SHOULD BE AFFORDED A NEW TRIAL AND SENTENCING HEARING BECAUSE THE REASONABLE DOUBT INSTRUCTION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

395.   The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

188

## A.   Introduction.

396.   The trial court instructed the jury on reasonable doubt in a way that unconstitutionally diminished the prosecution's burden of proof at both the guilt and sentencing phase; constricted the manner in which the jury could find a reasonable doubt; and undermined Petitioner's presumption of innocence. At capital sentencing, the court merely referred the jury back to this erroneous charge, causing Petitioner to be sentenced to death by a jury that was misinformed about the Commonwealth's burden of proof, and violating due process and the Eighth Amendment.

397.   Due process prohibits the criminal conviction of any person "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  Here, the jury instructions violated Petitioner's due process rights by defining "reasonable doubt" in a way that unconstitutionally diminished the Commonwealth's burden of proof and infringed upon the presumption of innocence.

## B.   The Erroneous  Guilt Phase Instruction.

398.   At the conclusion of the guilt stage of Petitioner's trial, the trial court gave the following reasonable doubt instruction:

> A person accused of a crime is not required to present evidence or prove anything in his own defense. The Commonwealth has to prove the case to you beyond a reasonable doubt.

189

This does not mean that the Commonwealth has to prove the case beyond all doubt. There would never be a conviction in this case because there can be a doubt about everything you do. It does not require that the Commonwealth prove the case to a mathematical certainty, nor must it demonstrate the complete impossibility of innocence.

A reasonable doubt is this: A reasonable doubt is a doubt that would cause a reasonable, careful and sensible person and restrain them from acting in matters of importance in their own affairs. I'll give you that definition again. A reasonable doubt is such doubt that would cause a reasonable and careful person to restrain from acting in matters of importance in your own affairs. *A reasonable doubt must fairly arise out of the evidence that was presented to you or the lack of evidence that was presented to you* with respect to some element of the crime the Defendant is charged with.

A reasonable doubt must be a real doubt. It cannot be one that is imagined, nor may it be a doubt that is manufactured. *It must be a doubt that arises from the evidence that is substantial* and well founded on reason, thinking and common sense.

A reasonable doubt is much more though than a mere suspicion about something or a mere probability that something occurred. That is what it is not. So in giving you the definition of a reasonable doubt, I've given you what it is not at the high end, that it's not beyond all doubt or a mathematical certainty or the impossibility of innocence.

On the low end, beyond a reasonable doubt is more than a mere suspicion that something occurred. So when filtering the evidence and the testimony and facts as you look at those and apply those facts to the elements of the crimes that we're about to go through, that is the burden of proof that the Commonwealth has to meet.

NT Vol. VI at 116-18.

399. These instructions were shot through with error from start to finish.

Read as a whole – as the law requires, <u>Holland v. United States</u>, 348 U.S. 121, 140

(1954) ("taken as a whole, the instructions [must] correctly convey the concept of

reasonable doubt to the jury") – they advise the jury that a reasonable doubt must be

a "substantial" doubt (a construction condemned in <u>Victor v. Nebraska</u>, 511 U.S. 1

(1994)); that a doubt arising from the <u>absence</u> of evidence (in other words, if the

Commonwealth failed to present adequate evidence as to a particular element) would

<u>not</u> constitute a reasonable doubt, but only a "possible" doubt; and finally, that a

person is presumed innocent <u>until evidence is presented which outweighs that</u>

<u>presumption</u> – language that describes a preponderance standard rather than the

reasonable doubt standard the Constitution demands.

