# Exhibit 4

COMMONWEALTH OF PENNSYLVANIA   :

ORIGINAL

                       :

          VS          :   DISTRICT NO. 12-0-01

                       :

SAMUEL B. RANDOLPH        :


TRANSCRIPT OF PROCEEDINGS
PRELIMINARY HEARING


BEFORE:  MARY E. CROSS, SR. DISTRICT JUSTICE

DATE:    MAY 23, 2002, 10:31 A.M.

PLACE:   501 MALL ROAD
           HARRISBURG, PENNSYLVANIA


APPEARANCES:

    OFFICE OF THE DISTRICT ATTORNEY
    BY:  FRANCIS T. CHARDO, ESQUIRE

       FOR - COMMONWEALTH

    LAW OFFICES OF ANTHONY N. THOMAS
    BY:  ANTHONY N. THOMAS, ESQUIRE
        KIRSTIN M. SWEIGARD, ESQUIRE

       FOR - DEFENDANT


                             LISA BRUAW, REPORTER
                             NOTARY PUBLIC

2

1                          I N D E X

2                          WITNESSES

3    FOR COMMONWEALTH        DIRECT    CROSS   REDIRECT RECROSS

4    Patty Garber              4         7       --        --

5    Thomas Carter             8        11       15        --

6    Alister Campbell, III    16        25       --        --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I'll call the hearing to order.

2    Counselor, do you waive the reading?

3          MR. THOMAS:  Yes, Your Honor.

4          MR. CHARDO:  We're prepared to proceed, Your

5    Honor.  We've sequestered our witnesses and we ask that

6    any defense witnesses are sequestered.

7          THE COURT:  Are there any witnesses in the

8    courtroom?

9          MR. THOMAS:  No, Your Honor.

10          MR. CHARDO:  The only other person I'm not

11    going to sequester is Investigator Carter, who's the chief

12    investigator.  One thing I would ask, Patty Garber is

13    present from the coroner's office.  Do you wish to have

14    her testify or do you wish to stipulate?

15          MR. THOMAS:  We'll stipulate to the results of

16    the coroner's report, but that's the extent of it.

17          MR. CHARDO:  In that case, our first witness is

18    Patty Garber.

19          MR. THOMAS:  Before we proceed, I'd like

20    clarification because there appears to be some discrepancy

21    between the information that's contained on our

22    preliminary arraignment notice and the criminal complaint.

23    On the arraignment notice it indicates there are four

24    counts of murder.

25          MR. CHARDO:  The charging document should

4

1    decide what the charges are.

2

3            PATTY J. GARBER, called as a witness, being

4    duly sworn, testified as follows:

5

6                    DIRECT EXAMINATION

7

8    BY MR. CHARDO:

9        Q     Please give us your name.

10       A     Patty J. Garber.

11       Q     Your official position?

12       A     Chief deputy coroner for Dauphin County.

13       Q     Did the coroner's office respond to a death

14   scene on September 19th, 2001, at Todd and Pat's Bar in

15   the city of Harrisburg?

16       A     Yes.  Mr. Lee Rung was the deputy corner.

17       Q     You have a report relating to that coroner's

18   action?

19       A     Yes, I do.

20       Q     Who were the dead involved in this inquiry?

21       A     Anthony Burton age 19 and Thomas Easter age 21.

22       Q     Where were these two fellows found within the

23   establishment?  Do you know?

24       A     According to Mr. Rung's report Mr. Burton was

25   found outside on the sidewalk.  Mr. Easter was found just

1    inside the front door.

2         Q     What wounds did first Burton have?

3         A     Mr. Burton sustained a gunshot wound to his

4    back.

5         Q     And Mr. Easter?

6         A     Gunshot wound to his head.

7         Q     Were autopsies performed in connection with

8    those two deaths?

9         A     Yes.

10        Q     By whom?

11        A     Dr. Wayne Ross.

12        Q     He's the forensic pathologist who was

13   under contract with your agency?

14        A     Yes.

15        Q     What did Dr. Ross determine to be the cause and

16   manner of death with regard to Anthony Burton?

17        A     For Mr. Burton cause of death gunshot wound to

18   the back, manner of death homicide.

19        Q     With regard to Mr. Easter?

20        A     Mr. Easter cause of death was gunshot wound to

21   the head, manner of death homicide.

22        Q     Did Dr. Ross determine exactly the point of

23   rest for the projectile that killed Burton?

24        A     Yes.  He has a detailed description for both,

25   actually both gunshot wounds to both the victims.

1     Q      With regard to Burton?

2     A      Mr. Burton's wound he describes the gunshot

3  wound as consists of a distant gunshot wound to the left

4  upper back.

5     Q      The path of travel?

6     A      The path proceeded in the back to front, left

7  to right and downward direction, goes through the chest

8  wall.  It enters between the second and third ribs.  It

9  goes through the left upper lobe of the lung, goes through

10  and through the pulmonary artery and anterior aspect of

11  the right ventricle.

12            It goes through the pericardial sac and through

13  and through the surface between the second and third rib

14  region.  Just over the surface there's a large caliber

15  jacketed missile that was recovered and given to Cindy

16  Baldwin.

17     Q      He was shot through the heart?

18     A      Basically, yes.

19            MR. CHARDO:  Those are the only questions I

20  have for Miss Garber.

21            MS. SWEIGARD:  May I approach, Your Honor?

22  May we have a moment, Your Honor?  We didn't have a prior

23  opportunity to look at this report.

24            MR. CHARDO:  I don't have a problem with them

25  reviewing it as long as we can move it along.  We will

7

1    provide this in discovery.  And it shouldn't be a

2    substitute for discovery.

3

4                      CROSS EXAMINATION

5

6    BY MS. SWEIGARD:

7         Q    Ma'am, on either of these reports first dealing

8    with Thomas Easter was there any tests done for any drugs

9    or alcohol in Mr. Easter's system?

