## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SAMUEL RANDOLPH,** | : | **CIVIL ACTION NO. 1:06-CV-901** |
| | : | |
| **Petitioner** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL, Secretary,** | : | **THIS IS A CAPITAL CASE** |
| **Pennsylvania Department of** | : | |
| **Corrections; JAMIE SORBER,** | : | |
| **Superintendent of the State** | : | |
| **Correctional Institution at Phoenix;** | : | |
| **and MARK GARMAN, Superintendent** | : | |
| **of the State Correctional Institution** | : | |
| **at Rockview,[1]** | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

Petitioner Samuel Randolph, an inmate currently confined at the State Correctional Institution at Phoenix in Collegeville, Pennsylvania, filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter is proceeding via an amended habeas petition.  (Doc. 182).  Randolph challenges his capital convictions and sentence from the Court of Common Pleas of Dauphin County, Pennsylvania.  Because Randolph was unlawfully denied his Sixth Amendment right to counsel of choice, we are compelled to grant Randolph's amended habeas petition, vacate his convictions and sentence, and provide the Commonwealth of Pennsylvania 90 days in which to conduct a new trial.

---

[1] Over the course of this habeas litigation, the appropriate respondents have varied due to changes in petitioner's place of confinement and appointment of new state officials.  Pursuant to Federal Rule of Civil Procedure 25, we substitute the proper respondents as of today's date.  See FED. R. CIV. P. 25(d).

## I.   Factual Background and Procedural History

Randolph's Sixth Amendment counsel-of-choice claim primarily involves the
circumstances leading up to and surrounding his trial.  Thus, to understand the
constitutional infringement at issue, it is only necessary to recount a limited set of
facts.  They include appointment of counsel, Randolph's attempts to retain private
counsel prior to trial, and the ultimate effect of the trial court's inelastic scheduling
decisions on Randolph's right to be represented by his attorney of choice.

### A.   Trial Court Proceedings

In July 2002, Randolph was arraigned on 12 charges in the Court of Common
Pleas of Dauphin County, Pennsylvania.  (Doc. 82-1 at 26-29).  Those charges related
to two shooting deaths and included, *inter alia*, two counts of first-degree murder,
one count each of attempted murder and conspiracy to commit murder, and five
counts of aggravated assault causing serious bodily injury.[2]  (Id.)  The government
informed Randolph that it would seek the death penalty and outlined the alleged
aggravating factors supporting its decision.  (Id. at 34-35).

Anthony N. Thomas, Esquire, was present at Randolph's arraignment but did
not formally enter his appearance as he was not prepared to be lead counsel in a
capital case.  (Id. at 26).  At the time, Roger Laguna, Esquire, was representing
Randolph on less serious offenses that the Commonwealth eventually sought to join

---

[2] Randolph's exhaustive list of charges from two different shooting incidents
in September 2001 are set forth in three separate dockets in the Court of Common
Pleas of Dauphin County: CP-22-CR-1220-2002, CP-22-CR-1374-2002, and CP-22-CR-
1746-2002.  The July 2002 arraignment concerned the most serious offenses,
including capital first-degree murder, which are found at CP-22-CR-1746-2002.  (See
Doc. 82-1 at 26-29).

with the first-degree murder charges.  (<u>Id.</u> at 26, 41).  Attorney Laguna requested

that alternate counsel be appointed in light of the gravity of the new capital charges.

(<u>Id.</u> at 26).

On August 27, 2002, the county court appointed Allen C. Welch, Esquire, as

lead counsel to represent Randolph in his capital case.  (<u>Id.</u> at 117; Doc. 86-1 at 18).

Attorney Thomas was later appointed as assistant counsel.  (<u>See</u> Doc. 86-1 at 54 ¶ 8).

At a pretrial hearing in December 2002, Attorney Welch indicated that he was still

awaiting important discovery materials and had only just received Randolph's case

file from Attorney Laguna and had not yet had time to review it.  (Doc. 82-1 at 39-

40).  Attorney Welch explained that he had encountered substantial difficulty in

obtaining Randolph's file from Attorney Laguna, eventually having to resort to

intervention by the court administrator.  (<u>Id.</u> at 46, 55).  The lead prosecutor also

offered that additional delay had been caused by the appointment process: a

conflict of interest prohibited the participation of the county public defender, and

there had been logistical difficulties securing Attorney Welch's appointment.  (<u>Id.</u> at

34, 39, 45-46).  Accordingly, Attorney Welch—with the government's concurrence—

sought his first trial continuance, which the court granted.  (<u>Id.</u> at 39-41).  Trial was

rescheduled for February 2003.  (<u>Id.</u> at 41).

The court held a pretrial conference on January 3, 2003.  (<u>Id.</u> at 44).  The

record reflects that Randolph was anxious to go trial, but Attorney Welch was

simply not prepared.  (<u>Id.</u> at 45).  He had just recently received a significant amount

of discovery material and was still waiting for transcripts of Randolph's grand jury

testimony.  (<u>Id.</u> at 45-47, 55).  In addition, he wanted to ensure sufficient time to file

and receive rulings on pretrial motions, which would undoubtedly inform his trial strategy. (Id. at 57). Moreover, the record demonstrates that Attorney Welch and Randolph were at odds regarding trial strategy, with Randolph expressing concern that his appointed counsel did "not have [his] best interest" in mind. (Id. at 49-50). As a result of these circumstances, the court concluded, *sua sponte*, that trial would have to be continued until March 2003. (Id. at 57, 67-68).