 400. The constitutional infirmity of the trial court's reasonable doubt

definition is further illustrated by comparison of that instruction to Pennsylvania's

pattern jury instruction: "A reasonable doubt is a doubt that would cause a

reasonably careful and sensible person to hesitate before acting upon a matter of

importance in his own affairs." Pennsylvania Standard Criminal Jury Instruction

7.01(3) (1979). An instruction that requires the jury to "restrain" from action, rather

than merely "hesitate" – as approved by the United States Supreme Court in <u>Victor</u>,

511 U.S. at 20 – materially changes the nature of the jury's obligations. <u>Compare</u>

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1061 (1976) ("hesitate" implies

a "pause or other sign of indecision before acting") <u>with</u> <u>id.</u> at 1936 ("restrain"
suggests "use of force, pressure, or strenuous persuasion to hold back a person or
thing from a course of action or to prevent the action itself"). Permitting proof of
guilt unless the evidence would stop the jury from acting at all, instead of acquitting
if the evidence was sufficient to give the jury pause and make it hesitate, erects a
much higher level of doubt – and lower burden of proof – than that countenanced by
due process.

401.  The court's instructions improperly and unconstitutionally reduced the
Commonwealth's burden and essentially told the jury that Petitioner must
demonstrate his innocence.  The court plainly told the jury that if evidence was
lacking that this *lack* of evidence was then "not a doubt arising from the evidence"
and *not a reasonable doubt.*  The charge had the effect of shifting the burden to
Petitioner to affirmatively prove his innocence:   the lack of evidence on the
Commonwealth's part would merely create a "possible doubt," and would not justify
"restraint" about rendering a verdict.   Only doubts "fairly aris[ing] out of the
evidence" – actual, positive evidence – could create a reasonable doubt that would
warrant restraint.

402.  Taken as a whole, there is far more than a "reasonable likelihood that the
jury understood the instructions to allow conviction based on proof insufficient to

meet the Winship standard." <u>Victor</u>, 511 U.S. at 6.

## C.     The Penalty Phase Instruction.

403.   During the penalty phase, when informing the jury of the
Commonwealth's burden of proof with regard to aggravating circumstances, the court
instructed as follows:

> – and I'm going to point out the aggravating circumstances have to be
> proven beyond a reasonable doubt.  And that I know I gave you the
> definition in the other proceeding, but a reasonable doubt is such a doubt
> that would cause a reasonable and careful person to restrain from acting
> in a matter of importance in your own affairs.  It doesn't require that the
> Commonwealth prove the case to you beyond all doubt or to a
> mathematical certainty or that (sic) the impossibility of innocence. *It's
> not that high of a burden.*  But it is more than a mere probability or a
> mere suspicion or a mere likelihood.  It is more than that.

NT Vol. VIII at 40.

404.   In addition to merely referring back to the erroneous guilt phase
reasonable doubt instruction, the court specifically instructed the jury that the
Commonwealth's burden of proving aggravating circumstances is *"not that high of
a burden,"* which had the effect of unconstitutionally diminishing the
Commonwealth's burden of proof.

## D.     Conclusion.

405.   The trial court's inaccurate instructions created special constitutional
infirmities because this is a capital case, where heightened procedural safeguards,

greater protection for the defendant and a heightened scope of judicial review are required by the Eighth Amendment. The trial court's instructions, however, diminished – rather than heightened – the procedural protections afforded Petitioner, and denied him the protections available to defendants who received the proper reasonable doubt instruction.

406. The Commonwealth was relieved of its burden of proving each and every element of the offense and aggravating circumstances beyond a reasonable doubt. Petitioner is entitled to a new trial and penalty proceeding.

407. Trial counsel's failure to object and request proper instructions and post-trial and appellate counsel's failure to properly raise and litigate this claim in subsequent proceedings constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Relief is required.

**CLAIM XII. PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING BECAUSE THE COURT'S INSTRUCTIONS ERECTED UNCONSTITUTIONAL REQUIREMENTS THAT THE DEFENSE MITIGATING EVIDENCE HAD TO HAVE BOTH A FACTUAL NEXUS TO THE OFFENSE AND MEET A QUALITATIVE THRESHOLD BEFORE THE JURY COULD GIVE EFFECT TO IT AS A REASON TO SPARE PETITIONER'S LIFE.**

408. The matters set forth in all other sections of this *Petition* are repeated and realleged as if set forth entirely herein.