10        A    Yes.

11        Q    And what were the results of those tests?

12        A    Mr. Easter it tested positive for ethyl --

13             MR. CHARDO:  I object.  I don't think the

14   decedent's toxicology is in any way relevant to a murder

15   charge.

16             MS. SWEIGARD:  We've stipulated to the content

17   of the report.  And this is indicated within the report.

18             MR. CHARDO:  Very well, if we can just not

19   belabor it.

20             THE WITNESS:  Ethyl alcohol and also MDMA which

21   is Ecstasy.

22   BY MS. SWEIGARD:

23        Q    With regards to Mr. Easter were there any

24   indications of any illegal drugs in his system?

25        A    Yes.  MDMA, which is Ecstasy.

```
 1              MS. SWEIGARD:  I have no further questions.

 2              MR. CHARDO:  Nothing else, Judge.  Investigator

 3    Carter.

 4

 5              THOMAS CARTER, called as a witness, being duly

 6    sworn, testified as follows:

 7

 8                         DIRECT EXAMINATION

 9

10    BY MR. CHARDO:

11        Q      State your name.

12        A      Tom Carter, C-a-r-t-e-r.

13        Q      Are you a member of the Harrisburg Bureau of

14    Police?

15        A      Yes, I am.

16        Q      And were you the lead investigator into the

17    murders that were just -- the shooting deaths that were

18    just described by Miss Garber?

19        A      Yes.

20        Q      You have some photographs with you up there?

21        A      Yes, I do.

22        Q      What are the photographs of?

23        A      The photographs are of the victims that were

24    inside the bar the night of the shooting and pictures of

25    their injuries.
```

1      Q    Other than the two decedent's, Easter and

2  Burton, who else do you have photographs that were wounded

3  on that night?

4      A    I have photographs of Alister Campbell,

5  Reginald Gillespie.

6      Q    The picture of Reginald Gillespie, what were

7  his wounds?

8      A    He received a gunshot wound to his left upper

9  thigh.

10     Q    Where was he treated?

11     A    He was treated at Osteopathic Hospital.

12     Q    Did you subsequently interview him?

13     A    Yes, I did.

14     Q    Who else do you have photographs of injuries?

15     MS. SWEIGARD:  Your Honor, I object to this

16  line of questioning.  I would assert that the victims

17  themselves could testify to what Detective Carter is

18  testifying to.

19     MR. CHARDO:  That is, of course, true; however,

20  we intend to present that as hearsay.  It's admissible at

21  a preliminary hearing.  We're going to present an

22  eyewitness who can establish who the shooter was.  But it

23  would be superfluous to call the witnesses.  And we're not

24  required to do so.

25     THE COURT:  I'll go along with that.

10

```
1    BY MR. CHARDO:

2         Q    Who else was wounded?

3         A    Lakisha Warren.

4         Q    Where was she wounded?

5         A    She was wounded in the buttocks.

6         Q    Who else was wounded?

7         A    Latoya Jackson.  She was wounded in the left

8    foot.

9         Q    Was there anyone else wounded?

10        A    John Brown, the bartender.

11        Q    Where was he wounded?

12        A    In his left shoulder.

13        Q    Other than the two decedents how many people

14   were wounded by gunfire?

15        A    Five.

16        Q    The survivors, the five survivors are all those

17   individuals live and still living in the Harrisburg area

18   for future testimony?

19        A    Yes, they are.

20        MR. CHARDO:  Those are the only questions I

21   have for Investigator Carter.

22

23                    CROSS EXAMINATION

24

25   BY MS. SWEIGARD:
```

11

1      Q     Detective, do you know where any of these

2  victims were treated?

3      A     Yes, all except Reginald Gillespie was treated

4  at Harrisburg Hospital.

5      Q     Did you take statements from any of these

6  eyewitnesses or victims?

7      A     Yes.

8      Q     Did you take statements from all of them?

9      A     All of them, correct.

10     Q     Are you aware of the contents of those

11  statements?

12     A     Yes.

13     Q     Did any of them identify Sam Randolph as the

14  person who shot them?

15     A     No.

16     Q     Were they able to identify anyone who shot

17  them?

18     A     Just a basic description.

19     Q     Do you have those photos with you today?

20     A     Yes.

21     Q     Do you have any of the photographs of the five

22  aggravated assault victims?

23     A     Yes, I have them on my table right there.

24     Q     How was it that you know who's who on the

25  pictures?

12

```
 1          A       I know them by --

 2          Q       You know somebody's foot?

 3          A       I know what she told me.  I know her from

 4    seeing her.

 5          Q       Tell us what the basic description of the

 6    alleged assailant was.

 7          A       By which individual?

 8          Q       Any of them beginning with Al Campbell.

 9          A       Al Campbell his description as to what he gave

10    me?

11          Q       Uh-huh.

12                  MR. CHARDO:  If I could, Al Campbell is going

13    to testify, Judge.  I don't have a problem with any of the

14    witnesses that we've listed as hearsay, but Al Campbell is

15    going to testify.

16    BY MS. SWEIGARD:

17          Q       Mr. Gillespie?

18          A       Mr. Gillespie testified he was on the floor

19    when the shooter came within a foot of him.  He said that

20    Mr. Easter was laying on his lap.  That's how he received

21    the wound to his thigh by Mr. Easter being shot in the

22    head and the bullet went through his head and struck Mr.

23    Gillespie in the thigh because Easter was huddled up in

24    the corner laying on him.

25                  So he was saying he was lying on the floor.  He
```

1    looked up and he saw a man he describes as being in dark

2    clothing and he didn't give a height or weight.

3         Q    Is it Lakisha Warren?

4         A    Correct.  She was also lying in the corner.

5    She was laying next to Mr. Gillespie.  And that's how she

6    received the wound to her foot.  She described the shooter

7    as just wearing dark clothing.

8         Q    Latoya Jackson?

9         A    Latoya Jackson she stated that she couldn't

10   see.  She just saw the gentleman come in with the hood on.