Trial did not take place in March, however. Attorney Welch moved for a second continuance in February because his mother was hospitalized and critically ill. (Doc. 82 at 11; Doc. 82-2 at 21). The court granted Attorney Welch's motion and reset trial for May 5, 2003. (Doc. 82 at 12; Doc. 82-2 at 21).

During several pretrial hearings, Randolph repeatedly expressed his dissatisfaction with Attorney Welch and requested substitute appointed counsel. (See Doc. 82-1 at 49-50, 59, 63, 132, 138, 143, 145, 146). On numerous occasions, Randolph complained that he and Attorney Welch had irreconcilable differences regarding pretrial and trial strategy, and that he did not believe that Attorney Welch was pursuing his "best interest." (Id. at 50, 51, 59, 63, 121-23, 128, 162). Randolph had so little confidence in Attorney Welch that he even opposed Attorney Welch remaining as standby counsel when addressing the possibility of self-representation. (Id. at 136, 145, 146). The trial court steadfastly refused to entertain Randolph's requests for substitute appointed counsel, informing Randolph that his only choices were to proceed with appointed counsel (Attorney Welch), hire private counsel, or represent himself. (Id. at 53, 60-61, 68, 132-33, 142, 146, 148). Randolph chose to continue with court-appointed representation, explaining that he could not

afford private counsel and could not adequately represent himself with limited access to legal materials while incarcerated. (Id. at 61, 63, 66, 68, 69, 136, 143, 147-48).

Randolph's financial circumstances changed several days before trial. Through sale of a family asset that had been pending for some time, Randolph was finally able to secure the funds necessary to retain his choice of private counsel, Samuel C. Stretton, Esquire. (Id. at 158-59; Doc. 86-1 at 53 ¶¶ 3-5). Randolph had been in contact with Attorney Stretton since January 2003 but had previously been unable to afford to hire him. (Doc. 82-1 at 157, 167; Doc. 86-1 at 53 ¶¶ 3-4; Doc. 86-1 at 123¶ 3). With funding secured, Attorney Stretton entered his appearance on Thursday, May 1, 2003—four days before the start of trial. (Doc. 82 at 13; Doc. 86-1 at 7-9). He contemporaneously moved to continue trial to the court's next trial term. (Doc. 82 at 13; Doc. 86-1 at 12-15). Attorney Stretton recalled that he had been contacted about his retention by Attorney Thomas on April 29 and had sent both his entry of appearance and the motion to continue trial via overnight mail the next day. (See Doc. 86-1 at 7-9, 12-15; Doc. 255, July 29, 2019 Hearing Transcript 10:7-14 [hereinafter "7/29/19 Hr'g Tr."]).

On May 1, the court convened a conference call with the parties, during which Attorney Stretton explained that he needed a short trial continuance for multiple reasons. (See Doc. 82-1 at 150-58). First, during the upcoming week—the week of Randolph's trial—Attorney Stretton was already scheduled for numerous court proceedings. (Id. at 152-53). On May 5 and 7, he had attorney disciplinary trials. (Id. at 152). Attorney Stretton had argument in Commonwealth Court on

May 6, (id.; Doc. 182-1 at 400), and was also scheduled for trial on May 8 and 9, (Doc. 82-1 at 153).  The following week he was under subpoena for hearings in Philadelphia in a capital post-conviction case and was also slated for Pennsylvania Supreme Court argument.  (Id.)  Attorney Stretton emphasized that he had yet to receive Randolph's file, and further noted that there had been a complete breakdown between Randolph and Attorney Welch—the primary driver of his entry of appearance.  (Id. at 152-53, 155, 158; Doc. 86-1 at 123-24 ¶¶ 5, 7).

Randolph, who had previously been averse to delays, likewise requested a short postponement of trial so that Attorney Stretton could try the case.  (Doc. 82-1 at 155-56, 162, 167).  The government opposed the continuance, arguing that this was the second special session of court scheduled and that 80 potential jurors[3] were noticed for May 1 and 2.  (Id. at 156).  Attorney Welch implored the court to grant the continuance, reiterating the breakdown in his relationship with Randolph and emphasizing the importance of a defendant's right to counsel of choice.  (Id. at 164).  He also highlighted the financial limitations he faced as appointed counsel when compared to private representation by Attorney Stretton, who could afford to hire various guilt-phase and mitigation experts for a more thorough capital defense.  (Id. at 165).

The court indicated that its "inclination" was to deny the continuance and proceed with jury selection on the morning of Monday, May 5.  (Id. at 162-63).

---

[3] There is some discrepancy in the record regarding whether the number of potential jurors called for the special session was 80 or 120.  We use 80 simply because this is the number argued by the government at the continuance hearing. (See id. at 156).