409. Petitioner is entitled to a new sentencing hearing because the trial court

unconstitutionally instructed the jury that there were factual and qualitative

prerequisites his mitigating evidence must meet before the jury could give effect to

that evidence as a reason to spare his life. In so doing, the court skewed the jury's

consideration of the evidence presented in sentencing, and rendered the resulting

death sentence arbitrary and unreliable in violation of the Eighth and Fourteenth

Amendments.

410.   In introducing the concepts of aggravating and mitigating circumstances

to the jury, the court instructed as follows:

> An aggravating circumstance is those things that would make this first
> degree murder or this killing more deserving of the death penalty, while
> mitigating circumstances that would be presented to you by the
> Defendant would be evidence and circumstances which would make it
> less likely and this crime less terrible and less deserving of the death
> penalty. So that's what this proceeding is about.

NT Vol. VIII at 22-23.

411.   This instruction blatantly violated the Eighth Amendment. Mitigating

evidence need not have any relationship to the *crime*, and it is most assuredly *not*

limited to making the crime "less terrible." Indeed, there is nothing about a capital

crime that can be anything but terrible, and it is constitutionally offensive to cabin

mitigation by requiring it to diminish the terribleness of the crime.

412.   But, momentarily ignoring the unconstitutionality of any "terribleness"

195

limitation, the trial court's instruction that mitigating circumstances are "evidence and circumstances which would make . . . *this crime* less terrible," placed the focus of mitigating evidence squarely on the circumstances of the offense at the expense of those aspects of the defendant's character, background, or record that make him a "uniquely individual human being," Woodson v. North Carolina, 428 U.S. 280, 304 (1976), and that would otherwise justify sparing his life.

413.   One of the most fundamental requirements of capital sentencing is that the jury must undertake an exhaustive review of both the criminal offense *and the offender.*   The jury must be able to consider *and give effect to* the character, background, and record of the defendant himself. E.g. Tennard v. Dretke, 124 S. Ct. 2562, 2570 (2004); Penry v. Lynaugh, 492 U.S. 302, 322, 324 (1989). At its essence, the Eighth Amendment constitutionally mandates *individualized* capital sentencing. Woodson v. North Carolina, 428 U.S. 280, 304 (1976); Sumner v. Shuman, 483 U.S. 66, 75-76 (1987). This requires a reasoned moral response to the personal culpability and the unique personal circumstances of the defendant. E.g., Woodson, 428 U.S. at 304. As the Supreme Court explained in Penry v. Lynaugh:

> [I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence. . . . Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that

> death is the appropriate sentence. . . ." Thus, the sentence imposed at the
> penalty stage should reflect a reasoned moral response to the
> defendant's background, character, and crime."

Penry v. Lynaugh, 492 U.S. at 302 (citations omitted).

414.   While the circumstances of the offense are an important consideration

in determining whether a defendant should live or be sentenced to die, that does not

alter the fundamental fact that *evidence need not have any causal connection to the*

*crime for it to be mitigating*, and that exclusion of such evidence violates the Eighth

Amendment.  See, e.g., Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986)

(defendant's post-arrest conduct in prison "would not relate specifically to

petitioner's culpability for the crime he committed" but "there is no question but that

such inferences would be 'mitigating'"); Penry v. Lynaugh, 492 U.S. 302 (1989)

(brain damage and mental retardation);[93] Eddings v. Oklahoma, 455 U.S. 104 (1982)

(evidence of defendant's turbulent family history); see also South Carolina v. Gathers,

490 U.S. 805, 817-18 (1989) (O'Connor, J., dissenting) ("not merely the

---

[93]  In Atkins v. Virginia, 536 U.S. 304, 316 (2002), this Court indicated that
"mentally retarded offenders [are viewed] as categorically less culpable than the
average criminal."  This categorically lesser culpability of persons with mental
retardation, extrinsic of the circumstances of the offense, now prevents the State from
applying the death penalty against a mentally retarded defendant.  But for the years
preceding Atkins, "it [was] precisely because the punishment should be directly
related to the personal culpability of the defendant that the jury [was required] to
consider and give effect to mitigating evidence" of mental retardation, irrespective
of the circumstances of the offense. Penry v. Lynaugh, 492 U.S. 302, 327-28 (1989).