11   She turned her head to try to get out of the bar.

12        Q    Did she give a description of the shooter?

13        A    I don't recall.

14        Q    And John Brown?

15        A    John Brown described the shooter as shorter

16   than him wearing dark clothing and some type of mask,

17   stocky build.

18        Q    How tall is John Brown?

19        A    John Brown is about five-eleven.

20        Q    Do they describe the mask to you?

21        A    John Brown described it as some type of Scream

22   mask.

23        Q    When were the statements given?

24        A    I interviewed them the day of the shooting, the

25   day after the shooting, and three times after that.

1    Q      Was that for each of the victims?

2    A      Different ones.  We interviewed people at

3    different times.  But everyone was interviewed the day of

4    the shooting and the day after the shooting.  Then as they

5    were recovering from their injuries they came to the

6    police station and gave a voluntary statement.

7    Q      Were all of those statements recorded in a

8    police report?

9    A      Yes.

10   Q      Did any of the witnesses give any information

11   regarding a third party that might have entered the bar

12   before the shooting?

13   A      Third party?

14   Q      A person that may have entered the bar before

15   the shooting?

16   A      Yes.

17   Q      Do you recall who that was?

18          MR. CHARDO:  Objection.  This is beyond the

19   scope.  We're not to prepared to give witnesses' names at

20   this time.  The Grand Injury deemed fit not to name the

21   witness in the presentment.  The time for revealing

22   eyewitnesses is for discovery.  I object to the question.

23          MR. SWEIGARD:  I wasn't questioning as to the

24   identity of the witness.  I was questioning as to which of

25   the victims identified this person.

1          MR. CHARDO:  That would be the naming of an

2    eyewitness.

3          THE COURT:  I'll sustain your objection,

4    Counselor.

5          MR. CHARDO:  Yes, Your Honor.

6          MS. SWEIGARD:  I have no further questions.

7

8                    REDIRECT EXAMINATION

9

10   BY MR. CHARDO:

11        Q     Detective, when you've been testifying on cross

12   have you access up there to your police report?

13        A     No.

14        MR. CHARDO:  Thank you.

15        MS. SWEIGARD:  Nothing, Your Honor.

16        MR. CHARDO:  Your Honor, while we are waiting

17   for the next witness we have a stipulation that Samuel

18   Randolph did not have a license to carry a firearm at the

19   time of the alleged offense; is that correct?

20        MR. THOMAS:  Yes.

21        MR. CHARDO:  The other thing we stipulate to is

22   one of the charges former convict I have a certification

23   of the Defendant's conviction for a felony drug offense

24   receiving one to four years in the state correctional

25   institution May 17, 1995 making him a former convict not

1    to own or possession a firearm.

2

3            ALISTER CAMPBELL, III, called as a witness,

4    being duly sworn, testified as follows:

5

6                    DIRECT EXAMINATION

7

8    BY MR. CHARDO:

9        Q    Give us your full name.

10       A    Alister Campbell, III.

11       Q    Mr. Campbell, how old are you?

12       A    20.

13       Q    Are you currently confined here in the Dauphin

14   County Prison?

15       A    Yes, sir.

16       Q    Do you know the Defendant Sam Randolph?

17       A    Yes, sir.

18       Q    Prior to September 19th, 2001, had you ever

19   seen the Defendant on any occasion?

20       A    Yes, sir.

21       Q    Prior to September 19th approximately how many

22   times would you say you had seen him?

23       A    Sporadically about seven or eight times.

24       Q    I want to call your attention to September

25   19th, 2001.  The location 1939 North 6th Street, a bar.

17

1     Do you know that bar?

2          A     Yes, sir.

3          Q     What's the name of the bar?  By what name do

4     you know the bar?

5          A     Charlie and Ernie's.

6          Q     Is that also known as Todd and Pat's Tavern?

7          A     Yes, sir.

8          Q     Were you there on September 19th, 2001?

9          A     Yes, sir.

10         Q     About what time did you get there?

11         A     I would say roughly about 9:30, 10:00.

12         Q     Did you go alone or did you go with others?

13         A     Two other people.

14         Q     With whom did you go?

15         A     Anthony Burton and Thomas Easter.

16         Q     Were they friends of yours?

17         A     Yes, sir.

18         Q     When you got to the bar was the bar opened?

19         A     Yes, sir.

20         Q     How many other people other than you and your

21    two friends would you say were in the bar?

22         A     About six or seven.

23         Q     This is when you arrived?

24         A     Yes, sir.

25         Q     While you were at the bar did you have anything

18

1     to drink?

2        A     Yes, sir.

3        Q     What was that?

4        A     A shot of Hennesey.

5        Q     Is that a whiskey?

6        A     I'm not sure.

7        Q     Some type of liquor?

8        A     Yes, sir.

9        Q     At some point during the night were you

10    wounded?

11       A     Yes, sir.

12       Q     I want to call your attention to immediately

13    before you were wounded.  Where were you in the bar?

14       A     There's like a touch-screen game on the counter

15    of the bar.  I was standing right in front of it.

16       Q     A type of video game?

17       A     Yes, sir.

18       Q     Where were your two friends Easter and Burton?

19       A     Easter was by the juke box and Burton was by

20    the pool table.

21       Q     Describe the lighting inside Todd and Pat's

22    Tavern that night?

23       A     It was bright lights.

24       Q     When you were playing the touch-screen game

25    what happened?

19

1  A  Well, somebody came into the bar, Sammie

2 Randolph.  And he began opening fire before I could, you

3 know what I mean, get out of the way.

4  Q  When he first came in the door were you still

5 at the touch-screen game?

6  A  Yes, sir.  But I was moved over shifted a

7 little bit to the right.

8  Q  The person who came in the door describe the

9 person as you saw them then, their dimensions?

10  A  What they had on?

11  Q  First tell us what they were wearing.

12  A  A fatigue jacket with a black hoody and a mask.

13  Q  Describe the mask.

14  A  It covered like 50 percent of his face from the

15 nose from under the eyes down.

16  Q  Describe the size.  First what was the race of

17 this person?