Attorney Stretton countered with a request to have jury selection delayed for "several days" or even just "a day or two" so that he could familiarize himself with the record and try the case.  (Id. at 163, 168).  The court responded that "the selection process is pretty much etched in stone" but that it was possible there could be a brief delay between jury selection and the start of trial, although no decision was made at that time.  (Id. at 168, 169).

On the morning of May 5, the parties convened before jury selection to clarify Randolph's representation.  (See generally Doc. 82-2 at 7-26).  During the on-the-record discussion, the court recounted that on Friday (May 2), Attorney Stretton had again modified his continuance request, *this time asking for jury selection to be postponed only until 12:00 p.m. on May 5* so that he could pick Randolph's jury but still attend the previously scheduled attorney disciplinary trial.  (Id. at 12).  The court noted that it had instead agreed to move jury selection back one hour, from 9:00 a.m. to 10:00 a.m.  (Id.)

The court stated that it "fully expected to see" Attorney Stretton or someone on his behalf that morning at the 10:00 a.m. start time "to begin the jury selection process."  (Id. at 12-13).  It then formally denied Attorney Stretton's motion to continue (with reasons to be placed "on the record at the appropriate time") and moved forward with Attorney Welch as Randolph's attorney of record.  (Id. at 13, 15).  Attorney Thomas renewed the request to delay jury selection for just "a few hours" so that Attorney Stretton could select the jury.  (Id. at 15).  The court once more denied the request, stating, "[Attorney Stretton] is not going to be counsel of record at this moment.  If he chooses to appear at some point later, we can deal with

that at that time." (Id.)  The court then issued a verbal order rejecting Attorney Stretton's entry of appearance.  (Id. at 15-16).

Attorney Welch made one final attempt to change the court's mind.  He emphasized, among other things, the "absolute[,] complete breakdown of communication" with his client, which was so severe that Attorney Thomas had to act as a "translator."  (Id. at 16-17).  Attorney Thomas reiterated that the only reason Attorney Stretton had not entered his appearance earlier was due to funds only becoming available "last week."  (Id. at 17).  Randolph, for his part, averred that Attorney Stretton was the attorney he wanted to defend him, that he finally had the money to afford him, and that his relationship with Attorney Welch was irreparably damaged.  (Id. at 23-24).  The court was unmoved, and counsel proceeded immediately to jury selection.  (Id. at 24-25).

Attorney Welch represented Randolph at jury selection and at the guilt phase of trial.  Following two days of jury selection and a four-day trial, the jury convicted Randolph on all counts, including the capital murder charges.  (Doc. 82-5 at 189-93); see Commonwealth v. Randolph, 873 A.2d 1277, 1280 (Pa. 2005).

After the verdict but before the penalty phase, Randolph informed the court that he did not wish to testify or present mitigating evidence at the sentencing phase of trial.  (Doc. 82-5 at 210).  Randolph explained that he was "not concerned" if the death penalty was imposed because he fervently believed that, among other perceived wrongs, he had been denied his right to counsel of choice and deserved a new trial.  (See id. at 211-12).  Following an overnight recess, Randolph reiterated his desire to waive presentation of mitigating evidence or argument.  (Doc. 82-6 at

12-16).  The court informed Randolph that it was denying his request to forgo

counseled argument against imposition of the death penalty, and Randolph

responded by moving to proceed *pro se*.  (Id. at 18-19).

Randolph was colloquied about representing himself and, after a brief recess,

the court granted Randolph's request to proceed *pro se*.  (Id. at 19-25).  The court

further directed that Attorney Welch or Attorney Thomas act as standby counsel.

(Id. at 25).  Randolph, acting *pro se*, refused to present any testimony, evidence, or

argument during the penalty phase.  (Id. at 34-35, 42).  The jury found two

aggravating circumstances and no mitigating circumstances and returned a verdict

of death on both capital counts.  (Id. at 60-61).

Attorney Stretton represented Randolph at the formal sentencing proceeding

held in July.  (See id. at 65, 66, 68).  Attorney Stretton initially moved for a new trial

and a new sentencing hearing based, respectively, on the trial court's failure to

grant a continuance and its alleged error in allowing Randolph to represent himself

at the penalty phase and present no mitigating evidence.  (Id. at 69-75).  Attorney

Stretton argued that denial of the requested continuance implicated both the Sixth

Amendment right to counsel of choice and the Fourteenth Amendment's due

process guarantees, as well as similar protections under the Pennsylvania

Constitution.  (Id. at 69-70).  The trial court denied Attorney Stretton's motions for

extraordinary relief, formally imposed death sentences for the first-degree murder

convictions, and sentenced Randolph to a term of years on the remaining counts.

(Id. at 78, 87-91).

Following sentencing, Attorney Stretton filed additional motions for a new trial based on newly discovered evidence and the prosecution's alleged failure to disclose material exculpatory evidence.  (See Doc. 182 at 6 ¶ 11); Brady v. Maryland, 373 U.S. 83 (1963).  Those motions were likewise denied.  (Doc. 82-6 at 249).