circumstances of the crime are relevant"; "[e]vidence extraneous to the crime itself is deemed relevant and indeed, constitutionally so"; itemized portions of Gathers' mitigating evidence, "[n]one of [which] was directly relevant to the [circumstances of the offense], but all of it was relevant to the jury's assessment of respondent himself and his moral blameworthiness unrelated to the offense"); Tennard, 124 S.Ct. at 2569-70 (rejecting the Fifth Circuit's requirement that in order to be constitutionally relevant mitigation evidence, defendant's low I.Q. must have contributed to the criminal act).

415. The instructional requirement that mitigation "evidence and circumstances" must make "*this crime* less terrible" is nothing more than a requirement that mitigating evidence have a factual nexus to the time and circumstances of the offense. Indeed, the Pennsylvania Supreme Court has recognized as much in explaining former Pennsylvania Suggested Standard Criminal Jury Instructions, Pattern Instruction 15.2502F, which states:

> Members of the jury, you must now decide whether to sentence the defendant to death or to life imprisonment. Your sentence will depend upon what you find about aggravating and mitigating circumstances. They are things that make a first degree murder *case* either more terrible or else less terrible.

The state court held that the pattern "less terrible" instruction "appropriately inform[ed the jury] that in order to find mitigating circumstances [it] must determine

that evidence existed showing appellant's character was impaired *in some way so as to diminish his capacity to appreciate his criminal behavior*." Commonwealth v. Saranchak, 544 Pa. 158, 675 A.2d 268, 276 (1996). This recognition strongly suggests that the pattern instruction may be unconstitutional, for in Tennard v. Dretke, 542 U.S. 274, 287 (2004), the Supreme Court unequivocally reaffirmed that such a nexus requirement "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context."

416.   But here, the constitutional violation is even clearer, for the instruction given in this case materially deviated from the pattern instruction in a clearly unconstitutional manner. Here, the jury was told that the mitigating evidence must have a factual link to *this crime*, while the Eighth Amendment requires a capital jury to consider any and all factors about the *defendant*, his character, background, and record, and not just factors related to the homicide for which his life was in jeopardy.

417.   Moreover, the concept that mitigation must make this killing less terrible involves not just the subject matter of what constitutes mitigating evidence but *how* the jury was to evaluate whether and to what extent the evidence is to be considered mitigating. In so doing, it creates an umbrella under which the jury's consideration of the already impermissibly limited mitigating factors had to fall. Thus, when the jury was later told that it may consider other evidence concerning defendant's

"character" and record, the jury's view of Petitioner's "character" was limited by the court's instruction as to the terribleness of the crime. Consequently, where the jury rejected Petitioner's mitigating evidence that was distinct from the crime itself, "ability to consider and give effect to [Petitioner's] mitigating evidence . . . was 'shackled and confined,'" Penry v. Johnson, 532 U.S. 782, 798 (2001) (Penry II), by the instruction that the mitigating value of evidence was dependent upon whether it made the murder less terrible. Under this instruction, "'[a] reasonable juror could well have believed that there was no vehicle for expressing the view that [Petitioner] did not deserve to be sentenced to death based upon his mitigating evidence.'" Id. at 804 (quoting Penry I, 492 U.S. at 326).

418.   So even though the court generally instructed that the defendant's character and record could constitute mitigating evidence, "the mechanism it purported to create for the jurors to give effect to that evidence was ineffective." Id.

419.   Finally, apart from any nexus requirement, the "less terrible" instruction erects a doubly unconstitutional *qualitative* requirement. First, Tennard reaffirms that the Eighth Amendment has never required any threshold screening test before mitigating evidence is constitutionally relevant. The requirement is – and has always been – that "a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." Tennard, 542 U.S.

200