18  A  The race?

19  Q  Yes.

20  A  Black.

21  Q  It was a male?

22  A  Yes.

23  Q  Describe the size of the person.

24  A  About five-eight, five-nine, somewhere in that

25 area, short not skinny, kind of stocky.

20

1      Q      When the person first walked in the door, you

2  said they eventually opened fire, did they have any

3  weapons that you saw when they first walked in the door?

4      A      Could you repeat that?

5      Q      You said -- did you see any weapons on this

6  person when they first entered the door?

7      A      No, sir.

8      Q      How were they physically positioned?

9      A      With both arms -- with both hands underneath

10  their arms.

11      Q      For the record when you were demonstrating your

12  arms were crossed and you had your left hand underneath

13  your right bicep and vice versa?

14      A      Yes, sir.

15      Q      When the person came in with their arms crossed

16  and hands underneath their biceps where did they go?

17      A      He walked up the steps and then he stopped at

18  the -- after about five feet away from the door.

19      Q      When he stopped how far away from you was he?

20      A      About 10 to 15 feet.

21      Q      When he stopped where were you looking?

22      A      Directly at him.

23      Q      What did he do when he stopped?

24      A      He pulled the guns out and began firing.

25      Q      From where did he pull the guns?

1    A    From under his biceps as I showed you.

2    Q    Describe the guns as best you can.

3    A    I know they were two handguns and then they had

4    to be automatics.

5    Q    You said he opened fire then?

6    A    Yes, sir.

7    Q    Where did he direct his fire?

8    A    Directly at me at first.

9    Q    Were you struck?

10    A    Yes, sir.

11    Q    Where were you hit by gunfire?

12    A    In my chest, in my arm, in my leg.

13    Q    What happened to you once you were hit by

14    gunfire?

15    A    I fell to the ground.  I just laid there.  And

16    I heard about 25 more shots or something and it stopped.

17    Q    How many gunmen did you see?

18    A    One.

19    Q    During the period that you saw the gunman how

20    much time were you looking at the gunman?

21    A    Could you repeat that?

22    Q    For how long before you went down were you

23    looking at the gunman?

24    A    About 25 to 30 seconds.

25    Q    You said that the mask covered half the face?

22

1   A   Yes, sir, from the eyes down.

2   Q   How much of the shooter's face did you see

3   during the whole incident?

4   A   Like 95 percent.

5   Q   How is it that you were able to see 95 percent

6   of the shooter's face when he had this mask on?

7   A   Well, he had like a hood on too with it.  But

8   the hood started to come back and the mask was coming down

9   off his face while he was shooting around the bar.

10   Q   What do you mean by the mask was coming down

11   off his face?

12   A   Like I told you it only covered from under his

13   eyes down.  And it started coming down when the hood came

14   down.

15   Q   When the mask came down from off his face as

16   you've demonstrated with your hands is that when you could

17   see 95 percent of his face?

18   A   Yes, sir.

19   Q   Are you able to identify that person, that

20   shooter in Todd and Pat's Bar on September 19th?

21   A   Yes, sir.

22   Q   Who is that person?

23   A   Samuel Randolph.

24   Q   Do you see him in the courtroom here today?

25   A   Yes, sir.

23

1      Q      Would you point to him?

2      A      Right here.

3             MR. CHARDO:  Let the record reflect the witness

4      pointed at the Defendant Sam Randolph.

5      BY MR. CHARDO:

6      Q      How certain are you he was the person that shot

7      you on September 19th, 2001?

8      A      100 percent.

9             MR. CHARDO:  Your Honor, I'm not going to have

10     any other questions for the witness.  But before counsel

11     cross-examines I want to note several things for the

12     benefit of counsel so they have a full opportunity to

13     cross-examine this witness.

14            Firstly, I've been informed by counsel for the

15     witness that the counsel Mr. Winnick, who's present, filed

16     a motion today or yesterday for bail for this witness so

17     that counselor can question him about the motion on his

18     bail alleging that threats had been made against him and

19     that's why he needed bail.

20            I told him I would likely after inquiry not

21     oppose such a motion.  So they can cross the witness on

22     that issue.  Furthermore, I will go hand counsel several

23     documents for today only.  They will ultimately be

24     provided in discovery.  And so I hand them over for cross-

25     examining purposes with the proviso they be returned to me

1    immediately following the cross examination.

2           The documents I'm turning over are a criminal

3    history from the National Crime Information Center for

4    this witness, from the Commonwealth Law Enforcement

5    Assistance Network which is a state criminal history for

6    this witness, a statement of this witness given on

7    September 27th, 2001 to the Harrisburg Police, a statement

8    given on March 26th, 2002 to the Harrisburg Police, and an

9    order of immunity signed by Honorable Todd Hoover to this

10   witness issued this date and served upon this witness and

11   they may cross-examine.

12          MR. THOMAS:  Your Honor, in light of the fact

13   that these documents have just been handed to me and it

14   looks likes it's more than just a few pages, I would

15   respectfully request a few moments to be able to review

16   them.

17          MR. CHARDO:  I don't have a problem with a

18   couple of moments.  I do want them for legal reasons to

19   have a full opportunity to cross-examine the witness.  If

20   we could without recessing if we could just give them a

21   few moments to examine them I think that would be

22   appropriate in this case.

23          THE COURT:  I'll give five minutes.  That's it.

24          (A break was taken.)

25          THE COURT:  I'm ready to resume the hearing.

25

1          MR. THOMAS:  I apologize, Your Honor, I'm just

2     simply not able to read that quickly.  There is obviously

3     some very important information contained in these

4     reports.  And it may make a difference in how he is

5     cross-examined here today.  We beg your indulgence for two

6     more minutes.

7          (A break was taken.)

8          MR. THOMAS:  Ready, Your Honor.

9

10               CROSS EXAMINATION

11

12     BY MR. THOMAS:

13     Q    Mr. Campbell, you said you arrived at

14     approximately 9:30 in the evening; is that correct?