## B.    Direct Appeal

Randolph, through Attorney Stretton, filed a statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  (Doc. 82-6 at 251; Doc. 82-7 at 1).  Randolph raised five issues on appeal, including the claim pertinent to the instant habeas petition: whether the trial court's denial of a continuance violated Randolph's Sixth Amendment right to counsel of choice.  (Doc. 82-6 at 251).  By opinion dated March 16, 2004, the trial court denied all claims of error raised.  (Doc. 82-7 at 24-71, Commonwealth v. Randolph, Nos. 1220 CR 2002, 1374 CR 2002, 1746 CR 2002 (Pa. Ct. Com. Pl. Dauphin Cty. Mar. 16, 2004) [hereinafter "Trial Court Op."]).

In accordance with 42 PA. CONS. STAT. § 9546(d), Randolph appealed his conviction and death sentence directly to the Supreme Court of Pennsylvania.  See Randolph, 873 A.2d 1277.  He asserted three issues, including—as characterized by the state supreme court—"[w]hether the trial court erred in denying [his] request to have his counsel of choice, Samuel C. Stretton, represent him and in denying a continuance to allow Attorney Stretton to represent him."  Id. at 1280-81.  The Pennsylvania Supreme Court rejected Randolph's claims and affirmed his convictions and sentence.  Id. at 1284.  The Supreme Court of the United States

subsequently denied *certiorari*.  Randolph v. Pennsylvania, 547 U.S. 1058 (2006) (mem.).

### C.    Post-Conviction Proceedings

Randolph's pursuit of post-conviction relief has been both protracted and circuitous.  In April 2006, the federal public defenders for the Eastern and Middle Districts of Pennsylvania initiated the instant federal habeas proceedings on Randolph's behalf.  Following their formal appointment, the federal defenders filed this Section 2254 petition in February 2007 along with a motion to stay the federal proceedings while Randolph exhausted state post-conviction relief.  We stayed the federal habeas case and directed Randolph to file his application for relief in state court if he had not already done so.

Randolph, in fact, had already filed a *pro se* petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. § 9541 *et seq.*, the state's corollary to federal habeas relief.  (See Doc. 182 at 7 ¶ 13).  Randolph had filed that petition in September 2006, shortly after the instant federal habeas proceedings were initiated.  (See id.)  Consequently, the federal public defenders amended Randolph's *pro se* PCRA petition, eventually filing a fourth amended petition.  (See Doc. 86-1 at 101-04).

Randolph's PCRA claims were never ruled on.  Following a series of events, including Randolph being severely injured during an altercation with correctional officers, Randolph sought to waive PCRA review and to pursue only federal habeas relief.  (See Doc. 14; Doc. 82-8 at 63-64).  Years of litigation ensued regarding Randolph's prison injuries and records, attorney-client visitation rights, discovery,

Randolph's proposed waiver of potential actual innocence claims, and his capacity to make such a decision. (See Doc. 182 at 8 ¶¶ 16-17; id. at 9-10 ¶ 21).

The PCRA court eventually permitted Randolph to withdraw his PCRA petition in February 2013. (See Doc. 203-1 at 30). Counsel filed a status report in this court soon afterward, recounting Randolph's PCRA withdrawal and requesting reactivation of his federal habeas proceedings. (Doc. 73). The parties engaged in additional discovery and, in April 2017, Randolph filed a counseled 300-page amended habeas petition, raising 15 claims for relief and requesting an evidentiary hearing. (See generally Doc. 182). Of note, Randolph's third ground for relief involves his claim that he was denied his right to counsel of choice in violation of the Sixth Amendment. (Id. at 107).

We granted Randolph's request for an evidentiary hearing as to exhausted and partially exhausted Claims I, III, and VIII of his amended habeas petition. We also directed that, at the hearing, the parties address questions of procedural default and whether Randolph can overcome any such default through proof that his convictions and death sentence represent a miscarriage of justice. (Doc. 218).

The evidentiary hearing was held on July 29, 2019. (See generally 7/29/19 Hr'g Tr.). Prior to the hearing, Randolph submitted *pro se* correspondence indicating that he unequivocally desired to waive Claim VIII of his habeas petition. (See Doc. 232). We addressed, *ex parte*, Randolph's waiver request. (7/29/19 Hr'g Tr. 4:5-6:16). After conducting a thorough colloquy of Randolph, we concluded that Randolph had made a knowing, voluntary, and intelligent waiver of Claim VIII, and we proceeded on the remaining Claims I and III. (See id. at 6:17-21). The parties

submitted post-hearing briefing, and Randolph's Section 2254 petition is now ripe for disposition.

II.    **Standards of Review**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody derives from 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq*. A habeas corpus petition pursuant to Section 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 68.

A.    **Exhaustion and Procedural Default**

The AEDPA requires that petitioners demonstrate that they have "exhausted the remedies available in the courts of the State" before seeking federal habeas corpus relief. 28 U.S.C. § 2254(b)(1)(A). Therefore, habeas relief cannot be granted unless all available state remedies have been exhausted, or there is an absence of available state corrective process, or circumstances exist that render such process ineffective to protect the rights of the applicant. See 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded in principles of comity to ensure that state

courts have the initial opportunity to review federal constitutional challenges to state convictions.  See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000).