15     A    Yes, sir.

16     Q    And you also said that you came just with the

17     two individuals that ended up being the victims Anthony

18     Burton and Thomas Easter; is that correct?

19     A    Yes, sir.

20     Q    While you were at the bar you said that you had

21     one drink?

22     A    Yes, sir.

23     Q    Was that one drink prior to the shooting?

24     A    Yes, sir.

25     Q    Did you have any drinks before you got to the

1    bar?

2          A      No, sir.

3          Q      Did you take any drugs before you got to the

4    bar?

5          A      No, sir.

6          Q      How long were you with the other two

7    individuals prior to your arriving?

8          A      Me and Thomas were together at first for about

9    approximately an hour or so and then we met up with

10   Burton.

11         Q      And you didn't take any Ectasy or anything else

12   like that?

13         A      No, sir.

14         Q      You said that you were friends with both of

15   those two individuals?

16         A      Yes, sir.

17         Q      When you say friends can you describe it as

18   more than mere acquaintances?  Describe your friendship.

19         A      Me and Easter was closer than me and Burton

20   were, but we all were real cool.

21         Q      When you say close, does that mean you see him

22   once or twice a week or once or twice a month?

23         A      Every day.

24         Q      Approximately what time would you say that the

25   shooting occurred?

27

1      A      It had to be about maybe a little after 10:00

2  about 10:30.

3      Q      So it was about an hour that you were there

4  before the shooter came in?

5      A      Yes, sir.

6      Q      And you just had one drink in that time?

7      A      Yes, sir.

8      Q      When you came in you said that you were

9  positioned at the bar at some sort of video game?

10     A      Yes, sir.

11     Q      Where is that video game at the bar in relation

12  to the front door of Todd and Pat's?

13     A      It's like when you walk in you have to go

14  around and then it's right there as soon as you go around

15  the little bar because the bar is like a circle or

16  something.

17     Q      So if that's the door -- if this is the door is

18  that the only door access in the bar?

19     A      Yes, sir.

20     Q      The front door.  And if you're walking in that

21  door are you saying that right in front of the door

22  there's a bar like a horse shoe; is that it?

23     A      Yes, sir.

24     Q      And is it a horse shoe with the open end of the

25  shoe facing the door or the opposite way?

28

```
 1        A       You could say either or.

 2        Q       What I'm trying to get at is I'm trying to

 3   figure out your exact location or position in relation to

 4   the front door?

 5        A       You mean when the shooting occurred or before?

 6        Q       At the time the shooting occurred.

 7        A       If you were to come in that door and you come

 8   straight you would be like right there where she's at as

 9   soon as you come around the corner.

10        Q       So then if you walk in then you were on the

11   right side of the door; is that correct?

12        A       The left side.  If you walk in the door it's

13   the left side.

14        Q       Just so the record is clear you're walking in

15   the door.  Now you're facing the inside of the bar?

16        A       Yes, sir.

17        Q       Are you on the right side looking in from the

18   door?  Are you on the right-hand side of the door?

19        A       Yes, sir.

20        Q       And did you have a direct view from where you

21   were at that point to the door?

22        A       Could you repeat that?

23        Q       Did you have a direct view?  Could you see

24   directly to the door?

25        A       Yes, sir.
```

29

1      Q      About how far from the door would you say that

2   you were positioned?

3      A      About 10 to 15 feet.

4      Q      Was it an awful short bar if it were only 10 to

5   15 feet?

6      A      Yes, sir.  The bar isn't that big at all.

7             MR. THOMAS:  Your Honor, may I approach the

8   witness?

9             THE COURT:  Yes.

10            MR. THOMAS:  10 to 15 feet from you to me it's

11  an approximate.

12            MR. CHARDO:  That's about four feet right

13  there.

14            MR. THOMAS:  These are six inches.  I'm sorry.

15  The tiles are eight inches.

16            MR. CHARDO:  About four or five feet.

17  BY MR. THOMAS:

18     Q      If you're at the bar right now from where you

19  are as I move back tell me where the door begins -- here

20  or is it back further?

21     A      Go back a little bit more than that to that

22  door.

23     Q      Almost to this door?

24     A      Uh-huh.

25            MR. THOMAS:  Your Honor, counsel obviously

30

1    doesn't have a measuring tape but --

2              MR. CHARDO:   I'd say it's about 15, 20 feet.

3              MR. THOMAS:   It appears to be in excess of

4    about 25 feet.

5    BY MR. THOMAS:

6        Q     Was there anybody else seated at the bar to

7    your left?

8        A     To my left?

9        Q     To your left on this side?

10       A     No, sir.  You mean on the same side that I was

11   on or the opposite side?

12       Q     If you were at the bar to your left was there

13   anybody else seated at the bar?

14       A     No, sir.

15       Q     Were you standing or sitting?

16       A     Standing.

17       Q     You said that the lighting in the bar was very

18   bright?

19       A     Yes, sir.

20       Q     Is it as bright as these lights are in here

21   today?

22       A     Yes, sir, pretty much.

23       Q     At 10:30 at night it was as bright as these

24   lights are?

25       A     Yes, sir.  They have a lot of lights in there.

31

1       Q     Do you wear any corrective lenses?

2       A     No, sir.

3       Q     No glasses or contacts?

4       A     No.

5       Q     When's the last time you had your eyes

6 examined?

7       A     Maybe when I was about 16.

8       Q     What's your relationship with Samuel Randolph?

9       A     There is no relationship.

10      Q     But you said that you knew him prior to this

11 incident?

12      A     I knew of him.

13      Q     You knew of him.  Does that mean you never had

14 any contact with him or did you in fact have contact with

15 him?

16      A     Yes, sir, I had contact with him.

17      Q     About how many times did you have contact with

18 him?

19      A     You mean in talking to each other?

20      Q     Any contact.

21      A     Well, I talked to him on the phone a few times

22 and I had an altercation with him in a bar once.

23      Q     Did you talk to him on the phone a few times

24 before or after your altercation?