A prisoner exhausts state remedies when he "fairly present[s]" the claims in question to the state courts by giving them "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  Castille v. Peoples, 489 U.S. 346, 351 (1989); O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  To "fairly present" a claim, a petitioner must proffer the claim's "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted."  McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999); see also Nara v. Frank, 488 F.3d 187, 197-98 (3d Cir. 2007) (claim is fairly presented when petitioner presents the same factual and legal basis for the claim to state courts).  Although the petitioner need not cite "book and verse" of the United States Constitution, Picard v. Connor, 404 U.S. 270, 278 (1971), he must "give the State 'the opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" before presenting those claims to a federal court, Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard, 404 U.S. at 275).

### B.    Merits Standard

When a claim is properly exhausted in state court and then raised on federal habeas review, the level of deference afforded to the state-court decision is substantial.  Bey v. Superintendent Greene SCI, 856 F.3d 230, 236 (3d Cir. 2017), cert. denied sub nom., Gilmore v. Bey, 138 S. Ct. 740 (2018) (mem.).  The AEDPA "does not 'permit federal judges to . . . casually second-guess the decisions of their state-court colleagues or defense attorneys.'"  Collins v. Sec'y of Pa. Dep't of Corr.,

742 F.3d 528, 543 (3d Cir. 2014) (alteration in original) (quoting <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013)).  Accordingly, under Section 2254(d), federal habeas relief is unavailable for exhausted claims unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  An "unreasonable application" of Supreme Court precedent includes situations where "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case."  <u>White v. Woodall</u>, 572 U.S. 415, 425 (2014) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000)).

This standard is exacting by design.  <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011).  Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" clearly established Supreme Court precedent.  <u>Id.</u>  Thus, to obtain federal habeas relief on an exhausted claim, a state prisoner must demonstrate that the state court's ruling on the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  <u>Id.</u> at 103.

Finally, when examining an exhausted claim, the federal court must review a state court's "last reasoned decision."  <u>Simmons v. Beard</u>, 590 F.3d 223, 231-32 (3d Cir. 2009) (citing <u>Bond v. Beard</u>, 539 F.3d 256, 289-90 (3d Cir. 2008)).  Hence, "[w]e review the appellate court decision, not the trial court decision, as long as the

appellate court 'issued a judgment, with explanation, binding on the parties before it.'" <u>Burnside v. Wenerowicz</u>, 525 F. App'x 135, 138 (3d Cir. 2013) (nonprecedential) (quoting <u>Simmons</u>, 590 F.3d at 232). But when the highest state court that considered the claim does not issue a reasoned opinion, we "look through" that decision to the last reasoned opinion, applying a rebuttable presumption that the higher court adopted the same reasoning as that set forth by the lower court. <u>Wilson v. Sellers</u>, 584 U.S. __, 138 S. Ct. 1188, 1192 (2018).

The highly deferential standard of Section 2254(d) applies only to claims that have been "adjudicated on the merits" in state court. <u>Han Tak Lee v. Glunt</u>, 667 F.3d 397, 403 (3d Cir. 2012). "[I]f the state court did not reach the merits of the federal claims, then they are reviewed *de novo*." <u>Id.</u> But the habeas court must still presume that the state court's factual determinations are correct, and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, even if a habeas petitioner overcomes Section 2254(d)'s hurdle on an exhausted claim, the habeas court then considers that claim *de novo*. See <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) (when Section 2254(d) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires").

**III.   <u>Discussion</u>**

Randolph contends that there were myriad constitutional violations in his state-court prosecution. We need not resolve the bulk of Randolph's

grievances,[4] however, because there is one claim that unequivocally demands habeas relief.  After careful consideration, we hold that Randolph was unconstitutionally denied his Sixth Amendment right to counsel of choice.[5]  This structural defect requires that Randolph be afforded a new trial.

### A.    Right to Counsel of Choice

The Sixth Amendment to the United States Constitution guarantees a criminal defendant's right to assistance of counsel.  U.S. CONST. amend. VI.  Part of that fundamental guarantee is the accused's right to counsel of choice if appointed counsel is not required.  United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006) (citing Wheat v. United States, 486 U.S. 153, 159 (1988)).  Specifically, the Sixth Amendment guarantees the accused "the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."  Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1989).

The right to counsel of choice "has been regarded as the root meaning" of the Sixth Amendment's right to assistance of counsel.  Gonzalez-Lopez, 548 U.S. at 151.  Nearly a century ago, the Supreme Court recognized that "[i]t is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair

---

[4] This includes Claim I, which was a focal point of the July 2019 evidentiary hearing.  The exculpatory evidence outlined in this claim, if admissible, can be advanced at Randolph's retrial.

[5] It is indisputable that Randolph properly exhausted his counsel-of-choice claim, as it was presented to, and adjudicated by, the Pennsylvania Supreme Court on direct appeal.  See Randolph, 873 A.2d at 1280-82.

opportunity to secure counsel of his own choice."  Powell v. Alabama, 287 U.S. 45,

53 (1932).  The Third Circuit has long acknowledged that "the most important

decision a defendant makes in shaping his defense is his selection of an attorney."