25      A     Before.

32

1      Q      Would you describe your relationship before

2  that friendly or amicable or not?

3      A      It wasn't too good.  It wasn't friendly at all.

4      Q      Why was that?

5      A      Because he was dating someone that I had a baby

6  to now and he called my house a few times and you know how

7  that goes, little story.  I asked him who he was and he

8  didn't tell me.  And it just went on from there.  And I

9  told him he could not call my house no more because I was

10 with the person he was obviously not with anymore.  But he

11 called about two or three times after that.

12     Q      So then was there some animosity between the

13 two of you?

14     A      Yes, sir.

15     Q      Is that what led to the altercation that came

16 later?

17     A      Yes, sir, you could say that.

18     Q      Tell us about that.

19     A      Well, like I said, he called my house before

20 and we like seen each other in the bar once.  And we had a

21 few words and a fight broke out.

22     Q      What bar was that?

23     A      Roebuck's.

24     Q      When was that?

25     A      It had to be around the first week of September

33

1    maybe.

2        Q     Were any of the victims with you today at that

3    time?

4        A     Yes, sir, one of them.

5        Q     Which one was that?

6        A     Thomas Easter.

7        Q     Is Thomas Easter also involved in the

8    altercation?

9        A     Yes, sir.

10        Q     Did the altercation involve anyone else other

11    than you, Thomas Easter, and Samuel Randolph?

12        A     Yes, Gary Waters my friend and Keemie

13    Washington.

14        Q     Were those other two individuals there in your

15    support or were they with Sam?

16        A     In my support.

17        Q     Can you describe that fight?

18        A     Well, Keemie Washington and Sammie were talking

19    conversating I guess.  And I was trying to tell Keemie

20    Washington to come on because we was about to leave.  And

21    I guess Sam felt like I was saying something directly to

22    him and then he responded by saying it ain't none of you

23    all on my level, none of you all can't see me.  And my

24    friend hit him.  And that's when the fight broke out.

25        Q     Which friend?

34

1     A     Who hit him?

2     Q     Yes.

3     A     Gary Waters.

4     Q     Had you had any contact with the Defendant

5 after that?

6     A     What do you mean, in talking to him?

7     Q     Yes, contact.  Had you seen him, spoken to him,

8 you know, talk on the phone or anything like that or had

9 another fight, anything at all?

10     A     Not nothing after that beside the bar incident.

11     Q     Mr. Campbell, you said that when the shooter

12 came into the bar --

13     A     Yes, sir.

14     Q     -- that he had fatigues did you say?

15     A     A jacket, yes, sir.

16     Q     Can you describe the jacket?

17     A     It was like the normal Army-colored green and

18 like a creamish color.  It came down about to his waist.

19     Q     Okay.  Did it have a pattern on it?

20     A     What do you mean a pattern?

21     Q     You just said it's green and cream colored?

22     A     Yes.

23     Q     That's two colors.  Was it striped? plaid?

24     A     It was like the whatever kind of designs that

25 they have on the Army jacket.

35

1    Q    Like camouflage type of look?

2    A    Yeah, that's it.

3    Q    And he was wearing a hoody, a hood sweatshirt?

4    A    Yes, sir.

5    Q    And a mask?

6    A    Yes, sir.

7    Q    You said the mask covered approximately half of

8    his face?

9    A    Yes, sir.

10    Q    Is that correct?

11    A    Under the eyes, yeah.

12    Q    When this individual first walked in the bar

13    did you notice him walking through the door?

14    A    Yes, sir.

15    Q    Were you able to identify him at that point?

16    A    No, sir, because he had his head down.

17    Q    At what point did the mask begin to come off

18    again?

19    A    As he began to open fire.

20    Q    As he began to open fire?

21    A    Well, he opened fire and he hit me three times

22    and then I kind of I was all falling to the ground.  And

23    then that's when he started shooting around the bar and

24    the hood came off first and then the mask started to come

25    down.

36

1      Q      So if you are sitting on the right side of the

2    bar as you walk through the door you testified earlier

3    that the shooter walked in and walked directly towards

4    you; is that correct?

5      A      Well, he wasn't toward me because if he was

6    coming towards me he would have to go around the little

7    bench.  But he walked in the door and stopped about five

8    feet away from the door.

9      Q      What does he do when he came in five feet from

10   the door?

11     A      He pulled two guns out from under his shoulders

12   or armpits, excuse me, and began firing.

13     Q      So if he walked five feet into the door and if

14   you're on the right-hand side of the bar how did he shoot

15   you in the legs?  Did he shoot on top of the bar?  How did

16   he shoot you if the bar was right there?

17     A      I don't know how I got struck in the legs to

18   this day to be honest.  Maybe it ricocheted off of

19   something, but I know I got shot in my leg.  And to

20   correct you on this, that if he was coming in the bar I

21   would be on the left-hand side.

22     Q      You testified earlier that if you were walking

23   in the bar you would be seated to the right?

24     A      When you first said it you was asking me was I

25   on the left or right.  You didn't state facing in the bar.

37

1      Q      Again, so the record is clear, when you walk

2   into the bar, that door is the entrance to the bar, and

3   now we're in the bar?

4      A      Yes, sir.

5      Q      And I'm at the door looking inside.  Are you on

6   the right-hand side or the left?

7      A      The left.

8      Q      Which leg were you shot in?

9      A      My left leg.

10      Q      So as soon as the shooter came into the bar

11   approximately five feet you just said --

12      A      Yes, sir.

13      Q      -- he began to open fire on you?

14      A      Yes, sir.

15      Q      Did you move or turn as soon as you saw him?

16      A      Yes, sir, I tried to get out of the way.

17      Q      What was directly behind you as you were seated

18   at the bar?

19      A      I was standing up.

20      Q      I'm sorry.  That's correct.  I remember that

21   you were standing at the bar at the video game.  What was

22   directly behind you?

23      A      Like a wall and then it's like a door that they

24   go in I guess where they have the liquor stored or

25   whatever.