United States v. Rankin, 779 F.2d 956, 958 (3d Cir. 1986) (quoting United States

v. Laura, 607 F.2d 52, 55 (3d Cir. 1979)).  "Attorneys are not fungible, and the ability

of a defendant to select his own counsel permits him to choose an individual in

whom he has confidence."  Id. (citations and internal quotation marks omitted).

Nevertheless, this right is not without limitation.  Gonzalez-Lopez, 548 U.S. at

144.  Obviously, it does not extend to defendants who require appointed counsel

because they cannot afford to hire a private attorney.  Id. at 151 (citing Wheat, 486

U.S. at 159 ("[A] defendant may not insist on representation by an attorney he

cannot afford or who for other reasons declines to represent the defendant.")).  The

right is also circumscribed when the desired attorney has a nonwaivable conflict of

interest.  Wheat, 486 U.S. at 159, 163.  And it must be balanced against the needs of

fairness and the demands of the trial court's calendar.  Gonzalez-Lopez, 548 U.S. at

152 (citing Wheat, 486 U.S. at 159; Morris v. Slappy, 461 U.S. 1, 11-12 (1983)).  The

presumption nonetheless remains "in favor of counsel of choice."  Wheat, 486 U.S.

at 160.

When a criminal defendant is erroneously deprived of his right to counsel of

choice, the deprivation is considered a structural defect not subject to "harmless

error" analysis.  Gonzalez-Lopez, 548 U.S. at 150.  Such structural errors require

automatic reversal because of their "potential to 'infect the entire trial process'" and

the "difficulty of assessing the effect of the error[s]" on the defendant's case.

Palmer v. Hendricks, 592 F.3d 386, 397 (3d Cir. 2010) (alteration in original)
(quoting, *inter alia*, Gonzalez-Lopez, 548 U.S. at 148-49 & n.4).  Thus, because an
unlawful denial of the right to counsel of choice "affect[s] the framework in which
the trial proceeds," it is unnecessary to conduct a prejudice inquiry.  Arizona
v. Fulminate, 499 U.S. 279, 310 (1991); see Gonzalez-Lopez, 548 U.S. at 150-51.
"Deprivation of the right is 'complete' when the defendant is erroneously prevented
from being represented by the lawyer he wants, regardless of the quality of the
representation he received."  Gonzalez-Lopez, 548 U.S. at 148.

###    B.    State Court Application of Federal Law

On direct appeal, Randolph invoked both the Sixth Amendment to the
United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution
in his counsel-of-choice claim.  (See Doc. 182-1 at 364, 371, 379).  The Supreme
Court of Pennsylvania, however, discussed only Pennsylvania law in its analysis.
See Randolph, 873 A.2d at 1281-82.  This approach is entirely acceptable when
"neither the reasoning nor the result" contradicts clearly established federal law.
Early v. Packer, 537 U.S. 3, 8 (2002); Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir.
2004); see, e.g., Werts, 228 F.3d at 203-04 (explaining that Pennsylvania's standard
for ineffective assistance of counsel comports with Strickland v. Washington, 466
U.S. 668 (1984), and thus is not "contrary to" federal law).

The Pennsylvania Supreme Court first addressed standards for determining
whether a trial court abuses its discretion by refusing to grant a continuance.  See
Randolph, 873 A.2d at 1281.  This state law issue, however, is not within the purview

of a federal habeas court.[6]  Estelle, 502 U.S. at 67-68.  The court then set forth the

law regarding a criminal defendant's right to counsel of choice.  Randolph, 873 A.2d

at 1282.  It correctly noted that the right to counsel of choice is not absolute, see id.,

and provided two statements of law from prior decisions concerning limitations on

the right, id.  The court stated that "the right of the accused to choose his own

counsel . . . must be weighed against and may be reasonably restricted by the state's

interest in the swift and efficient administration of criminal justice."  Id. (quoting

Commonwealth v. Robinson, 364 A.2d 665, 674 (Pa. 1976)).  The court further

explained that "while defendants are entitled to choose their own counsel, they

should not be permitted to unreasonably 'clog the machinery of justice' or hamper

and delay the state's efforts to effectively administer justice."  Id. (quoting

Commonwealth v. Baines, 389 A.2d 68, 70 (Pa. 1978)).

     These statements of law regarding a criminal defendant's right to counsel of

choice are consonant with clearly established federal law, i.e., precedent from the

United States Supreme Court.  In Morris, the Court recognized that a defendant's

right to counsel of choice must, at times, give way to other weighty considerations,

including the demands of the trial court's calendar, the rights of victims, and the

effective administration of justice.  See Morris, 461 U.S. at 11, 14-15.  Courts face

many issues when trying to assemble witnesses, lawyers, and jurors for trial, the

burden of which "counsels against continuances except for compelling reasons."

Id. at 11.  In Gonzalez-Lopez, the Court reiterated that the right to counsel of choice

---

[6] Nor was it the gravamen of Randolph's counsel-of-choice claim.  (See Doc.
182-1 at 364-79).

must be weighed against concerns of "fairness" and the efficient administration of criminal justice.  Gonzalez-Lopez, 548 U.S. at 152.[7]

### C. Reasonableness of State Court Application of Federal Law

Whether the state supreme court identified the correct law is only half the equation.  Its application of the law must also have been reasonable.  28 U.S.C. § 2254(d)(1); White, 572 U.S. at 425.  The facts and circumstances in this case leave no doubt that the state court's application of federal law was objectively unreasonable.