38

1   Q   How much space would you say there is between
2   you and that wall?
3   A   About one and a half, two feet.
4   Q   So when you say you attempted to move and get
5   out of the way which direction did you go?
6   A   I tried to go around and duck down.
7   Q   So you attempted to move farther into the back
8   of the bar?
9   A   Yes, sir.
10   Q   To come around the back of it I guess; is that
11   what you're saying?
12   A   Around the back of what?
13   Q   Clarify it for me.  Explain this again.  When
14   you moved out of the way where did you move?  How did you
15   move?
16   A   I moved to my left, went to my left and tried
17   to go around towards the shooter because there's a little
18   table right there which I had to go around and get behind
19   the table.
20   Q   Can you explain for us then if you were seated
21   on the left-hand side and the door is there as I am now
22   and the shooter is five feet in the door how is it you got
23   shot in the left leg if your right leg would have been
24   facing the shooter?
25   A   Sir, it was so crazy I can't really explain how

39

1    it happened.

2         Q     So what did you do when you hear the first

3    shot?

4         A     I tried to get out of the way, but it was too

5    late.  The first shot hit me in the chest.

6         Q     Did that first shot knock you to the floor?

7         A     Not immediately.

8         Q     How long was the shooter in the bar before he

9    began shooting?

10         A     Maybe a split second.

11         Q     You testified earlier though that you looked at

12    him about 25 to 30 seconds before he started shooting?

13         A     That's because he had time to come all the way

14    in the bar and when the shot hit me you said how much did

15    I see him.  You didn't say how many times did I see him.

16    How long did I see him when he opened fire?  I looked at

17    him for about 25 seconds from the time he walked in the

18    steps all the way from the bar until the time I fell to

19    the ground.

20         Q     You were the first person shot; is that

21    correct?

22         A     Yes, sir.

23         Q     After you were shot when did you fall to the

24    ground?

25         A     He tried to shoot me again in my face, but I

40

1   put my arm up and when I put my arm up I spinned around

2   and then I fell to the ground.

3       Q       And all the time the shooting was directed at

4   you were you looking directly at the shooter?

5       A       Yes, sir.

6       Q       You didn't cover your head or try to protect

7   yourself in any way?

8       A       Like I told you, when he hit me in my chest

9   first I moved around, tried to go around to the left.  And

10  he tried to shoot me in my face, but I put my arm up.  And

11  when I put my arm up he shot me in the arm.  I put my arm

12  up and that's when I spun around.

13      Q       How many shots were fired at you?

14      A       Maybe about six or seven.

15      Q       While you were on the ground you watched the

16  shooter walk up the steps; is that correct?  What did you

17  do while you were on the ground?

18      A       I laid there.

19      Q       Face down?  Face up?

20      A       My back, on my back.

21      Q       What could you see from where you were?

22      A       I couldn't see anything.  I was just my eyes

23  were really closed.  I just heard a lot of chairs and

24  tables moving around and rumbling.  It sounded like people

25  was trying to get out of there.

41

```
1        Q      If you fell to the ground and you couldn't see

2   anything at that point then isn't it true that you really

3   didn't see his mask come off of his face?

4        A      Like I told you before, I seen him from the

5   time he came up the steps he opened fire on me.  When he

6   started shooting around after he shot me I didn't fall to

7   the ground immediately until he started shooting around

8   the bar.  I got a clear look at his face.  He tried to

9   shoot me in the face.  I put my arm up.  That's when I

10  fell to the ground and then I heard continuous shots.

11       Q      So you got a clear look at his face at the time

12  he was attempting to shoot you?

13       A      Yes, sir.

14       Q      Are you absolutely sure that on that evening it

15  was Samuel Randolph?

16       A      Yes, sir.

17       Q      On that same evening at the time that the

18  shooting was occurring then on that night September 19th

19  were you sure that it was Samuel Randolph?

20       A      Yes, sir.

21              MR. THOMAS:  Your Honor, may I approach the

22  witness?

23              THE COURT:  (Nodded head.)

24              MR. THOMAS:  Your Honor, I don't see the need

25  to lay a foundation for the statement he gave to the
```

42

1    police on September 27th unless you think it's necessary,

2    then we will.

3              MR. CHARDO:  Ask him if he recognizes the

4    statement.  He'll agree he does.

5    BY MR. THOMAS:

6         Q    Did you make a statement to the police on

7    September 27th in relationship to this incident?

8         A    Yes, sir.

9         Q    Do you recognize this document that's referred

10   to as a voluntary statement from the criminal

11   investigation division of the Harrisburg Police

12   Department?

13        A    Uh-huh.

14        Q    And this is the statement that you gave; is

15   that correct?

16        A    Yes, sir.

17        Q    Did you tell the police on September 27th that

18   you didn't see or did you tell them that you did see who

19   the shooter was?

20        A    I told them that I wasn't positive at that

21   point in time.

22        Q    Didn't you just testify here a few minutes ago

23   that you were in fact positive on that date?

24        A    Yes, sir.

25        Q    So what's the truth, that you were or that you

43

1 weren't according to your statement?

2     A    Well, I made two statements.  The first

3 statement I was scared for my life and the life of my

4 loved ones.  That's why I was pretty sure that I didn't

5 want to tell them the truth or not.

6     Q    You were fearful for your life on September

7 27th why?

8     A    Because he had already shot me and, you know, I

9 have family out on the streets.  I didn't know what was

10 going to happen next because this wasn't the only occasion

11 of the shootings.

12     Q    What happened between September 27th and the

13 date of your next statement March 26th?  What happened

14 between that time?

15     A    What do you mean what happened?

16     Q    What caused you to feel less threatened?

17     A    Well, for one he had got -- I guess he got

18 confined during that time.

19     Q    So you did in fact give a statement on the date

20 of March 26th; is that correct?

21     A    Yes, sir.

22     Q    A statement to the police?

23     A    Yes, sir.

24     Q    Do you recall telling the police that the

25 reason you gave the name of Samuel Randolph is because he

44

1   was suspected -- he was the suspected shooter at the bar?