The Pennsylvania Supreme Court's analysis of Randolph's counsel-of-choice claim consists of one paragraph, which we reproduce in full:

> This case had already been continued twice at the request of court-appointed counsel.  [Randolph] waited until May 1, 2003, two business days before trial was scheduled to commence, to apprise the trial court of his desire to have private counsel represent him, even though he had first contacted private counsel about representation in January, 2003.  The trial court denied [Randolph]'s request for a continuance but gave private counsel the opportunity to participate and was willing to accommodate his schedule and allow him time to prepare following jury selection.  However, private counsel never showed up at trial or during sentencing.  In considering the motion for continuance, the trial court weighed [Randolph]'s right to counsel of his choice against the state's interest in the efficient administration of justice.  We find no abuse of discretion in the trial court's refusal to grant [Randolph]'s request for a continuance.

---

[7] Gonzalez-Lopez was decided in 2006 and thus does not inform the "clearly established" federal law existing at the time of Randolph's trial.  We rely on Gonzalez-Lopez merely for its affirmation of prior, clearly held Supreme Court jurisprudence.

Randolph, 873 A.2d at 1282. This abbreviated and selective recitation of facts excludes numerous critical details surrounding the trial court's denial of the requested continuance and its rejection of Attorney Stretton's entry of appearance. It also focuses on matters largely irrelevant to the choice-of-counsel question and presents a skewed impression of Attorney Stretton's actions. We set forth the following additional facts indispensable to evaluating the constitutional claim at issue. See Williams, 529 U.S. at 397-98 (finding that state court unreasonably applied federal law when it "failed to evaluate the totality of the . . . evidence" in its determination on Strickland claim).

This case was not a run-of-the-mill criminal prosecution. Randolph was facing the death penalty for not one, but two counts of first-degree murder. His case was further complicated by the fact that he was charged with numerous other serious offenses—some stemming from separate events—which appeared on multiple different dockets.

At the time of his arraignment, and for most of the time leading up to trial, Randolph could not afford to hire a private attorney. Due to the court's difficulties in finding qualified capital counsel, Attorney Welch was not appointed to represent Randolph until August 27, 2002, nearly two months after Randolph's arraignment. Even after his appointment, administrative issues and difficulties communicating with prior counsel hindered Attorney Welch's trial preparation. Attorney Welch accordingly moved for his first continuance in December 2002 with the full concurrence of the prosecution.

Additional issues beyond the control of Randolph and Attorney Welch prevented trial from taking place in February 2003.  The trial court *sua sponte* continued trial to March, recognizing the obvious need for defense counsel to have copies of Randolph's grand jury testimony—which the government had yet to produce—as well as time for Attorney Welch to obtain funds for an investigator and to properly prepare for trial.  The second and *only other* continuance Attorney Welch sought was in February 2003 because his mother was critically ill and hospitalized, circumstances again outside the control of Randolph and his counsel.

The attorney-client relationship between Randolph and Attorney Welch had eroded well before the start of trial, a fact the Pennsylvania Supreme Court failed to even mention.  This issue was brought to the attention of the trial court on numerous occasions, including on the morning of May 5.  The breakdown had become so severe that Attorney Thomas had to act as an intermediary between Randolph and Attorney Welch.  The trial court staunchly refused to entertain Randolph's requests for substitute appointed counsel, even going so far as to deny Randolph an opportunity to formally present the reasons underlying the breakdown.[8]  (See Doc. 82-1 at 146-47).

---

[8] Refusal to consider substitute appointed counsel when there is a potentially irreparable conflict between an indigent defendant and his appointed attorney raises its own constitutional concerns.  See McMahon v. Fulcomer, 821 F.2d 934, 942 (3d Cir. 1987).  "When a defendant requests substitution of counsel on the eve of trial," the trial court "must engage in at least some inquiry as to the reasons for the defendant's dissatisfaction with his existing attorney."  Id. (quoting United States v. Welty, 674 F.2d 185, 187 (3d Cir. 1982)).  Although the right to counsel of choice is not absolute, "the trial court still has the duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known."  Id. (citation and internal quotation marks omitted).

Although it is true that Randolph had first contacted Attorney Stretton in January 2003, the funds to hire him did not become available until April 29.  The very next day, Attorney Stretton overnight-mailed his entry of appearance and a motion to continue trial.  There was no delay whatsoever on the part of Attorney Stretton once he was notified that his retainer could be paid.  Randolph, Attorney Welch, Attorney Thomas, and Attorney Stretton all explained to the trial court—on multiple occasions—that this was the reason why hiring private counsel was not discussed until May 1.

Finally, and most compellingly, Attorney Stretton sought to delay trial by only *three hours*.  He had initially requested a one-month continuance, which seems entirely reasonable for someone taking over a capital murder case.  But Attorney Stretton was willing to negotiate.  When the trial court noted that it was inclined to deny the continuance, he counteroffered with a postponement of only several days, and then just "a day or two" so that he could review discovery and still attend the previously scheduled disciplinary trial.  Finding no purchase with the court, Attorney Stretton then requested a delay of just three hours so that he could select the jury.