2   Do you recall that?

3       A       Could you repeat that?

4               MR. CHARDO:   I ask if he is going to impeach

5   the witness in this way show him his statement so he can

6   see it and refer to a page, please.

7               MR. THOMAS:   May I approach, Your Honor.

8               THE COURT:   (Nodded head.)

9   BY MR. THOMAS:

10      Q       Do you recognize this document that comes from

11  the criminal investigation division?   It's a voluntary

12  statement?

13      A       Yes, sir.

14      Q       Do you recognize that?

15      A       Yes, sir.

16              MR. CHARDO:   Dated March 26th, 2002.

17  BY MR. THOMAS:

18      Q       On page 33 of your voluntary statement -- 36 of

19  your voluntary statement you said that the reason you gave

20  the name Sam Randolph is because he was the suspected

21  shooter in the bar?

22      A       (Witness nodded head.)

23      Q       Do you recall saying that?

24      A       Yes, sir.

25      Q       And that was the only reason you gave then was

45

1    because he was suspected; isn't that correct?

2         A     No, sir.  I gave a statement because I was

3    positive.

4         Q     How did you know he was suspected?

5         A     I heard about him.  My people told me about it

6    and I read it in the newspaper.

7         Q     So that what you're saying then is that there

8    was all sorts of information out there on the street from

9    your friends and from others saying that it was Samuel

10   Randolph?

11        A     Yes, sir.

12        Q     Are you aware of any other eyewitnesses?

13        A     From the bar?

14        Q     From that night are you aware of any other

15   ones.

16        A     Am I aware of anybody else that seen?

17        Q     Are you aware of any other eyewitnesses simple

18   question.

19              MR. CHARDO:  I object to the question.

20              THE COURT:  We're going over this and over

21   this.  And I say we have to move on.  He objected to that

22   and I'm going to back him up on that.

23   BY MR. THOMAS:

24        Q     You said my people.  Who are my people?

25        A     My family members.

46

1    Q    Did any of your family members see Sam Randolph

2    do the shooting?

3    A    No, sir.

4    Q    How or why is it that you were so uninfluenced

5    then by all the information?

6    A    All the information really doesn't matter

7    because I know what I saw.  So other people was just

8    giving their opinion.  People say they thought it was him

9    and they knew it was him.

10   Q    Why did you give that statement to the police

11   then?

12   A    What do you mean?

13   Q    The only reason you gave his name was because

14   he was suspected in the shooting.

15        MR. CHARDO:  That's completely out of context.

16   He testified it was him.  He said in the statement he gave

17   the name because he heard it.  He doesn't say that's the

18   only reason.  So I have a problem with that because it's

19   taken out of context.

20        THE COURT:  All right.

21   BY MR. THOMAS:

22   Q    Mr. Campbell, did you discuss your testimony

23   here today with anybody?

24   A    No, sir.

25   Q    You did not discuss your testimony with the

1   police?

2        A      Yes, sir.

3        Q      Did you discuss your testimony with the

4   district attorney's office?

5        A      What do you mean by testimony?

6        Q      Mr. Campbell, you're currently in prison right

7   now.  You're incarcerated?

8        A      Yes, sir.

9        Q      What is the nature of charges that you're here

10  for?

11       A      Possession of a firearm.

12       Q      Have you been informed of the amount of time

13  you'll be looking at if you got convicted of that charge?

14       A      By my lawyer, yes, sir.

15       Q      How much time?

16       A      I think it was about five years.

17       Q      Is that because you have a prior felony

18  conviction?

19       A      No, sir.  I don't think so, no.

20              MR. CHARDO:  The witness doesn't have any

21  felony convictions if you look at the record.

22  BY MR. THOMAS:

23       Q      Were there other felony charges that were

24  brought against you that were subsequently dropped?

25       A      Yes, sir.  Being an adult I don't think they

48

1   had enough information like they said.  That's why the

2   charges were dropped.

3       Q      Were those charges dropped before or after you

4   gave information to the police about Samuel Randolph?

5       A      After.

6       Q      Are you required as part of any plea agreement

7   or anything like that to testify on behalf of the

8   Commonwealth here today?

9       A      No, sir.

10      Q      Yet you've been granted immunity for your

11  testimony.  Do you know why you were granted immunity?  So

12  that you would not be incriminated?

13          MR. CHARDO:  How's the witness going to know

14  why I gave him immunity?  He's been given use immunity and

15  it's outside his ability to know.

16          THE COURT:  I'll sustain that.

17          MR. THOMAS:  Your Honor, he might know, that's

18  why I asked the question.

19          MR. CHARDO:  It wouldn't be based on personal

20  knowledge.

21  BY MR. THOMAS:

22      Q      Mr. Campbell, did you testify earlier that you

23  did see two handguns?

24      A      Yes, sir.

25      Q      And is it your testimony here today that you

49

1    did in fact see two handguns?  And the reason why I ask

2    the question is because earlier you testified that you

3    didn't.  Here today you did.

4        A    Could you repeat that?

5        Q    Yes, I'd be happy to.  I asked if you testified

6    here today that you saw the shooter with two handguns.

7    You said yes.

8        A    Yes, sir.

9        Q    And I asked for clarification because earlier

10   in your testimony here today you said that you didn't and

11   then you said that you did.  So your testimony is --

12            MR. CHARDO:  Objection.  He said when he first

13   walked in he couldn't see them because they were

14   underneath his arms.

15            THE COURT:  Sustain your objection.

16   BY MR. THOMAS:

17       Q    Your voluntary statement dated September 27th

18   when questioned about the guns you were asked if you saw

19   whether the masked person was carrying a handgun.  You

20   said yes.  Was he carrying one or two guns.  You said it

21   could have been two because it was like continuous

22   shooting and like different sounds.  Then you were asked

23   can you describe the gun or guns that he was carrying.

24   You said no, I didn't get a chance to see them.  And then

25   the questioning continues on other issues.  So, again, did