Once the full panoply of relevant facts is articulated, the Sixth Amendment counsel-of-choice balancing becomes elementary.  On one side of the scales sits a multitude of good-faith, compelling reasons for permitting Attorney Stretton to represent Randolph and for delaying trial by just a few hours so that he could select a jury.  Further tipping the scales in Randolph's favor is the fundamental nature of a criminal defendant's Sixth Amendment right to counsel of choice.

On the other side there is, quite literally, not a single countervailing reason for denying the continuance, a denial which effectively precluded Randolph from being represented by his counsel of choice.[9]  Any potentially legitimate basis to deny the continuance evaporated when Attorney Stretton modified his request and asked for a mere three-hour delay: the jury pool would not need to be sent home and recalled on a different day; no other criminal or civil matters would be affected or delayed; the prosecution would not be materially prejudiced by having to reschedule witnesses; the victims' families would not be facing significant delays in trial.  Quite simply, no objectively valid reason for denying the continuance remained.

Hence, we are constrained to hold that the state court's rejection of Randolph's Sixth Amendment counsel-of-choice claim was unreasonable.  See Harrington, 562 U.S. at 102.  Put differently, the state court's ruling on this claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Id. at 103.

Our conclusion does not change even if we were to "look through" the state supreme court's decision to the reasoning provided by the trial court in its Rule 1925 opinion.  See Wilson, 138 S. Ct. at 1192.  The trial court proffered that Randolph "failed to timely apprise the court of his efforts to obtain private counsel, a continuance would have impeded the efficient administration of justice, and

---

[9] The trial court itself acknowledged that its denial of the continuance, "in effect, left [Attorney Stretton] out."  (Doc. 82-6 at 76).

private counsel waived reasonable scheduling accommodations which would have allowed him to participate in the trial." Trial Court Op. at 23-24. None of these proffered justifications withstands even superficial scrutiny.

It is doubtful that the timing of Randolph's notice to the court of his efforts to hire a private attorney has any relevance to the counsel-of-choice calculus in this case. Randolph informed the court about his desire to retain Attorney Stretton as soon as retaining him was possible, *i.e.*, when funds became available. And this notice was provided four days before trial—plenty of time in which to continue trial, reschedule jurors, notify witnesses, *etc*. We fail to see how knowing that Randolph wanted to hire private counsel since January 2003 but was unable to afford to do so would have provided a more compelling basis to grant the continuance.[10] This is especially true when the trial court had known for months that Randolph was ardently opposed to being represented by Attorney Welch. In fact, Randolph had seriously considered proceeding *pro se* rather than continuing with Attorney Welch but ultimately decided against this option because he knew he could not adequately prepare his own defense while incarcerated.

More importantly, as discussed above, a three-hour continuance would have in no way "impeded the efficient administration of justice." Trial would have commenced only a few hours later than originally scheduled. In point of fact, it was *the court*—not Attorney Stretton—that declined "reasonable scheduling

---

[10] Presumably, most—if not all—indigent criminal defendants would prefer to hire private counsel but for their lack of financial resources.

accommodations" which would have permitted Attorney Stretton to select a jury and try Randolph's case.[11]   The trial court's conclusory observation that it had "offered ample accommodations which would have allowed [Attorney Stretton]'s representation during jury selection," Trial Court Op. at 28-29,  is rebutted by clear and convincing evidence, see 28 U.S.C. § 2254(e)(1).  *Per contra*, the court refused even the most meager accommodation that would have allowed Attorney Stretton to select the jury: moving selection back a few hours so that Attorney Stretton could attend the previously scheduled disciplinary trial and pick a jury in the afternoon.

### D.    Federal Habeas *De Novo* Review

Normally, once a petitioner has satisfied Section 2254(d)(1) by showing that the state court's application of federal law was unreasonable, the federal habeas court must review the claim *de novo*.  See Johnson v. Williams, 568 U.S. 289, 303 (2013) (citing Panetti, 551 U.S. at 953); Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 311-12 (3d Cir. 2016) (*en banc*).  Such a step would be mere formality here.  As the foregoing discussion squarely demonstrates, there is but one conclusion a reasonable jurist could reach when confronted with the facts of this case: Randolph was unlawfully denied his Sixth Amendment right to counsel of choice.  Indeed, the constitutional balancing permits no other result.  This structural defect requires that Randolph be granted a new trial.

---

[11] It is well settled that jury selection is a "critical stage" of a felony trial.  See Gomez v. United States, 490 U.S. 858, 872-73 (1989); see also Gonzalez-Lopez, 548 U.S. at 150; Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).

IV.  **Conclusion**

The Sixth Amendment to the United States Constitution protects a criminal defendant's right to counsel of choice.  Although this right is not absolute, it is not to be lightly abrogated.  In the instant case, the trial court's "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" violated Randolph's constitutional right to counsel of choice.  Morris, 461 U.S. at 11-12.  Accordingly, we will conditionally grant Randolph's Section 2254 petition, vacate his Pennsylvania convictions and death sentence, and direct the Commonwealth to retry him within 90 days or to provide for his release.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    May 27, 2020